# EXHIBIT 3.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YITZCHOK FRANKEL *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA *et al.*,<br><br>Defendants. | Case No. 2:24-cv-04702-MCS-PD<br><br>**ORDER RE: MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 48)** |

1

In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our constitutional guarantee of religious freedom that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith*. UCLA does not dispute this. Instead, UCLA claims that it has no responsibility to protect the religious freedom of its Jewish students because the exclusion was engineered by third-party protesters. But under constitutional principles, UCLA may not allow services to some students when UCLA knows that other students are excluded on religious grounds, regardless of who engineered the exclusion.

In response to the exclusion of Jewish students from portions of UCLA's campus, Plaintiffs Yitzchok Frankel, Joshua Ghayoum, and Eden Shemuelian moved for a preliminary injunction against Defendants Regents of the University of California, Michael V. Drake, Gene D. Block, Darnell Hunt, Michael Beck, Monroe Gorden, Jr., and Rick Braziel (hereinafter, "UCLA"). (Mot., ECF No. 48-1.) UCLA opposed, (Opp'n, ECF No. 62), and Plaintiffs filed a reply, (Reply, ECF No. 64). Amici Agudath Israel of America, Union of Orthodox Jewish Congregations of America, and Faculty for Justice in Palestine at UCLA filed amicus briefs. (First Amicus Br., ECF No. 76; Second Amicus Br., ECF No. 88.) The Court heard oral argument on July 29, 2024. (Mins., ECF No. 77.) At the hearing, the Court ordered the parties to meet and confer on the terms of a proposed preliminary injunction that would protect Plaintiffs' rights while allowing UCLA the flexibility needed to administer the UCLA campus. (*Id.*) Plaintiffs and UCLA filed separate responses to the order, but were unable to make meaningful ground on a compromise position. (*See* Pls.' Resp., ECF No. 82; Defs.' Resp., ECF No. 83.) The Court deems this matter appropriate for decision without further oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

///

## I. BACKGROUND[1]

At the outset, the Court notes that this case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counterprotest movements responding thereto.[2] This case is narrowly focused on the materially undisputed factual allegations presented to the Court in the complaint and motion papers.[3]

On April 25, 2024, a group of pro-Palestinian protesters occupied a portion of the UCLA campus known as Royce Quad and established an encampment. (Beck Decl. ¶ 5,

---

[1] Evidence in support of and in opposition to this motion includes the sworn declarations of Plaintiffs Frankel, Ghayoum, and Rassbach; Defendants Beck, Braziel, and Gorden; Plaintiffs' counsel Eric Rassbach; defense counsel Matthew Cowan; and third party Kamran Shamsa, as well as exhibits including various news articles, social media posts, emails, and documents. At later stages of this case, some of this evidence may be inadmissible for many reasons, including as hearsay. "A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citing *Republic of Phil. v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1984)); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). The Court exercises its discretion to consider evidence that might otherwise be inadmissible in connection with the motion because Defendants do not place the key facts upon which this Order relies in material dispute.

[2] Nor is this case about the content or viewpoints contained in any protest or counterprotest slogans or other expressive conduct, which are generally protected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[3] Amicus Faculty for Justice in Palestine at UCLA asserts several allegations in its brief that, if true, could support claims for violations of the constitutional or civil rights of pro-Palestinian activists. (Second Amicus Br. 7–12.) Those possible claims would be better addressed in a separately filed action.

ECF No. 62-3; Shemuelian Decl. Ex. 15, ECF No. 48-23.) Royce Quad is a major thoroughfare and gathering place and borders several campus buildings, including Powell Library and Royce Hall. (Shemuelian Decl. ¶¶ 49–52, ECF No. 48-8; Ghayoum Decl. ¶¶ 16–18, ECF No. 48-4.) The encampment was rimmed with plywood and metal barriers. (Frankel Decl. ¶¶ 29, 34, ECF No. 48-2; Ghayoum Decl. ¶ 37.) Protesters established checkpoints and required passersby to wear a specific wristband to cross them. (*See* Ghayoum Decl. ¶¶ 39–41.) News reporting indicates that the encampment's entrances were guarded by protesters, and people who supported the existence of the state of Israel were kept out of the encampment. (Rassbach Decl. Ex. 22, ECF No. 48-59.)[4] Protesters associated with the encampment "directly interfered with instruction by blocking students' pathways to classrooms." (Shemuelian Decl. Ex. 19, ECF No. 48-27.)

Plaintiffs are three Jewish students who assert they have a religious obligation to support the Jewish state of Israel. (Frankel Decl. ¶¶ 11–13; Ghayoum Decl. ¶ 11; Shemuelian Decl. ¶¶ 11, 128.) Prior to the protests, Plaintiff Frankel often made use of Royce Quad. (Frankel Decl. ¶¶ 23–25.) After protesters erected the encampment, Plaintiff Frankel stopped using the Royce Quad because he believed that he could not traverse the encampment without disavowing Israel. (*Id.* ¶¶ 26, 38, 41.) He also saw protesters attempt to erect an encampment at the UCLA School of Law's Shapiro courtyard on June 10, 2024. (*Id.* ¶ 45.) Similarly, Plaintiff Ghayoum was unable to access Powell Library because he understood that traversing the encampment, which

---

[4] In its brief, Amicus Faculty for Justice in Palestine at UCLA disputes the facts presented in the complaint and motion papers and asserts, inter alia, that no one "was denied entrance to the Palestinian solidarity encampment based on their identity." (Second Amicus Br. 5.) This conclusory assertion is in tension with Plaintiffs' record evidence, which UCLA declined to refute. Further, Amicus' assertion that no one was excluded from the encampment based on identity does not grapple with an important nuance—that Plaintiffs here assert that supporting the Jewish state of Israel is their sincerely held religious belief.

4

blocked entrance to the library, carried a risk of violence. (Ghayoum Decl. ¶¶ 34–38.) He also canceled plans to meet a friend at Ackerman Union after four protesters stopped him while he walked toward Janss Steps and repeatedly asked him if he had a wristband. (*Id.* ¶¶ 39–45.) Plaintiff Ghayoum also could not study at Powell Library because protesters from the encampment blocked his access to the library. (*Id.* ¶ 48.) And Plaintiff Shemuelian also decided not to traverse Royce Quad because of her knowledge that she would have to disavow her religious beliefs to do so. (Shemuelian Decl. ¶¶ 111, 118–20, 128.) The encampment led UCLA to effectively make certain of its programs, activities, and campus areas available to other students when UCLA knew that some Jewish students, including Plaintiffs, were excluded based of their genuinely held religious beliefs.

The encampment persisted for a week, until the early morning of May 2, when UCLA directed the UCLA Police Department and outside law enforcement agencies to enter and clear the encampment. (Shemuelian Decl. Ex. 19.)

Since UCLA dismantled the encampment, protesters have continued to attempt to disrupt campus. For example, on May 6, protesters briefly occupied areas of the campus. (Braziel Decl. ¶ 28, ECF No. 62-5.) And on May 23, protesters established a new encampment, "erecting barricades, establishing fortifications and blocking access to parts of the campus and buildings," and "disrupting campus operations." (Shemuelian Decl. Ex. 25, ECF No. 48-33; Rassbach Decl. Ex. 20, ECF No. 48-57; *see* Braziel Decl. ¶ 29.)

Most recently, on June 10, protesters "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" on campus. (Rassbach Decl. Ex. 21, ECF No. 48-58 (emphasis removed); *see* Braziel Decl. ¶ 30.) These protesters "restricted access to the general public" and "disrupted nearby final exams." (Rassbach Decl. Ex. 21. (emphasis removed).) Some students "miss[ed] finals because they were blocked from entering classrooms," and others were "evacuated in the middle" of finals. (Shemuelian Decl. Ex. 27, ECF No. 48-35.)

5

Based on these facts and other allegations, Plaintiffs assert claims for violations of their federal constitutional rights, including violation of the Equal Protection Clause, the Free Speech Clause, and the Free Exercise Clause; claims for violations of their federal civil rights, including violations of Title VI of the Civil Rights Act of 1964, conspiracy to interfere with civil rights, and failure to prevent conspiracy; claims for violations of their state constitutional rights, including violation of the California Equal Protection Clause and the California Free Exercise Clause; and claims for violations of their state civil rights, including violations of section 220 of the California Education Code, the Ralph Civil Rights Act of 1976, and the Bane Civil Rights Act. (Compl. ¶¶ 320–430, ECF No. 1.)

## II. STANDING

UCLA raises a challenge to Plaintiffs' constitutional standing to sue. (Opp'n 8–12.) Since the challenge pertains to the Court's jurisdiction, the Court addresses it first. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012) ("A district court may not grant a preliminary injunction if it lacks subject matter jurisdiction over the claim before it."), *aff'd*, 709 F.3d 1281 (9th Cir. 2013).

### A. Legal Standard

At the preliminary injunction stage, a plaintiff "'must make a clear showing of each element of standing,' proving (1) an injury in fact that is 'concrete and particularized' and 'actual or imminent'; (2) 'a causal connection between the injury and the conduct complained of'; and that (3) 'the injury will likely be redressed by a favorable decision.'" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)). To have standing "for injunctive relief . . . the threat of injury must be 'actual and imminent, not conjectural or hypothetical.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). In determining

standing to pursue injunctive relief, courts "presume the truth of [plaintiffs'] allegations" and "construe all of the allegations in [plaintiffs'] favor." *Id.* at 971.

UCLA's challenge to Plaintiffs' standing focuses on the first two elements. The Court considers each in turn.

### B. Imminent Likelihood of Future Injury

UCLA argues that Plaintiffs lack standing because they fail to allege an imminent likelihood of future injury. (Opp'n 8–11.) But, "[i]t is well settled that evidence of past instances of enforcement is important in a standing inquiry." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (citing *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1128 (9th Cir. 1996)); *accord American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 507 (9th Cir. 1991)). While, "[p]ast wrongs are 'insufficient by themselves to grant standing,' [they] are 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (quoting *Davidson*, 889 F.3d at 967). "When a plaintiff's standing is grounded entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Id.* at 1119 (alteration in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020) (ellipsis in original) (quoting *Lyons*, 461 U.S. at 102). "Courts have also considered the Government's failure to disavow" unconstitutional acts "as a factor in favor of a finding of standing." *LSO, Ltd.*, 205 F.3d at 1155 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979), *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996), and *American-Arab*, 970 F.2d at 508). When government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Id.*

UCLA contends that its remedial actions following the Royce Quad encampment make any "future injury speculative at best." (Opp'n 8–9.) These actions include the creation of a new Office of Campus Safety and the transfer of day-to-day responsibility for campus safety to an Emergency Operations Center. (Braziel Decl. ¶¶ 12–16, 21, ECF No. 62-5.) The changes, while commendable, do not minimize the risk that Plaintiffs "will again be wronged" by their exclusion from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs below "a sufficient likelihood." *Wright*, 48 F.4th at 1119 (internal quotation marks omitted). First, since UCLA's changes, protesters have violated UCLA's protest rules at least three times: on May 6, May 23, and June 10. (Braziel Decl. ¶¶ 28–30.) While these events may not have been as disruptive as the Royce Quad encampment, according to a UCLA email, the June 10 events "disrupted final exams," temporarily blocked off multiple areas of campus, and persisted from 3:15 p.m. to the evening. (Shemuelian Decl. ¶ 151 & Ex. 27.) Similarly, also according to UCLA emails, the May 6 and 23 events disrupted access to several campus areas. (*Id.* ¶¶ 145, 148 & Exs. 25–26, ECF No. 48-33 to 34.) Further, any relative quiet on UCLA's campus the past few months, (Braziel Decl. ¶ 26), is belied by the facts that fewer people are on a university campus during the summer and that the armed conflict in Gaza continues, Fed R. Evid. 201(b)(1). Finally, while UCLA's focus on safety is compelling, UCLA has failed to assuage the Plaintiffs' concerns that some Jewish students may be excluded from UCLA's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs should exclusionary encampments return. In response to these concerns raised at the hearing, UCLA did "not state[] affirmatively that" they "will not" provide ordinarily available programs, activities, and campus areas to non-Jewish students if protesters return and exclude Jewish students. *Bland*, 88 F.3d at 737.

It remains to be seen how effective UCLA's policy changes will be with a full campus. While the May and June protests do not appear to have resulted in the same religious-belief-based exclusion as the prior encampment that gives rise to the

Plaintiffs' free exercise concerns, the Court perceives an imminent risk that such exclusion will return in the fall with students, staff, faculty, and non-UCLA community members. As such, given that when government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown an imminent likelihood of future injury for standing purposes.

**C.     Causation**

UCLA also argues that Plaintiffs lack standing because "they have not pleaded facts demonstrating that *UCLA* would be the *cause* of any future injury that they might suffer, such that an injunction directed *at UCLA* would redress those alleged injuries." (Opp'n 11–12.) "To show causation, the plaintiff must demonstrate a 'causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

UCLA, however, misconstrues the Plaintiffs' injuries. The injuries are not simply the exclusion of Plaintiffs from certain of UCLA's ordinarily available programs, activities, and campus areas. The injuries result when Plaintiffs are excluded from certain of UCLA's ordinarily available programs, activities, and campus areas *and* UCLA *still provides* those programs, activities, and campus areas to other students knowing that Plaintiffs and students like them are excluded based on their religious exercise. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" (alteration in original) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)); *Carson*

9

*v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."). The complaint is replete with allegations that Plaintiffs and other students were denied access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs. (*See, e.g.*, Compl. ¶¶ 16, 113, 115, 118, 121–22, 124, 134, 203, 249, 255, 278, 287, 348.) Taking these allegations as true, as the Court must at this stage, and given that when government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd.*, 205 F.3d at 1155, the Court finds that Plaintiffs have sufficiently shown causation for standing purposes.

The Court rejects UCLA's standing challenge and proceeds to the merits of Plaintiffs' motion.

### III. PRELIMINARY INJUNCTION

#### A. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Ninth Circuit also employs a "version of the sliding scale approach" where "a stronger showing of one element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, an injunction may issue if the plaintiff shows that serious questions go to the merits, the balance of hardships tips sharply toward the plaintiff, the plaintiff is likely to suffer irreparable injury, and an injunction is in the public interest. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line,*

*Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### B. *Winter* Factors

#### 1. Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of their federal equal protection, free speech, free exercise, and Title VI claims. (Mot. 15–24.) Because analysis of Plaintiffs' free exercise claim resolves this motion, the Court addresses only that claim in the interest of judicial economy.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see also Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free Exercise Clause extends to the states under the Fourteenth Amendment). The clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran*, 582 U.S. at 458 (alteration in original) (quoting *City of Hialeah*, 508 U.S. at 533, 542). "[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S.at 466 n.4 (quoting *Lukumi*, 508 U.S. at 533). In other free exercise cases, challenged laws "must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S. at 780 (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 478 (2020)). "To satisfy strict scrutiny, government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* (internal quotation marks omitted).

Here, UCLA made available certain of its programs, activities, and campus areas when certain students, including Plaintiffs, were excluded because of their genuinely

held religious beliefs. For example, Plaintiff Frankel could not walk through Royce Quad because entering the encampment required disavowing the state of Israel. (Frankel Decl. ¶¶ 11, 26, 38; *see* Rassbach Decl. Ex. 22.) Similarly, Plaintiff Ghayoum was prevented from entering a campus area at a protester checkpoint, (Ghayoum Decl. ¶¶ 11, 39–45), and Plaintiff Shemuelian could not traverse Royce Quad, unlike other students, (Shemuelian Decl. ¶ 111, 118–120, 128).

In other contexts, the Supreme Court has invalidated state acts that had the effect of excluding individuals from public benefits based on their religious status. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (holding a state cannot withhold unemployment benefits from Seventh-day Adventist who refused to work on the Sabbath); *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 709, 720 (1981) (similar holding as to Jehovah's Witness who refused to participate in the production of weapons). As such, Plaintiffs' exclusion from campus resources while other students retained access raises serious questions going to the merits of their free exercise claim. *See All. for Wild Rockies*, 632 F.3d at 1131.

UCLA argues that their acts focused on deescalating and preventing violence satisfy strict scrutiny. (Opp'n 15–18.) This might be true, but the acts related to deescalating and preventing violence are not the acts which led to the likely Free Exercise Clause violation. As such, UCLA's strict scrutiny argument is not relevant to the free exercise issue.

### 2. Likelihood of Irreparable Injury

"It is axiomatic that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc) (cleaned up). "Irreparable harm is relatively easy to establish in a First Amendment case" because the plaintiff "need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch.*

*on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (internal quotation marks omitted). For all the reasons stated above, Plaintiffs have put forward a colorable claim that UCLA's acts violated their Free Exercise Clause rights. Further, given the risk that protests will return in the fall that will again restrict certain Jewish students' access to ordinarily available programs, activities, and campus areas, the Court finds that Plaintiffs are likely to suffer an irreparable injury absent a preliminary injunction.

### 3. Balancing the Equities and Public Interest

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). As discussed above, Plaintiffs have demonstrated serious questions as to the merits. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *De Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). And the state "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). As such, the Court finds that the balance of the equities tips sharply toward Plaintiffs, and the public interest favors the issuance of an injunction.

### 4. Summary

For the reasons stated above, the Court finds that all the *Winter* factors favor granting a preliminary injunction. Because the Court analyzes only the facts pertinent to the federal free exercise claim, the Court issues a preliminary injunction addressing only those risks. The Court's injunction is thus narrower than Plaintiffs' proposed preliminary injunction.[5]

---

[5] The Court does not issue the injunction against Defendant Regents of The University of California. "The Eleventh Amendment bars suits which seek either damages or

13

Under the Court's injunction, UCLA retains flexibility to administer the university. Specifically, the injunction does not mandate any specific policies and procedures UCLA must put in place, nor does it dictate any specific acts UCLA must take in response to campus protests. Rather, the injunction requires only that, if any part of UCLA's ordinarily available programs, activities, and campus areas become unavailable to certain Jewish students, UCLA must stop providing those ordinarily available programs, activities, and campus areas to any students. How best to make any unavailable programs, activities, and campus areas available again is left to UCLA's discretion.

### C. Security

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks omitted).

UCLA does not request a bond. (Defs.' Resp. 9.) Courts have issued preliminary injunctions "without requiring security based on" likelihood of success of prevailing on a First Amendment claim. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 966 (N.D.

---

injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its agencies." *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995) (citation omitted). "The Regents, a corporation created by the California constitution, is an arm of the state for Eleventh Amendment purposes, and therefore is not a 'person' within the meaning of section 1983." *Armstrong v. Meyers*, 964 F.2d 948, 949–50 (9th Cir. 1992). That said, the injunction may issue as against the other defendants; immunity under the Eleventh Amendment is not absolute, and under the *Ex parte Young* doctrine, immunity does not apply when plaintiffs sue state officials in their official capacities for prospective injunctive relief. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996).

14

1 | Cal. 2023); *see also Weaver v. City of Montebello*, 370 F. Supp. 3d 1130, 1139 (C.D.
2 | Cal. 2019). As such, the Court does not require security.

### D. Stay

UCLA requests a stay of any preliminary injunction pending appeal. (Defs.' Resp. 8–9.) The request is denied for failure to comply with rules governing motion and ex parte practice. *E.g.*, C.D. Cal. Rs. 6-1, 7-3, 7-4, 7-19; *Smith v. Premiere Valet Servs., Inc.*, No. 2:19-cv-09888-CJC-MAA, 2020 U.S. Dist. LEXIS 228465, at *42 (C.D. Cal. Aug. 4, 2020) (collecting cases for the proposition that "a request for affirmative relief is not proper when raised for the first time in an opposition"). Denial is without prejudice to reraising the request in a properly noticed motion or ex parte application after an appeal is taken, if any.

## IV. CONCLUSION

"If a movant makes a sufficient demonstration on all four *Winter* factors (three when as here the third and fourth factors are merged), a court must not shrink from its obligation to enforce [movant's] constitutional rights, regardless of the constitutional right as issue." *Baird*, 81 F.4th at 1041 (cleaned up). Thus, the Court orders:

1. Defendants Drake, Block, Hunt, Beck, Gordon, and Braziel ("Defendants") are prohibited from offering any ordinarily available programs, activities, or campus areas to students if Defendants know the ordinarily available programs, activities, or campus areas are not fully and equally accessible to Jewish students.

2. Defendants are prohibited from knowingly allowing or facilitating the exclusion of Jewish students from ordinarily available portions of UCLA's programs, activities, and campus areas, whether as a result of a de-escalation strategy or otherwise.

3. On or before August 15, 2024, Defendants shall instruct Student Affairs Mitigator/Monitor ("SAM") and any and all campus security teams (including without

limitation UCPD and UCLA Security) that they are not to aid or participate in any obstruction of access for Jewish students to ordinarily available programs, activities, and campus areas.

4.  For purposes of this order, all references to the exclusion of Jewish students shall include exclusion of Jewish students based on religious beliefs concerning the Jewish state of Israel.

5.  Nothing in this order prevents Defendants from excluding Jewish students from ordinarily available programs, activities, and campus areas pursuant to UCLA code of conduct standards applicable to all UCLA students.

5.  Absent a stay of this injunction by the United States Court of Appeals for the Ninth Circuit, this preliminary injunction shall take effect on August 15, 2024, and remain in effect pending trial in this action or further order of this Court or the United States Court of Appeals for the Ninth Circuit.

**IT IS SO ORDERED.**

Dated: August 13, 2024

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE