

www.pbwt.com

January 24, 2025

Lisa E. Cleary
Partner
(212) 336-2159
(212) 336-2366 Direct Fax
lecleary@pbwt.com

**By ECF**

The Honorable John P. Cronan, U.S.D.J.
United States District Court for the
Southern District of New York
500 Pearl Street, Room 1320
New York, New York 10007

> **Re:** **Notice of Post-Briefing Decisions –** *Gartenberg et al v. The Cooper Union for the Advancement of Science and Art* **(1:24-cv-02669-JPC)**

Dear Judge Cronan:

On behalf of The Cooper Union for the Advancement of Science and Art ("Cooper Union") in the above-referenced case, we respectfully write to notify the Court of two post-briefing decisions.

The first was issued by the late Judge Messitte, a district court judge in the District of Maryland, granting a preliminary injunction restraining the University of Maryland from prohibiting a pro-Palestinian vigil from taking place at campus grounds on October 7, 2024. *See Univ. of Maryland Students for Just. in Palestine v. Bd. of Regents of Univ. Sys. of Maryland*, No. CV 24-2683 PJM, 2024 WL 4361863 (D. Md. Oct. 1, 2024) (enclosed as Exhibit A).

The second was issued by Judge McHugh, a district court judge in the Eastern District of Pennsylvania, which dismissed Title VI and breach of contract claims against Haverford College. *See Landau, et al. v. The Corporation of Haverford College*, Case No. 2:24-cv-02044-GAM, 2025 WL 35469 (E.D. Pa. Jan. 6, 2025) (enclosed as Exhibit B).

These decisions are persuasive authorities in support of Cooper Union's pending motion to dismiss.

Respectfully submitted,
*/s/ Lisa E. Cleary*
Lisa E. Cleary

cc:    All counsel of record (*via* ECF)

# EXHIBIT A.

2024 WL 4361863
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

UNIVERSITY OF MARYLAND STUDENTS FOR JUSTICE IN PALESTINE, Plaintiff,

v.

BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF MARYLAND, et al., Defendants.

Civil No. 24-2683 PJM

|

Signed October 1, 2024

**Attorneys and Law Firms**

Lena F. Masri, Gadeir F. Abbas, CAIR, Washington, DC, Radhika Sainath, Pro Hac Vice, Palestine Legal, New York, NY, Victoria Porell, Pro Hac Vice, Palestine Legal, Chicago, IL, for Plaintiff.

Jennifer Ann DeRose, Office of the Attorney General, Educational Affairs Division, Baltimore, MD, Patrick Sheridan, Maryland Office of the Attorney General, Higher Education Division, Baltimore, MD, for Defendants.

Nicholas Taichi Steiner, American Civil Liberties Union of Maryland, Baltimore, MD, for Amici ACLU, ACLU of Maryland, Knight First Amendment Institute at Columbia University, Foundation for Individual Rights and Expression.

**MEMORANDUM OPINION**

PETER J. MESSITTE, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION [1]

 **\*1** University of Maryland Students for Justice in Palestine ("SJP" or "Plaintiff") has sued the Board of Regents of the University System of Maryland ("Board of Regents" or "Board"); the University of Maryland, College Park ("UMCP" or "University"); and UMCP's President Pines (together, "Defendants") for revoking their reservation of an SJP event. See Compl., ECF No. 1. SJP, in its application, described the event as an interfaith vigil to be held on the University's College Park campus on October 7, intended to mourn lives lost in Israel's purported "genocide" in Gaza. See id. ¶ 25. In revoking the approval, the University also banned all student-organized events on the College Park campus on that day, id. ¶ 3, as well as such events throughout the University system statewide, id. ¶ 5.

The suit alleges violations of SJP's free-speech rights under the First Amendment to the U.S. Constitution. Id. ¶¶ 60–77. Although SJP seeks a permanent injunction and declaratory relief, as well as monetary damages under 24 U.S.C. § 1988, Compl. at 18, in light of the imminent arrival of October 7, the Court in this Opinion focuses only on SJP's Motion for a Preliminary Injunction. See Pl.'s Mot. Prelim. Inj., ECF No. 8.

SJP is a student organization formally registered in accordance with UMCP requirements. Compl. ¶ 10. Its stated purpose is to raise awareness about what it believes are the human-rights violations committed against the Palestinian people. Id. As a registered student organization, SJP is authorized to reserve space on campus, receive and raise funds, and otherwise participate as other student organizations do in student life at UMCP. Id.

The Board of Regents is the governing body for all University of Maryland campuses, of which UMCP is the "flagship." Id. ¶ 11. The University System of Maryland ("USM") is an instrumentality of the State of Maryland and a public corporation,

the governance of which is vested in the Board of Regents. Md. Code Ann., Educ. ("ED"), § 12-102(a)(2), (b). The Board of Regents may sue and be sued in all courts on behalf of the University of Maryland. ED § 12-104(b)(3).

UMCP is a constituent institution of the University System of Maryland. Compl. ¶ 12. Its mission is to be "the State's flagship campus with programs and faculty nationally and internationally recognized for excellence in research and the advancement of knowledge." ED § 12-106(a)(1)(iii)(1)(A).

Darryll J. Pines is the President of UMCP. Compl. ¶ 13. He is being sued in his individual and official capacities. *Id.* Pursuant to ED § 12-109(d)(1), he is the Chief Executive Officer of UMCP. *Id.* He is responsible for the conduct of UMCP and the supervision of each of its departments. *Id.* The UMCP policies and procedures challenged in this action were approved and issued by the President of UMCP. *Id.*

## II. JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

 **\*2**  Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and 1391(e) because the acts and injuries alleged occurred in and continue to occur in this judicial district.

## III. BACKGROUND

### A. University Adoption of Free Speech Principles

The University System of Maryland and its Board of Regents celebrate and defend free speech on campus. In a public statement issued five years ago, they committed "to promoting and protecting every person's freedom to express their views, however controversial, in a lawful manner." USM & USM Bd. of Regents, *Freedom of Speech and Expression Value Statement and Guidelines* (June 21, 2019), https://www.usmd.edu/regents/bylaws/guidelines/ Freedom_of_Expression_Principles_Guidelines.pdf (last visited Sept. 30, 2024). In the statement, USM and the Board laid out the general principles of free speech that USM would follow. In essence, USM institutions, they declared, would promote free speech because speech—even offensive, detestable speech—promotes discourse, and discourse promotes learning. USM and the Board of Regents, to be sure, acknowledged the need for balance between promoting speech and the duty to "protect the physical safety of all community members." *Id.* Thus, it would be proper for USM institutions to ban speech that amounts to true threats and unlawful harassment. *Id.* And "USM institutions may restrict time, place, and manner of speech," so long as they do so reasonably and without regard to the speech's content. *See id.* Fundamentally, however, USM and the Board recognize that:

> USM institutions have no obligation to protect any person from exposure to speech with which they might disagree. *Exposure to all perspectives, including those that may be deemed disagreeable or even offensive, can be an essential part of the educational experience* and can help foster a greater understanding of how to respect a person while communicating a differing opinion.

*Id.* (emphasis added). [2]

### B. University Policy & Procedure for Reserving Event Space

 **\*3**  For years, UMCP students as well as outsiders have used UMCP's McKeldin Mall as a forum for free expression, one of only four venues that UMCP allows for students to host "Scheduled Expressive Activity." *See* Univ. of Md., *University of Maryland Policy and Procedures for the Use of Facilities and Outdoor Spaces*, Policy No. VI-4.10(A) at app. A(V)(A)(1)

(Aug. 19, 2024), https://policies.umd.edu/general-administration/university-of-maryland-policy-and-procedures-for-the-use-of-facilities-and-outdoor-spaces [https://perma.cc/SF7U-5Q4U]. The Mall is a rectangular field, consisting of some nine acres, centrally located on the College Park campus. Compl. ¶ 21. Reserving spaces such as the Mall has different requirements as between "Internal" and "External" users. *See* Policy No. VI-4.10(A) at app. A(IV), (V). An "Internal User" is, among other things, defined as a "Registered Student Organization ... or an individual or group of registered University students." *Id.* at III(E). A "Registered Student Organization" is defined as a student group that is registered with the Student Organization Resource Center ("SORC"). *Id.* at III(J). Registered student organizations are listed on TerpLink, the University's student-organization database. TerpLink is also the platform through which a student organization requests to reserve event space and schedule its "expressive activity." UMCP allows recognized student organizations to host "Scheduled Expressive Activity" at McKeldin Mall. *Id.* at app. A(V)(A)(1)(a).

To reserve the Mall, an organization must request a reservation at least seven days in advance of the event, *id.* at app. A(V)(A)(2), then wait for an initial confirmation, *see* Univ. of Md., *7-Step Student Organization Event Planning Guide* (UMCP Student-Event Guide), https://acrobat.adobe.com/link/track?uri=urn% 3Aaaid% 3Ascds% 3AUS% 3Aec52a8d0-3c46-487d-9ebe-8af38f41347a&viewer% 21megaVerb=group-discover [https://perma.cc/YCB6-A647] (last visited Oct. 1, 2024). "Reservation requests are approved based on the stated expected use of the space without regard to the content or viewpoint of the Expressive Activity." Policy VI-4.10(A) at app. A(V)(A)(3). Following UMCP approval of the reservation request, the student organization must submit another form, this time to inform "numerous units from across campus that need to know about [the] event including the SORC Finances Team, UMPD [UMCP's police department], Risk Management, and the Fire Marshal's office." UMCP Student-Event Guide. UMPD, for certain expressive events, conducts security assessments. When appropriate, UMPD relies on outside security to increase security presence, according to UMPD's Chief of Police David Mitchell who testified at the Preliminary Injunction hearing on September 30, 2024. Indeed, Chief, Mitchell testified that UMCP contracts with an outside security agency and "routinely" uses them. Chief Mitchell further testified that UMPD can call on local and state police for additional crowd-control. The Policy provides that the University reserves the right to reschedule or cancel events, *see* Policy VI-4.10(A)(VII)(A), although Chief Mitchell testified that, to his knowledge, UMCP has never done so.

Finally, according to the Policy, the student organization must also pay an event deposit if requested by UMCP, 25% up front, the remainder due at least seven days before the event. UMCP Student-Event Guide. After the event, if the University determines that the event cost more than anticipated, it may require additional fees "due 10 business days after [the] event." *Id.*

### C. SJP's Reservation

SJP, in its constitution as a registered student organization at UMCP, states as its aim "to promote justice, human rights, and the right of self-determination for the Palestinian people." SJP Const. art. I (ratified May 2, 2024), *for download at* https://terplink.umd.edu/organization/students-for-justice-in-palestine-umd-chapter [https://perma.cc/7BJX-274E] (last visited Sept. 29, 2024). SJP declares that it stands against indiscriminate violence by either party in the conflict in Israel. *Id.* ("SJP condemns all acts of unlawful violence, or violence that indiscriminately targets civilians or civilian infrastructure, committed by either side in the course of the conflict."). SJP further declares that it "categorically opposes any form of prejudice or discrimination based on race, religion, ethnicity, or gender." *Id.* at art. II. Likewise, and of particular relevance here, SJP promises that it and its members will "conduct only nonviolent actions and reject actions that violate its guiding principles," *id.* at art. III, and that it "understands and is committed to fulfilling its responsibilities of abiding by the University of Maryland College Park policies," *id.* at pmbl.

**\*4** SJP is a chapter of National SJP,[3] an umbrella organization supporting "over 350 Palestine solidarity organizations on campus across the continent." *Who Are We?*, National SJP, https://www.nationalsjp.org/about [https://perma.cc/D3SY-CFWB] (last visited Oct. 1, 2024). National SJP hosts events to educate local chapters, has relationships "with national and international partners," and "[c]oordinate[s] joint campaigns and actions" across the country. *Id.*; *see, e.g.*, Daniel Arkin, *How a Pro-Palestinian Campus Group Became a National Lightning Rod*, NBC News (Nov. 24, 2023), https://www.nbcnews.com/

news/students-justice-palestine-became-national-lightning-rod-rcna125420 (last visited Oct. 1, 2024). It has even prepared a "National Resistance Toolkit," suggesting to its various chapters how they might conduct a campus protest. https://dw-wp-production.imgix.net/2023/10/DAY-OF-RESISTANCE-TOOLKIT.pdf [https://perma.cc/5T2Z-KGKK].

As a recognized student organization at UMCP, SJP and its members are within the class of persons or groups for whom the UMCP makes its facilities, including McKeldin Mall, available. Compl. ¶ 23. On July 31, 2024, a member of the board of SJP submitted a reservation request through the UMCP's reservation system to allow SJP to hold an "Awareness Event" on October 7, 2024 on McKeldin Mall. *Id.* ¶ 24. [4] That same day SJP received an email confirming its reservation of McKeldin Mall. Event Request Approval, ECF No. 1-1. In a follow-up submission made on August 1, 2024 providing more details, SJP represented that it would host an invitation-only "educational event to teach the public regarding the genocidal bombing campaign in Gaza." Event Request, ECF No. 23-2. SJP expressly indicated that it expected 25 to 50 attendees and expressly agreed to comply with all student-organization event guidelines and policies. *Id.* After the reservation was confirmed, it was listed publicly in the student-event registration system. Compl. ¶ 24. No details of the event, however, were listed, only that SJP had reserved McKeldin Mall on October 7 for a certain period of time. *Id.*

SJP indicates that it primarily planned to use their reservation of McKeldin Mall to hold a vigil commemorating the thousands of lives lost since what it characterizes as the initiation of Israel's current attack on Gaza. *Id.* ¶ 25. Over the course of the day, the group stated that it would also host several other activities, including teach-ins about Palestinian history, culture, and solidarity between Palestinians and other marginalized groups; tables highlighting Palestinian art and traditional crafts; a visual display of kites, a motif in Palestinian poetry; as well as a vigil and inter-faith prayers. *Id.* The group indicated that it had invited several SJP members who have personally lost family members in Gaza to speak. *Id.*

**\*5** SJP says it chose October 7 specifically because October 7 marks the beginning of what it calls Israel's most recent "genocidal campaign" which, SJP claims, has resulted in the death of over 40,000 Palestinians in Gaza. *Id.* ¶ 26. Another recognized student organization, Jewish Voice for Peace at the University of Maryland ("JVP-UMD"), has agreed to co-sponsor SJP's event. *Id.* ¶ 27. At the proposed vigil, JVP-UMD "planned to build a community space to grieve all innocent lives that have been lost in the past year, Palestinian and Israeli, while acknowledging the unique magnitude of Palestinian suffering as the death toll in Gaza climbs ...." [5] *Id.*

On August 2, 2024, a member of the UMCP administration requested to meet with students from SJP, and a meeting was held on for August 19, 2024, at 9:00 a.m. over Zoom. *Id.* ¶ 29.

Present at the meeting on August 19, 2024, were University President Pines, University Vice President for Student Affairs Patricia Perillo, and a few members of the SJP board. *Id.* ¶ 30. During the meeting, SJP related once again that the purpose of its reservation of McKeldin Mall was to host a vigil to commemorate Palestinian lives lost since the beginning of Israel's alleged "genocide" in Gaza on October 7 and to provide a space for the pro-Palestinian community to process their emotions and grieve together. *Id.* SJP board members also indicated that they had not yet finalized the exact details of their event. *Id.*

At the August 19 meeting, President Pines and Vice President Perillo reported that they had been receiving considerable pressure from groups inside and outside the University to cancel SJP's event, but also stated that they were committed to protecting the free speech of students. *Id.* ¶ 31. Pines and Perillo indicated that some groups on campus were angered by SJP's reservation of McKeldin Mall, the largest open space on campus, but that nevertheless the reservation rightly belonged to SJP and that SJP had duly followed all event planning and facility reservation policies. *Id.*

UMCP concedes that it heard directly from people demanding SJP's October 7 event be canceled, as well as public demands. *Id.* ¶ 32. According to SJP, none of those requesting that SJP's event on October 7 be censored or canceled possessed any information about what the content of the proposed event would be. *Id.* Their demands, according to SJP, were based solely on the fact that SJP had reserved space on October 7, as well as stereotypes about SJP, and disagreement over what the oppositional individuals and groups believed SJP's intended message might be on that day. *Id.*

An open letter titled "Letter from the Community to Leaders of the University of Maryland" addressed to Chancellor Perman, President Pines, Provost Rice, and Vice President Perillo began circulating for signatures. *Id.* ¶ 33. The letter demanded that the University "immediately shut down the event" should students "accuse Israel of committing genocide" or should there be "any mention of Israel as an apartheid state," which, the letter stated, was "not agreed to by the US State Department" and which would be viewed by the signatories as "an antisemitic attack." ECF No. 1-4.

The letter also called on UMCP to censor certain phrases and viewpoints should they be expressed at the vigil, including any suggestion "that Israel had killed over 150,000 Palestinians," or any use of the words "freedom fighters," "martyrs," or "intifada" (presumably in reference to the Palestinian militant force known as Hamas). *See* Compl. ¶ 34. The letter concluded, "we are not asking that SJP be denied their right to assemble," but it also stated that "there is a probability" that SJP's event would express the viewpoints and use the language the letters' signatories found disagreeable, even offensive. *Id.* ¶ 35.

 **\*6** Another petition was started on August 29, 2024 by a group whose purpose SJP characterizes as existing to challenge people who express opinions critical of Israel online. *Id.* ¶ 36. This petition, entitled "Stop Terror on Campus: Urge Universities to Ban Antisemitic Protests on October 7," explicitly called on the UMCP to rescind permission for SJP to use campus space on October 7. [6] *Id.* ¶ 36.

This petition did not include any information about SJP's proposed event nor why it was deemed objectionable, concluding instead that any use of University space by SJP would be "disgusting," analogizing approval of the event to "granting permission to white supremacists to burn a cross on campus on the day commemorating the assassination of Dr. Martin Luther King Jr." *Id.* ¶ 37. As of the date the Complaint was filed, the petition had received 27,960 signatures. *Id.*

Other anti-Palestinian or pro-Israel groups also lobbied UMCP to cancel or censor SJP's event because the groups disagreed with the message they believed SJP would convey. [7] *Id.* ¶ 39.

Days later, on September 1, 2024, UMCP administrators informed SJP that the University had revoked the group's October 7 event reservation. *Id.* ¶¶ 44, 46. And shortly after, in an email blast to the campus community, a version of which was posted online, [8] President Pines stated that he had decided to ban all student-sponsored events due to an "overwhelming" number of complaints:

> Applications for events led by several student organizations have been submitted for October 7, and questions have been raised about the events of the day. Numerous calls have been made to cancel and restrict the events that take place that day, and I fully understand that this day opens emotional wounds and evokes deeply rooted pain. The language has been charged and the rhetoric intense.

> Given the overwhelming outreach, from multiple perspectives, I requested a routine and targeted safety assessment for this day to understand the risks and safety measures associated with planned events. UMPD has assured me that there is no immediate or active threat to prompt this assessment, but the assessment is a prudent and preventive measure that will assist us to keep our safety at the forefront.

> I have also consulted with the University System of Maryland about the importance of our university and all of our USM schools prioritizing safety and reflection on this one-year anniversary. Jointly, out of an abundance of caution, we concluded to host only university-sponsored events that promote reflection on this day. All other expressive events will be held prior to October 7, and then resume on October 8 in accordance with time, place and manner considerations of the First Amendment.

 **\*7** Ltr. from Pres. Pines to Campus Cmty., ECF No. 1-3. The USM in fact made President Pines's October 7 ban on expressive activity statewide. *Id.* ¶ 52; USM on Marking October 7, ECF No. 1-2. On that day in October, no student-selected speakers would be allowed to present at any of the USM campuses serving more than 150,000 students. Compl. ¶ 52.

At the Preliminary Injunction hearing, Chief Mitchell testified, as part of his security assessment of SJP's proposed vigil, that —given that McKeldin Mall is hard to secure due to its location and size—he could not guarantee student and faculty safety on October 7. He recommended, instead, rescheduling all expressive events on the UMCP campus for that day. UMCP's Vice President of Student Affairs, Dr. Patricia Perillo, further testified at the hearing that UMCP's administration considered three options in their "scenario planning": (1) move classes online and allow expressive events on campus; (2) move classes online and reschedule all expressive events; or (3) keep classes in person and reschedule expressive events. She testified that it chose the third option because UMCP's primary mission is learning, research, and service.

By its action, says SJP, the University has violated its free-speech rights protected by the First and Fourteenth Amendments. *See id.* ¶¶ 60–77. By revoking SJP's permission to host its vigil, which it planned to co-host with JVP-UMD, a public university has censored speech based on viewpoint, on content, and the identity of the speaker. *See id.*

## IV. PRELIMINARY INJUNCTIVE RELIEF

As indicated, SJP's Complaint seeks preliminary and permanent injunctive relief, as well as declaratory relief and money damages. *Id.* at 18. However, given the recency of its filing and the imminence of October 7 as the proposed event date, the only matter before the Court at this juncture is SJP's request for preliminary injunctive relief. At this stage, different criteria inform the analysis than would apply to a merits determination. Accordingly, the Court looks to the standards for the issuance *vel non* of a preliminary injunction.

## V. STANDARDS FOR ISSUANCE OF PRELIMINARY INJUNCTION

The Fourth Circuit in *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), had this to say about preliminary injunctions:

> A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial. Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial....

> [T]he Supreme Court articulated clearly what must be shown to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is the public interest." And all four requirements must be satisfied.

**\*8** *Id.* at 345–46 (citations omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Court considers those four elements in the context of this case.

### 1. Likelihood of Success on the Merits

The first requirement for the issuance of a preliminary injunction is that the movant make a clear showing that "it will *likely succeed* on the merits." *Id.* at 347. This requirement is "far stricter" than the former test for such an injunction, which required "that the plaintiff demonstrate only a grave or serious *question* for litigation." *Id.*

Student demonstrations on college campuses in protest of the status quo, invariably with significant First Amendment implications, have a relatively long history in this country, including:

• The Free Speech Movement at the University of California, Berkeley in the 1960s;

• The Vietnam War protests at Kent State University in Ohio in 1970;

• The racial justice protest at Jackson State College in Mississippi in 1970;

• The South Africa anti-apartheid protests nationwide in 1985;

• And the protests over the Gaza conflict nationwide today.

Kayla Jimenez, *US Has Long History of College Protests: Here's What Happened in the Past*, USA Today (Apr. 28, 2024), https://www.usatoday.com/story/news/education/2024/04/28/us-has-long-history-of-college-protests-what-happened-in-the-past/73431111007/ [https://perma.cc/SG6T-5Y9P]. Student groups in the State of Maryland, as SJP points out, are no exception, having protested apartheid in South Africa in 1987. [9] Compl. ¶ 18.

How, then, do things stand in Maryland today?

SJP has picked a particularly controversial date to hold an event to commemorate Gaza War dead, to decry what it terms Israeli "genocide," and to promote multiple aspects of Palestinian life and culture. Groups opposing the event have taken deep offense over an event on October 7, a day when it has been widely reported that Hamas fighters invaded Jewish settlements near Gaza, killing some 1,200 occupants, torturing others, and taking some 250 hostages (said by some to be the worst day Jews have suffered since the Holocaust [10] ). Individuals and groups opposing SJP's proposed October 7 event take further offense by reason of the event's likely references to the Hamas fighters as patriots, martyrs, or freedom fighters, and by at least one slogan arguably interpreted to call for the extinction of Israel ("From the river to the sea"). Numerous university students, parents, alumni, donors, and members of the public have expressed passionate opposition to the event. But like them or not, these very terms appear in the media virtually daily. [11] They are expressive of ideas, however vile they may seem to some. There is no reason why they should not be given protection as speech when they are used in the forum of a public university.

**\*9**  Moreover, there is no suggestion, *in SJP's reservation form at least*, that any space other than the commonly used McKeldin Mall will be occupied on October 7 or that Jewish students will be threatened or harassed or otherwise impeded from attending classes, or that any buildings will be occupied, an encampment established, or property destruction contemplated. SJP has held more than 70 events on campus since October 7, 2023, including meetings, protests, sit-ins, and demonstrations, all without significant disruption or conflict. Mitchell Aff., ECF No. 27-2. Indeed, as testified to at the September 30 hearing, the parties agree that SJP and UMCP have a respectful, even collaborative, relationship. For example, in May 2024, opposing groups held an event, Israel Fest, and counter-event (termed a boycott of Israel Fest) on opposite sides of UMCP's McKeldin Mall. Chief Mitchell testified that police set up fencing around each group, increased security personnel, checked bags, among other proactive security measures. Despite the controversial nature of the event, it was, Chief Mitchell testified, "very peaceful." In all, SJP appears to want to hold another peaceable, if highly controversial, event.

But this is a matter of law, not of wounded feelings. Free speech as guaranteed by the First Amendment may be the most important law this country has. In many ways, all other basic freedoms—freedom of religion, of the press, of the right to assemble, and to petition the government—depend upon it. *Palko v. Connecticut*, 302 U.S. 319, 327 (1937) (Cardozo, J.) (First Amendment is "the matrix, the indispensable condition, of nearly every other form of freedom").

Accordingly, subject to certain conditions that the Court will impose, the Court will order UMCP to permit the October 7 event to go forward. The law very much inclines in support of this decision.

Since the University is a public institution, the First Amendment, which reads as follows, applies: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. 1; *see also ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005) (holding that "the College Park campus is a limited public forum" and restrictions on speech are "subject to strict scrutiny 'if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available' " (quoting *Warren v. Fairfax County*, 196 F.3d 186, 193 (4th Cir. 1999))). [12]

Several Supreme Court precedents related to free speech on campus are relevant. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (speech can only be prohibited if it is directed to incite or produce imminent lawless action, and is "likely to incite or produce such action"); *Hess v. Indiana*, 414 U.S. 105, 107–08 (1973) (anti-war protesters at university yelled, "We'll take the fucking street later"; conviction overturned because speech not directed at particular person or persons and unlikely to "produce[ ] imminent disorder"); *Healy v. James*, 408 U.S. 169, 194 (1972) (state college could not deny recognition of anti-war group based on group's association with national organization and fear of disruption on campus); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (family could not sue for emotional distress where individuals on public property picketed soldier's funeral because "speech was at a public place on a matter of public concern ... [and] entitled to 'special protection' under the First Amendment"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (2001) ("There is no 'categorical harassment' exception to the First Amendment's free speech clause.").

*\*10*  To survive First Amendment constitutional challenges, restrictions must satisfy a three-prong test outlined by the Supreme Court in *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). *First*, the regulation must be content neutral; *second*, it must be "narrowly tailored to serve a significant government interest"; and *third*, it must " 'leave open ample alternative channels' " for communicating the speaker's message. *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

The Court recognizes that the University has compelling interests in maintaining campus safety and carrying out its educational mission; however, the decision to deny University student organizations permission to sponsor expressive events on October 7 was not narrowly tailored to address those concerns. The Constitution protects even what many would deem despicable speech. *See Snyder*, 562 U.S. 443. Consider the Maryland case, originating in this very Court, involving a protest that took place outside a funeral. In 2006, Fred Phelps, founder and leader of the Westboro Baptist Church, learned of a military funeral to be held in Westminster, Maryland. Phelps's church had, by then, picketed nearly 600 military funerals. It did so to espouse its view that "God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military." *Id.* at 448. Thus, at the news of the upcoming funeral for twenty-year-old Marine Lance Corporal Matthew Snyder, a Westminster native killed while serving in Iraq, Phelps notified police that his church would picket the event. And picket they did, on public land across the street from the funeral. They held signs with slogans highly offensive to many, most especially Lance Corporal Snyder's grieving family.

They stated, for instance: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You."

*Id.* The Snyder family sued Phelps for the injury his church's words inflicted. At trial, a Maryland jury found these words to be so outrageous that it held the church liable for more than $10 million in damages. *Id.* at 450.

Despite the outrageous words in that case—words almost certainly intended to inflict anguish, words (to a Maryland jury) warranting multi-million-dollar damages—the Fourth Circuit reversed the trial court's judgment. *Snyder v. Phelps*, 580 F.3d 206, 226 (4th Cir. 2009). The Supreme Court affirmed. It did so because " 'the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' " *Snyder*, 562 U.S. at 458 (quoting *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 574 (1995)). Even if outrageous words cause pain, "we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461.

It is clear to the Court that UMCP's decision to revoke its permission to SJP to hold its event on October 7 was neither viewpoint-neutral, nor content-neutral, [13] nor narrowly tailored to serve a significant government interest. The decision clearly came in response to possible speech that several groups or individuals claimed would be highly objectionable. It was further motivated by a concern—not unreasonable—that violence might ensue. *Cf. Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) ("Government's instinctive and understandable impulse to buy its peace—to avoid all risks of public disorder by chilling speech assertedly or demonstrably offensive to some elements of the public—is a recurring theme in first amendment

litigation." (citations omitted)). Those potentialities, however, in no way legally justified the revocation. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992) ("Speech cannot be ... punished or banned, simply because it might offend a hostile mob."); *accord Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010) (noting, in an unpublished decision, that the Government has the "responsibility to permit unpopular or controversial speech in the midst of a hostile crowd reaction" (citations omitted)); [14] Sunstein, *supra*, at 37 (there is no "hate speech" exception to the First Amendment; true threat means direct threat to individual students or targeting a single student; *Brandenburg* test must be met). UMCP's decision to revoke appears to be nothing less than an effort to suppress speech which would be offensive to some, indeed many. This is true even if Defendants—despite their claiming early on that "no immediate or active threat" prompted their security assessment— in fact really did anticipate on-campus turbulence.

**\*11** Nor, under the circumstances of this case, is it meaningful to suggest that ample alternative channels of communication might exist for SJP. Hold the event on October 8? At a different venue? Using a different mode of communication (e.g., the Internet)? No channel of communication would be nearly as dramatic as what SJP hoped to pursue on October 7. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."); *Sable Commc'ns of Calif., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (the Government *may* "regulate the content of constitutionally protected speech" so long as it does so "to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.").

Testimony at the hearing established that UMCP indeed did have reasonable alternatives to an entire ban on expressive speech on October 7. UMCP could, for example, arrange to employ extra security personnel, rely on the assistance of local and state police, [15] install temporary metal detectors, erect fencing for crowd control, and check student identification.

The Court finds that SJP has made a clear showing that it is likely to succeed on the merits, that it will be able to demonstrate that the University's actions in revoking its planned event for October 7 amounted to an unconstitutional denial of SJP's First Amendment rights.

### 2. Irreparable Harm

The second factor that SJP must clearly show in its quest for a preliminary injunction is that it is likely to suffer irreparable harm if the injunction is not issued permitting its planned event for October 7 to go forward. The University suggests that October 7 is clearly a date deliberately intended to stir the ire of pro-Israel groups and gloss over and minimize the reportedly savage attacks by Hamas operatives on Israeli settlements and the loss of lives Israel suffered on October 7; it is in effect, in the view of many, a deliberate misappropriation of a date of deep tragedy for Israel.

The Supreme Court has held that chilling speech ipso facto constitutes irreparable injury. As stated in *Elrod v. Burns*, 427 U.S. 347, 373 (1976), "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Moreover, even if pro-Israel groups see October 7 as somehow sacrosanct, it is at least fair argument for pro-Palestine groups to see the date as sacrosanct as well, symbolic of what they believe is Palestine's longstanding fight for the liberation of Gaza. The facts remain—SJP chose the October 7 date, complied with the reservation process, obtained the University's preliminary approval for the date, and then had the approval abruptly taken away. No other date, as SJP sees it, can make the point of their mission quite as forcefully as October 7; to SJP, it is unique. That, in the Court's view, fortifies SJP's claim of irreparable harm over and above the infringement of SJP's First Amendment rights.

### 3. The Equities

**\*12** The third factor a district court must undertake in considering a preliminary injunction is to weigh the harm to the movant if the injunction does not issue against the harm to the non-movant if it does. *See Hughes Network Sys. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 693–94 (4th Cir. 1994) (balance of hardship is vital component in assessing whether to grant preliminary injunctive relief).

In the Court's view, the harm SJP would suffer if the preliminary injunction does not issue is clearcut: It will lose the opportunity to express its grievances and commemorate the loss of life on what it believes is a sacrosanct day. It is not a question of agreeing or disagreeing with SJP's message. *Snyder*, 562 U.S. at 458.

What about harm to the University?

The grave harm the University cites is the potential disruption and violence that it believes will follow if the October 7 event goes forward. The University submits that its decision is a narrowly tailored, neutral time, place, and manner restriction. But in the Court's view the decision of the University to revoke SJP's reservation was clearly neither viewpoint- nor content-neutral. It came about for reasons that the Constitution simply does not countenance: fear of disruption, and anger of opponents. Again, the case authority emphatically rejects these reasons. *See Brandenburg*, 395 U.S. at 447; *Hess*, 414 U.S. at 107–08; *Healy*, 408 U.S. at 194; *Snyder*, 562 U.S. at 458.

From a financial standpoint, of course, the University would seem to suffer little, if any, harm. It regularly allows recognized student groups to hold events on campus, especially at McKeldin Mall, and obviously sees such events as an integral component of campus culture. Still there is a special caution in the circumstances of this case. Experience with similar protests over Gaza in universities and colleges around the country suggests that certain conduct not protected by the First Amendment, e.g., incitement to violence, physical threats and harassment to individuals, disruption of classes, occupation of buildings, encampments, and property destruction, may well be accompaniments to the protests. Moreover, in some Gaza protest-related cases, reportedly at Columbia and CCNY, for instance, the number of non-student protesters who were arrested approached 50% of the total protestors arrested for apparent misconduct. [16]

Allowing that SJP may engage in speech that is protected, controversial though it may be, and despite SJP's claim that only 25 to 50 students will attend, [17] it remains entirely plausible that the University may need to beef up its security personnel (and perhaps seek the assistance of regular law enforcement) in order to maintain order during the protests, as well as to arrange for appropriate personnel to monitor any substantial inflow of non-student protestors and in general to keep the crowd under control. It simply cannot be said with assurance that personal threats, violence, and property damage as a result of campus protests involving Gaza, given recent experience around the country, will not occur. [18] But, as stated before, there are less restrictive alternatives to meet these potential challenges short of suppressing expressive conduct under the First Amendment.

**\*13** While University policy with regard to student-sponsored events may provide that a host student organization remains financially responsible at least for clean-up and almost certainly for the possible cost of enhanced security personnel, *see* Policy VI-4.10(A), the critical point made by Defendants at the hearing on this proposed injunction is that they seek only minimal bond. Dr. Petrillo stated that money was not the concern of Defendants, the safety of students was. Be that as it may, in the Court's view, however laudable, this sentiment simply does not outweigh the importance of the free speech rights of SJP. This is especially so given that Chief Mitchell conceded that, if necessary, additional security assistance can be arranged. The Court finds that the balance of equities as an element of the preliminary injunction analysis favors SJP.

### 4. The Public Interest

The fourth and final factor in a preliminary injunction analysis is the public interest. *The Real Truth About Obama*, 575 F.3d at 346. The Supreme Court has rejected the suggestion that, "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' " *Healy*, 408 U.S. at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

Professor Cass R. Sunstein, in a recent guest essay in *The New York Times*, captured quite well the public interest component of college and university protests prompted by the ongoing conflict in the Middle East:

[F]reedom always deserves the benefit of the doubt. The educational mission does not give colleges the universities a green light to punish speech that their alumni, their donors or influential politicians abhor or perceive as harmful. As Justice Oliver Wendell Holmes Jr. put it, "we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death." [*Abrams v. United States*, 250 U.S. 616, 630 (1919).]

Colleges and universities exist for one reason above all: to promote learning. They are democracy's greatest arsenal. They do not need the unanimity of the graveyard. They need the noisy, teeming pluralism of living communities that search for truth.

Cass R. Sunstein, *Only the First Amendment Can Protect Students, Campuses and Speech*, N.Y. Times (Sept. 6, 2024), https://www.nytimes.com/2024/09/06/opinion/first-amendment-campus-protest.html (last visited Sept. 30, 2024); *see also* note 13 *supra*; *W. Va. State Bd. of Educ. v. Burnette*, 319 U.S. 624, 641 (1943) (Jackson, J.) ("Compulsory unification of opinion achieves only the unanimity of the graveyard."); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."). The University cannot justify a ban by reference to its educational mission. *See id.* at 829.

The Court embraces Professor Sunstein's statement as a reasonable articulation of the public interest element of its preliminary injunction analysis.

\* \* \*

Summing up, while speech and slogans by SJP will be permitted on October 7, any negative conduct not protected by the First Amendment will not be—including any incitement to imminent violence, physical or verbal threats, impeding access of any students to class or buildings, property damage of any sort, the occupation of buildings, encampments, and, in general, defiance of reasonable crowd control measures employed by security personnel. Violators may be subject to arrest and/or ouster from the campus. The University's policy requirements with respect to campus events as they presently stand will apply in full. [19]

 **\*14** Nothing in this Opinion or in the Preliminary Injunction that accompanies it, however, is intended to preclude the University from banning expressive activity in the Maryland system outside the College Park campus on this upcoming October 7. That matter, however, may be revisited in the future course of these proceedings.

But, at the end of the day, SJP's Motion for Preliminary Injunction will be **GRANTED**. For now, its request to remove the ban outside the College Park campus on this October 7 will be **DENIED WITHOUT PREJUDICE**.

### VI. SECURITY

Federal Rule of Civil Procedure 65(c) requires a bond before a court may issue a preliminary injunction:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

While the bond is mandatory, the court has discretion to set the bond amount and may set a nominal amount or even set the amount at zero. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 & n.3 (4th Cir. 1999); *District 17VMWA v. A&M Trucking*, 991 F.2d 108, 110 n.2 (4th Cir. 1993). The purpose of a bond is two-fold:

(1) it assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured, and (2) it provides the plaintiff with notice of the maximum extent of its potential liability, since the amount of the bond "is the limit of the damages the defendant can obtain for a wrongful injunction, ... provided the plaintiff was acting in good faith."

*Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989) (footnote omitted) (quoting *Coyne-Delany Co. v. Cap. Dev. Bd. of Ill.*, 717 F.2d 385, 393 (7th Cir. 1983)). The amount of the bond is intended to secure costs and damages that might be sustained by reason of wrongful issuance of the preliminary injunction, not for damages that depend on the outcome of the merits. *See Lever Bros. Co. v. Int'l Chem. Workers Union*, 554 F.2d 115, 120 (4th Cir. 1976). "The amount of the bond ... ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst*, 174 F.3d at 421 & n.3. Generally, though, courts are cautioned to "err on the high side" because "damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000).

Ordinarily, given that a reasonable prospect of violence and destructive conduct might occur, *see supra* note 18, a bond in some reasonable amount would be appropriate. *See, e.g.*, *St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 383 (D. Md.) (Hollander, J.), *aff'd*, 2021 WL 6502220 (4th Cir. 2021). Defendants, however, have expressly stipulated to a nominal or *de minimis* bond, so the Court will not explore the issue further. The Court will set a bond in the amount of $2,500 dollars.

This Preliminary Injunction will not take effect unless and until the requisite bond is filed and approved by the Court.

The Court, of course, retains jurisdiction over the case as it progresses through its next phases.

A separate Order follows.

**All Citations**

Slip Copy, 2024 WL 4361863

---

### Footnotes

1    The Court relies on affidavits and exhibits referenced in the pleadings of the parties, as well as the live testimony and exhibits adduced at the hearing on Plaintiff's request for Preliminary Injunction on September 30, 2024.

2    Groups outside of Maryland consider USM and its Board's commitment to free speech to be an adoption of the *Chicago Principles* (also called the *Chicago Statement*). *See, e.g.*, Am. Council of Tr. & Alumni, *The Chicago Principles: Report of the Committee on Freedom of Expression*, https://www.goacta.org/the-chicago-principles/ [https://perma.cc/ M5EE-3H8H] (last visited Oct. 1, 2024) (noting the USM Board "adopted or affirmed the Chicago Principles or a substantially similar statement"); Found. for Individual Rts. & Expression, *Chicago Statement: University and Faculty Body Support*, https://www.thefire.org/research-learn/chicago-statement-university-and-faculty-body-support (last visited Oct. 1, 2024) (listing USM as the sixty-fifth university or university system having "adopted or endorsed the *Chicago Statement* or a substantially similar statement"); *cf.* Off. of Gen. Couns., Univ. of Md., *Freedom of Speech on Campus*, https://ogc.umd.edu/freedom-of-speech (last visited Oct. 1, 2024) ("As the University of Chicago's Kalven Report on the University's Role in Political and Social Action stated, 'the university is the home and sponsor of critics; it is not itself the critic.' ").

3    SJP disclaims any relationship with National Students for Justice in Palestine ("National SJP"). That is a proposition yet to be determined. SJP is registered with UMCP under the name "Students for Justice in Palestine UMD Chapter," and in its mission statement calls itself "Students for Justice in Palestine, University of Maryland College Park chapter." *See* Students for Justice in Palestine UMD Chapter, https://terplink.umd.edu/organization/students-for-justice-in-palestine-umd-chapter [https://perma.cc/7BJX-274E]. A *chapter* is defined as a "local part of a larger organization." *Chapter*, *Black's Law Dictionary* (12th ed. 2024). Given SJP's registration as a "chapter" of Students for Justice in Palestine, the Court understands, at least at this preliminary phase of the proceedings, that SJP (at UMCP) is affiliated with National SJP.

4    SJP did not append a copy of its reservation request to its Complaint, but a copy was subsequently submitted to the Court at its request. *See* ECF No. 23.

5    Jewish Voice for Peace at the University of Maryland (@jvp_umd), Instagram, https://www.instagram.com/p/C_bZtiFPLG8/?img_index=3 (last visited Sept. 30, 2024) [https://perma.cc/YM7D-553H].

6    End Jew-Hatred Campus, *Stop Terror on Campus: Urge Universities to Ban Antisemitic Protests on October 7*, Change.org (Aug. 29, 2024), https://www.change.org/p/stop-terror-on-campus-urge-universities-to-ban-antisemitic-protests-on-october-7 (last visited Oct. 1, 2024).

7    *See* JI Staff, *University of Maryland Reverses Decision to Allow Oct. 7 Anti-Israel Protest on Campus*, JewishInsider (Sept. 2, 2024), https://www.yahoo.com/news/university-maryland-reverses-decision-allow-234811554.html [https://perma.cc/QH7X-X33B]; Sam Janesch, *University of Maryland to Block Some Student Events on Oct. 7 Anniversary, Including Vigil for Palestinians*, Balt. Sun (Sept. 3, 2024), https://www.baltimoresun.com/2024/09/02/university-of-maryland-oct-7-anniversary/ [https://perma.cc/J955-35RU].

8    Darryll J. Pines, *Remembering the One-Year Anniversary of October 7, 2023*, Univ. of Md., Off. of the Pres. (Sept. 1, 2024), https://president.umd.edu/articles/remembering-the-one-year-anniversary-of-october-7-2023 [https://perma.cc/97WL-ZXDU].

9    *Student Activism at University of Maryland*, Univ. of Md., Univ. Libraries, https://lib.guides.umd.edu/c.php?g=1110836&p=8162346 [https://perma.cc/VN2Y-7Z6Y] (last visited Sept. 30, 2024).

10   *See Statement from President Joe Biden on International Holocaust Remembrance Day*, White House (Jan. 26, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/01/26/statement-from-president-joe-biden-international-holocaust-remembrance-day-statement-2024/ [https://perma.cc/3ZEA-3KQT].

11   According not SJP's student witness at the Preliminary Injunction hearing, these very words have been spoken several times during the 70 or so events SJP has held at College Park since October 7, 2023.

12   Many people do not realize that the First Amendment does not apply to *private* universities and colleges. *See generally* Cass R. Sunstein, *Campus Free Speech: A Pocket Guide* 81–87 (2024) (Chapter 4: "Public and Private"). Accordingly, some *private* institutions have banned groups such as SJP altogether. Daniel Arkin, *How a Pro-Palestinian Campus Group Became a National Lightning Rod*, NBC News (Nov. 24, 2023), https://www.nbcnews.com/news/students-justice-palestine-became-national-lightning-rod-rcna125420 (last visited Oct. 1, 2024). As a *public* university, the University of Maryland, except perhaps in the most extreme circumstances not present here, does not have this option.

13   There are three kinds of restrictions on speech:

     A viewpoint-based restriction is one that punishes people because of the point of view that they express. For example, such a restriction might say that while students may praise the president of the university, they may not criticize the president of the university. Or it might say that students may not make disrespectful statements about their teachers, with an understanding that respectful statements are permitted (and most welcome).

A content-based restriction is one that targets or punishes people because of the content of their speech. All viewpoint-based restrictions are content-based, but some content-based restrictions are viewpoint-neutral. For example, a university might say that students cannot discuss an ongoing war, whatever they propose to say about it. Or a university might say that students cannot discuss religion over dinner.

A content-neutral restriction applies regardless of what is being said. A "time, place, and manner" restriction would count as content-neutral. For example, such a restriction might say that between the hours of midnight and six AM, no loud talking of any kind will be allowed in dormitories. A content-neutral restriction applies to all points of view, and to know whether it is violated, we do not need to know anything about the content of the relevant speech.

Sunstein, *supra* at 12; *see also* Erwin Chemerinsky & Howard Gillman, *Free Speech on Campus* 111 (2017) (especially Chapter Five: "What Colleges Can and Can't Do").

14    Unpublished opinions of the Fourth Circuit may be cited if persuasive. 4th Cir. Loc. R. 32.1(a).

15    Campus Security Chief David Mitchell, a preeminent authority on campus security, conceded at the hearing that UMPD routinely hired additional security and did so during Israel Fest:

> [THE COURT:] Well, assume a level of violence might come to pass. Do you have the wherewithal to put people out to monitor? Can you call on the local police?

> [CHIEF MITCHELL:] I can.

> * * *

> [THE COURT:] Incidentally, could you, in fact, hire additional security personnel for October 7th?

> [CHIEF MITCHELL:] We could.

> [THE COURT:] Where would you hire them from?

> [CHIEF MITCHELL:] Probably through an organization called CSC. Those are the yellow jackets you see at play contests. You see them around the stadiums. And we have a contract with them, the University does. And we routinely use CSC. And we did on Israel Day.

16    *Protesters Unaffiliated with CCNY, Columbia Made Up Nearly Half of Arrests: Police*, ABC7NY Eyewitness News (May 2, 2024), https://abc7ny.com/columbia-ccny-protesters-arrested-quarter-of-them-not-affiliated-with-schools/14754563/ [https://perma.cc/5CRC-TJD4].

17    At the hearing, SJP did not provide a convincing argument that the event would be or, practically speaking, *could* be limited to 25 to 50 students. It bears noting that USM policy specifically allows student-event holders to invite outside participants. *See* Policy VI-4.10(A)(V)(B).

18    *See, e.g.*, *Photos: Campus Protests Continue Nationwide as Some Turned Violent*, NPR (May 4, 2024), https://www.npr.org/sections/pictureshow/2024/05/04/1248904667/campus-protests-photos [https://perma.cc/5NV8-VPL6]; Ayana Archie, *New York Police Arrest 300 People as They Clear Hamilton Hall at Columbia University*, NPR (May 1, 2024), https://www.npr.org/2024/05/01/1248401802/columbia-university-protests-new-york [https://perma.cc/V79S-6DR9]; Bill Chappell, *Violence Erupts at UCLA as Protests over Israel's War in Gaza Escalate Across the U.S.*, NPR (May 1, 2024), https://www.npr.org/2024/05/01/1248433624/protests-campus-ucla-universities-israel-gaza-palestinians [https://perma.cc/3BND-ANEF]; *UW Must Take Action After Protesters Vandalize Property, Intimidate Students*, Seattle Times (Apr. 18, 2024), https://www.seattletimes.com/opinion/editorials/uw-must-take-action-after-protesters-vandalize-property-intimidate-students/ (last visited Sept. 30, 2024); *'I Assumed I Was Getting Shot At': Dozens Injured After UF Vigil for Israel Erupts in Chaos*, Gainesville Sun

(Oct. 10, 2023), https://www.gainesville.com/story/news/local/2023/10/10/uf-vigil-for-israel-victims-leads-to-dozens-injured-hospitalized/71129088007/ [https://perma.cc/J5EA-26L8].

19    The same liability for negative conduct not protected by the First Amendment would apply to any counter-protestors who might attend the October 7 event. Moreover, free speech does not mean hecklers have the right to shut down campus debate; they do not have a so-called "heckler's veto." *See generally* Sunstein, *supra*, at 42 ("There is no First Amendment right to shout down speakers."); *Terminiello v. Chicago*, 337 U.S. 1, 5 (1949) (holding that the First Amendment protects a speaker whose "speech stir[s] people to anger, invite[s] public dispute, or br[ings] about a condition of unrest"); Hank Reichman, *Thoughts on the "Heckler's Veto,"* Academe Blog (Apr. 14, 2023), https://academeblog.org/2023/04/14/thoughts-on-the-hecklers-veto/ [https://perma.cc/B7LM-EK8N]; Jenny Martinez, *The First Amendment Does Not Give Protesters a Heckler's Veto*, Stanford Mag. (May 2023), https://stanfordmag.org/contents/the-first-amendment-does-not-give-protesters-a-heckler-s-veto [https://perma.cc/ZK2R-CHLF]; Dylynn Lasky, *Overriding the Heckler's Veto*, Bipartisan Pol'y Ctr. (May 16, 2023), https://bipartisanpolicy.org/blog/ overriding-the-hecklers-veto/. "Otherwise, there would always be a heckler's veto. The only speech then we would ever hear is that which is sufficiently noncontroversial that no one wants to stop it." Professor Erwin Chemerinsky, *quoted in* Susan Kelly, *Legal Scholar: Campuses Must Protect Free Speech – Even Hate Speech*, Cornell Chron. (Nov. 21, 2017), https://news.cornell.edu/stories/2017/11/legal-scholar-campuses-must-protect-free-speech-even-hate-speech [https://perma.cc/2T69-YMNT]. This includes shouting down speakers, banging on implements, blocking access to speakers, or otherwise trying to drown out remarks that counter-protesters find unacceptable.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B.

2025 WL 35469

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

ALLY LANDAU, HJSB, HJSC, and JEWS AT HAVERFORD

v.

THE CORPORATION OF HAVERFORD COLLEGE

CIVIL ACTION No. 24-2044

|

Filed 01/06/2025

**MEMORANDUM**

Gerald Austin McHugh United States District Judge

**\*1**  The filing that commenced this action set forth a panoply of complaints, as did an amended version, spread across 430 paragraphs. But a litany of complaints related in a general way to the same subject – in this instance the serious problem of antisemitism – is not the same thing as a legally cognizable complaint pled in accordance with the Federal Rules of Civil Procedure. To survive, a complaint must plausibly set forth facts sufficient to support a recognized cause of action. Applying that standard here, Plaintiffs' complaint falls well short of the mark. I will therefore grant Defendant Haverford's motion to dismiss, albeit with leave to amend.

## I. Standard of Review

Haverford moves for dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), and motions to dismiss under Rule 12(b)(1) are governed by a similar standard set forth in *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). In both instances, the Court must accept as true all material allegations laid out in the complaint and construe those facts in favor of the nonmoving party. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003).

## II. Overview

Following Hamas' attack on Israel in October 2023, the Israel-Palestine conflict has been at the center of public discourse. This debate is especially evocative on college campuses, and Haverford College is no exception.

Plaintiffs Jews at Haverford, Alumni Ally Landau, and two anonymous students [1] (collectively "Plaintiffs") allege that over the past year, Haverford College ("Haverford" or "the College") has become a bastion of antisemitism that is tolerated and at times perpetuated by the College. Am. Compl., ¶¶ 18-21, ECF 14. Plaintiffs contend that they have been personally affected by the eruption of disorder on campus. *Id.* ¶¶ 45-50. Specifically, they state that they have lost friends, faced harassment, been forced to change their routines, and missed out on seminal Haverford experiences because of escalated antisemitism. *Id.* They assert that antisemitism at Haverford has fostered a hostile educational environment in violation of Title VI, and that Haverford has breached certain contractual obligations by failing to deal with campus unrest. *Id.* ¶¶ 404-423.

At this stage, a court would typically review the relevant facts. I cannot cogently do so here due to the sprawling and disorganized character of Plaintiffs' Amended Complaint, which appears to detail every frustration and disagreement of Jewish students

and faculty that has occurred at Haverford over the last year. It spills pages of ink on lengthy frolics about events on other college campuses and about ideological debates. Rather than isolating instances of harassment and logically relating them to the elements of a hostile environment claim, Plaintiffs set forth a running list of grievances that reads more as an opinion editorial than it does a legal complaint.

**\*2**  Some of the instances alleged are concerning, and if pled properly, could perhaps support a cognizable legal claim under Title VI. Yet, the Complaint is diluted by instances that no reasonable person could construe as intentional discrimination. For example, Plaintiffs contend that Haverford did not announce the month of May as "American Jewish History Month," and instead only celebrated "Asian American/Pacific Islander Month." Am. Compl. ¶ 333. Or, Plaintiffs complain that some graduating students at the Spring 2024 commencement donned attire that signified their support for Palestinians – a classic example of protected First Amendment expression. *Id.* ¶¶ 340-344. Elsewhere, Plaintiffs include comments made by a professor who does not even attend Haverford. *Id.* ¶ 189. As a result of Plaintiffs' scattered pleading, any serious allegations of actionable discrimination are buried as needles within a haystack of distraction.

Plaintiffs also dedicate a full eight pages of their Complaint to their effort to link Judaism to Zionism, while simultaneously insisting that they are not asking the Court to resolve any religious issues. *Id.* ¶¶ 56-103. Plaintiffs' equivocation is disingenuous, but likely strategic, seeking to blur the line between Zionism as a political philosophy and Zionism as a component of Jewish identity, and in the process implicitly sweep any and all criticism of Israel into the basket of antisemitism. [2] As a threshold matter, as I have done previously, [3] I reject Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views.

Although Plaintiffs present pockets of compelling facts, the burden is on Plaintiffs to articulate how particular facts support the elements of a legal claim, not to send the Court on a scavenger hunt. As cogently observed by Judge Boudin of the First Circuit, it is not the Court's role, "especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief." *Yeomalakis v. F.D.I.C.*, 562 F.3d 56, 61 (1st Cir. 2009).

## III. Discussion

### A. Standing

As a threshold issue, Plaintiffs narrowly show sufficient Article III standing. To establish standing, a plaintiff must have "1) suffered an injury in fact, 2) that is fairly traceable to the challenged conduct of the defendant, and 3) that is likely to be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs assert that both current and former individual student Plaintiffs have standing to seek damages. Opp'n to Mot. to Dismiss, at 21-22, ECF 23 ("Mem. in Opp'n"). The record is thin as to the specific injuries incurred by the individual Plaintiffs and whether those injuries are of the sort that could be financially compensated, the sole relief available. [4] The Amended Complaint, however, generally sets forth several instances that, if experienced by these individual Plaintiffs, would reasonably demonstrate injury in fact. The individual Plaintiffs also plainly allege that they were "injured" by the College's deliberate indifference to antisemitic harassment on campus. Am. Compl. ¶¶ 46-48, 416-417, 422; *see also Ballentine*, 486 F.3d at 810 (citing *Lujan*, 504 U.S. at 561) ("general factual allegations of injury may suffice."). I therefore find that the individual student Plaintiffs have standing to seek damages. *See also Kestenbaum v. President & Fellows of Harvard Coll.*, No. 24-10092, 2024 WL 3658793, \*4 (D. Mass. Aug. 6, 2024) (finding that a graduated student had standing to seek monetary relief for a Title VI hostile environment harassment claim based on antisemitism).

**\*3**  Jews at Haverford also has standing to pursue injunctive relief at this juncture. An association has standing to sue on its members' behalf when (1) at least one of its members would have standing to sue individually, (2) the interests it seeks to

protect are "germane to the organization's purpose," and (3) the claims and types of relief requested do not require individual participation of the members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-343 (1977). Plaintiffs aver that "Jews at Haverford" is an "unincorporated association consisting of Jewish students and faculty at Haverford College, as well as Haverford alumni and parents of students and alumni, who are Jewish and share a commitment to the existence of Israel as a Jewish state." Am. Compl. ¶ 45. Although Plaintiffs provide no additional detail on the association, or its membership, structure, or functions, despite several hundred pages of briefing, at this stage I am bound to accept Plaintiffs' factual representations. [5]

Jews at Haverford nominally satisfies each of the three criteria for associational standing. First, at least one member of Jews at Haverford would have standing to sue in their own right, assuming that at least one person in the association experienced antisemitic harassment and notified the College. Second, as a group allegedly comprised of Jewish Haverford community members dedicated to the existence of Israel, holding the College accountable for the spread of antisemitism where it intersects with anti-Zionism is surely "germane to the organization's purpose." *Hunt*, 432 U.S. at 343. Finally, because Jews at Haverford seeks only injunctive relief, the association could litigate most claims without the participation of individual members, supporting the grant of associational standing. *See Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 284 (3d Cir. 2002) (suits for injunctive relief often require less individual involvement than would a suit for monetary relief, making injunctive relief actions better suited for associational standing).

I will therefore deny Defendant's Motion to Dismiss under 12(b)(1).

### B. Title VI Hostile Environment

Plaintiffs claim that Haverford created a hostile environment in violation of Title VI by failing to act, or at times choosing not to act, in the face of widespread antisemitism on campus. Am. Compl. ¶¶ 17-19. Although Title VI broadly protects students on federally funded college campuses from antisemitic discrimination, Plaintiffs fail to plead all required elements of the hostile environment claim they seek to articulate. Accordingly, I will dismiss their Title VI claim with leave to amend.

*1. Title VI Applies to Antisemitic Harassment*

On its face, Title VI does not address discrimination on the basis of religion. But there is ample precedent classifying antisemitic harassment and discrimination as tantamount to racial discrimination. *See, e.g. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (finding that "the Court of Appeals erred in holding that Jews cannot state a § 1982 claim against other white defendants"); *T.E. v. Pine Bush Central School Dist.*, 58 F.Supp.3d 332, 354-355 (S.D.N.Y. 2014) (holding that "regardless of whether they assert their claims on 'national origin' or 'race,' Plaintiffs are within their rights to assert a claim under Title VI based on anti-Semitic discrimination."). The Department of Education's Office of Civil Rights has also advised that Judaism is akin to race in specific instances where attacks are levied on "shared ancestry or ethnic characteristics." U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics (Nov. 7, 2023). I conclude therefore that Title VI applies. How to apply it is a far more complex question.

**\*4** As noted above, Plaintiffs posit that Zionism is "a central tenant of Judaism" under the purview of Title VI, whereas Haverford proposes that Zionism is merely a political belief unprotected by Title VI. Am. Compl. ¶ 57; Mot. to Dismiss, at 11, ECF 17. [6] For purposes of legal analysis, resort to such generalities is not useful, because the many meanings of "Zionism" make its relationship to Judaism extremely complex, [7] made all the more complicated by strong emotions incited by strife in the region, and by the broad diversity of opinion within the Jewish population itself. [8] Deciphering when criticism of Israel or promotion of the Palestinian cause veers into antisemitism is necessarily a fact specific endeavor, and on that score Plaintiffs' complaint is insufficiently pled.

*2. Plaintiffs do not plead facts supporting aggregation of their claims, and
as a result, fail to plausibly establish the existence of a hostile environment*

Courts in this Circuit recognize the "hostile environment" theory of Title VI [9] suits for intentional discrimination. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 n. 5 (3d Cir. 2001). [10] A plaintiff raising a hostile environment claim must show that 1) they experienced harassment that was "so severe, pervasive, and objectively offensive" that it deprived the victim of access to an educational activity or benefit, and 2) that the school was "deliberately indifferent" to known acts of harassment. [11] *Davis, as Next Friend of LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999).

To determine whether a hostile environment exists, courts consider whether the alleged conduct was sufficiently severe or pervasive. *See Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (conduct need only be severe *or* pervasive, not necessarily both); *see also Yael Canaan v. Carnegie Mellon Univ.*, No. 23-2107, 2024 WL 5145899, at *11 (W.D. Pa. Dec. 17, 2024). One particularly offensive instance may be sufficiently severe. On the other hand, multiple less egregious instances over time might evince sufficiently pervasive harassment. Mere name calling or one-off instances of moderate bullying will not suffice, nor will simple disagreement with educators' management decisions. *Davis*, 426 U.S. at 651-652. In determining whether a hostile environment exists, courts should consider the totality of the circumstances. *Castleberry*, 863 F.3d at 264.

A typical hostile environment claim considers the totality of a single individual's circumstances, such as the frequency of the harassing conduct, its severity, and whether it was physically threatening or humiliating, or instead an offensive utterance. *See Saxe*, 240 F.3d at 205. Here, however, Plaintiffs attempt to aggregate the experiences of many Jewish people at Haverford to paint the picture of a hostile environment endured collectively by all Plaintiffs. In fact, Plaintiffs specifically represent that it is the "environment, rather than any individual acts of harassment" that create a right of action. Mem. in Opp'n, at 36.

 **5** Courts are split as to whether multiple Plaintiffs may aggregate individual instances of harassment to establish a hostile environment. Absent Third Circuit precedent on this question, both parties cite the Sixth Circuit opinion in *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714 (6th Cir. 2012). In *Berryman*, a group of African American employees sued their employer under Title VII for a hostile work environment based on multiple employees' allegations about multiple different race-based incidents. *Id.* at 716. The Sixth Circuit applied a totality of the circumstances test, much like the test in the Title VI context, [12] and concluded that courts may aggregate claims from multiple plaintiffs to determine whether a hostile environment exists, even where those claims were not directed at or experienced by the same plaintiff. *Id.* at 718.

But *Berryman* further held that aggregation is *only* permitted where a plaintiff shows that they were personally aware of the specific instances of harassment alleged by other employees. *Id.* at 719. The Sixth Circuit reasoned that courts may not infer collective knowledge where plaintiffs operate in a large space with multiple buildings. *Id.* ("In a physically large and partitioned workplace like the separated warehouses in this case, it is inappropriate for us to infer that Plaintiffs perceived events they did not discuss in their depositions."). While a plaintiff does not need to be the target of or a witness to a specific instance of harassment for that instance to be considered in evaluating the presence of severe or pervasive harassment, a plaintiff does need to "marshal basic evidence" to show that they knew about it. *Id.*

Yet in seeking aggregation here, Plaintiffs do not provide any facts that could support a finding that each plaintiff was aware of the other acts of harassment alleged. [13] Plaintiffs simply aver that "Haverford is a small and intimate campus, of approximately 1400 students in all years. The events described in the FAC were known virtually universally, and certainly among the Jewish students at whom they were directed." Mem. in Opp'n, at 35. Such conclusory assertions of collective knowledge are insufficient to show individual knowledge on behalf of each Plaintiff.

To take one example, it is unclear who witnessed a professor's alleged comments that he would not write recommendation letters for any student seeking to study Judaism or study in Israel. Am. Compl. ¶ 303. Further, it is unclear who the student

that initially heard the statement then told, which of the named Plaintiffs knew of that incident, and when each Plaintiff was made aware, if ever. There is no allegation, for example, that Jews at Haverford organizationally had any channel for sharing such information. The entire complaint suffers from similar deficiencies as to the spread of information about instances that purportedly created a hostile environment.

Absent clear factual pleadings as to who knew what and when they knew it, Plaintiffs cannot show that each Plaintiff was aware of each instance of harassment alleged, and as such may not aggregate their claims to demonstrate the presence of a hostile environment. Without aggregation, the vast majority of Plaintiffs' claims in isolation are not sufficiently severe or pervasive to constitute a hostile environment under Title VI.

### 3. Plaintiffs do not show that Haverford was aware of each episode of harassment, but responded with indifference

**\*6**  Even if one or more of Plaintiffs' allegations was sufficiently severe or pervasive to constitute actionable harassment, Plaintiffs still fail to plead facts that would allow the Court to evaluate whether Haverford both knew about the harassment and acted with deliberate indifference – a critical element of a hostile environment claim. Specifically, Plaintiffs do not set forth clearly, for each instance in the Amended Complaint, who complained to whom, if so, about what, and when. [14]

Harassment perpetrated by a student or teacher is only actionable where the school's action or lack thereof constitutes "deliberate indifference." *Davis*, 526 U.S at 642. A school may not be held liable for harassment based on a respondeat superior theory. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). Instead, a school can only be liable for harassment where its indifference effectively "caused" the discrimination. *Davis*, 526 U.S at 642. Logically, therefore, a central element in pleading deliberate indifference for a Title VI claim is that administrators knew about the incidents that allegedly comprise the hostile environment, because a school's conduct can only be evaluated in light of *known* circumstances. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012)); *see also StandWithUs Ctr. for Legal Justice v. Mass. Inst. of Tech.*, No. 24-10577, 2024 WL 3596916 (D. Mass. July 30, 2024) (holding that a university's unsuccessful efforts to contain escalating-on campus protests were insufficient to show deliberate indifference, based on what they knew at the time).

Additionally, a school can only act with deliberate indifference where the administrators with notice have authority to act. In other words, the administrator must be in a position to exercise "substantial control over both the harasser and the context in which the known harassment occurs." *See Davis*, 526 U.S. at 645 ("Only then can the [school] be said to 'expose' its students to harassment or 'cause' them to undergo it.").

Of the 430 paragraphs in the Complaint, only twice do Plaintiffs plead that someone put administrators on notice of allegedly discriminatory conduct, and in neither case would Haverford's response meet the legal standard for deliberate indifference. In the first instance, Plaintiffs objected to a public statement by Dean McKnight, which, according to Plaintiffs, "compared the butchery of Jews in Israel by a known terrorist group committed to eradicating the Jewish State and slaughtering all the Jews within it to a 'hurricane' or other natural disaster." Am. Compl. ¶ 118. Plaintiffs state that "a Jewish student leader complained," presumably to Dean McKnight himself, though the Complaint does not specify, who then responded, "I got emails from all different individuals; I can't make everyone happy." *Id.* Assuming that the Dean failed to meet the moment in how he responded to the butchery of Hamas, students' disappointment with an administrator's choice of words, even deeply felt disappointment, cannot be deemed deliberate indifference. For the Supreme Court has made clear school administrators are accorded wide latitude in matters of campus governance. *See, e.g., Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

**\*7**  Second, Plaintiffs aver that posters advertising a Shabbat dinner and a discussion of Jewish identity were torn down, Am. Compl. ¶ 160, an incident easily construed as antisemitic. The allegations regarding this incident provide the *most* detail as to whether anyone complained to administrators, yet still fall short of what proper pleading would demand.

The Plaintiffs aver that "a Jewish leader and several Jewish students complained to the Haverford administration and asked that this be investigated." *Id.* ¶ 161. Once again, however, the Amended Complaint omits any information as to when students complained, whether the request to investigate was formal or informal, or which administrator received the complaint(s). Ironically, while Plaintiffs contend that "no member of the Haverford Administration publicly acknowledged the intentional destruction of the posters," *id.*, the *very next* paragraph of the Amended Complaint contradicts that, averring that that President Raymond issued a statement, saying that if there had been a "targeted removal" of any materials based on their promotion of Jewish activities, that would be "a clear case of antisemitism." *Id.* ¶ 162.

Plaintiffs then assert that an alleged perpetrator later identified himself, referencing a tweet that a Haverford student posted on his pseudonymous, personal Twitter account, which reads "I be tearing down Chabad posters and eating them like f*ckin fruit rollups." *Id.* ¶ 163. Plaintiffs repeatedly state that the student was never punished, and even won a student-selected award at graduation. *Id.* ¶¶ 7, 164, 349-356. Importantly, however, Plaintiffs do not plead that the alleged perpetrator was identified at any point to administrators, or that any administrator was made aware of his tweet. Title VI does not incorporate a common law negligence standard of "should have known." It requires that Haverford had actual knowledge of antisemitic conduct which it then ignored. Taking insinuation out of the equation, on the record as it stands, Plaintiffs have pleaded that there was a reprehensible incident followed by public condemnation from the College President, allegations that fall well short of pleading deliberate indifference.

For all remaining incidents in the Amended Complaint, the Court is left to wonder whether a complaint was lodged, and if so, whether the complaint was made to someone with authority to remedy the situation. For example, Plaintiffs include a series of tweets made by Haverford Professor Guangtian Ha, one of which reads "[t]he state of Israel must be dismantled and the society de-Nazified. Arms embargo, sanction, boycott, attack Zionism on all fronts. Zionism is Nazism, it is fascism. Zionists are racists." Am. Compl. ¶ 182. Yet, nowhere do Plaintiffs assert any facts to show that anyone with remedial authority at Haverford was ever made aware of the tweets. Elsewhere, Plaintiffs allege that anonymous posters reading "from the river to the sea" were hung around campus. Am. Compl. ¶ 147. But Plaintiffs do not state for how long the posters remained up, whether any administrators saw the posters, or whether anyone complained to administrators about the posters. In both instances, the dearth of information as to whether and when administrators with remedial authority were put on notice of alleged harassment makes it impossible to discern whether Haverford acted with deliberate indifference – a fundamental element of a hostile environment claim.

**\*8** Ultimately, Plaintiffs repeatedly fail to show that they endured severe or pervasive harassment, either through their own experiences or through their awareness of others' experiences, that the College had notice of the alleged harassment, and that its response or lack of response can be considered deliberate indifference. Because Plaintiffs do not plead the elements of a Title VI hostile environment discrimination claim, dismissal is warranted.

### C. Contract Claims

Plaintiffs also raise several breach of contract claims grounded in assorted College policies. To state a claim for breach of contract, a plaintiff must "set forth facts regarding (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages.*" Doe v. Haverford Coll.*, 656 F.Supp.3d 540, 545 (E.D. Pa. 2023) (citing *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010)). Under Pennsylvania law, relationships between private colleges and their students are contractual in nature. *Kimberg v. Univ. of Scranton*, No. 06-1209, 2007 WL 405971, at *3 (M.D. Pa. Feb. 2, 2007) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)). "Written guidelines, policies, and procedures" distributed to students over the course of enrollment may constitute the terms of such contracts. *Id.*

A plaintiff suing a private college for breach of contract must assert allegations that "relate to a specific and identifiable promise that the school failed to honor." *David v. Neumann Univ.*, 187 F.Supp.3d 554, 558 (E.D. Pa. 2016); *see also Miller v. Thomas Jefferson Univ. Hosp.*, 908 F.Supp.2d 639, 655 (E.D. Pa. 2012) (a plaintiff must "point to *specific* undertakings in the [contract] that were not provided.") (emphasis added). When interpreting university policies as contracts, each provision must be read in

the context of the larger policy – a plaintiff may not cherry-pick helpful language and disregard the rest. *Murphy v. Duquesne Univ. Of The Holy Ghost*, 777 A.2d 418, 432 (Pa. 2001) ("the parties' contractual intent cannot be gleaned by ignoring all but one sentence in the Contract, and then reading that sentence out of context."). Finally, a plaintiff may not enforce a policy to which they are merely a third party, such as a promise from the college to some other student, absent a specific intention to grant third party enforcement authority. *Guy v. Liederbach*, 459 A.2d 744, 751 (1983).

### *1. Social Media Policy*

Looking first to the social media policy, Plaintiffs fail to identify a specific undertaking that is relevant to any of the facts alleged. Plaintiffs quote several lines from the Policy that appears to govern any social media use on campus, and then broadly allege that these instructions are "systematically violated on a recurring basis by students who have attacked Jewish students at Haverford who support Israel or who attend religious services...". Am. Compl. ¶¶ 144-145. But Plaintiffs omit language just a few lines above the quoted text that the Policy applies *only* to "faculty, staff, and students who administer or contribute to *official Haverford College-related social media channels.*" Mot. to Dismiss, Ex. 4, at 2 (emphasis added). A contractual term must be read in its context. *Murphy*, 777 A.2d at 432. Such sleight of hand erodes not just the plausibility of the claims advanced but also Plaintiffs' credibility. Because none of Plaintiffs' allegations involving social media involve official Haverford-related social media channels, this policy is irrelevant, and no breach of contract exists.

### *2. Poster Policy*

 **\*9** Plaintiffs' breach of contract claim as to the Haverford Poster Policy similarly fails to articulate a specific actionable promise between Haverford and Plaintiffs. The Poster Policy in relevant part provides that "[t]he posters and other small notices must contain the name of the sponsor(s). An e-mail address where the sponsor can be reached should also appear on the notice." Am. Compl. ¶ 146. Plaintiffs then include a photo of an anonymous poster reading "from the river to the sea Palestine will be free," accurately pleading that the anonymous poster fails to include contact information in violation of the Policy. Am. Compl. ¶ 147. But Plaintiffs point to no undertaking by Haverford as to enforcement of the Poster Policy. Rather, the remedy that the policy explicitly provides is one of self-help: "any member of the community may take down any posting that is in violation of this policy." *See* Mot. to Dismiss, Ex. 5, ¶ 4(d). An offended student could instantly remove it. As a contractual matter, the Poster Policy is more in the nature of an agreement between Haverford and those who seek to hang posters, setting forth the conditions under which posters may be displayed, not a promise to those who might see them. Plaintiffs dedicate eight paragraphs to exploring the import of the phrase on the poster, ranging from analogies to confederate flags to White House statements in response to October 7th. But the offensiveness of the phrase to students of Jewish heritage has no bearing on the legal question of whether the policy creates an enforceable contract, and I am compelled to conclude that it does not.

### *3. Scope of Expressive Freedom*

Plaintiffs' breach of contract claims based upon the "scope of expressive freedom" also lack specificity, for Plaintiffs do not articulate which specific language or policy is at issue, nor which conduct is at issue. Am. Compl. ¶ 419. Plaintiffs include three block quotes, each from a different Haverford policy, that provide in general terms that students have a right to protest and express their views, subject to an obligation to respect the dignity of others. Am. Compl. ¶¶ 122-124. A generalized assurance is not the same as a specific contractual promise. Plaintiffs do not articulate any specific instances that demonstrate a clear violation of any of the three excerpts which seemingly make up Plaintiffs' "scope of expressive freedom" claim. On the one hand, Plaintiffs plead no instances where they attempted to protest and were denied the opportunity. On the other hand, that Haverford allowed protests counter to Plaintiffs' interests to proceed on campus only shows that the College was abiding by its own policies on expressive freedom. Thus, absent more specific pleading as to a precise policy provision at issue and one or more specific instances that demonstrate a violation, Plaintiffs' claim fails.

*4. Non-discrimination Statement*

Finally, Plaintiffs allege that Haverford breached its "Non-discrimination statement." Plaintiffs include the following excerpt:

> Haverford College is committed to providing an employment and educational environment free from all forms of unlawful discrimination because of race, color, sex/gender (including pregnancy, childbirth, related conditions, and lactation), religion, age, national origin, ancestry, citizenship, disability, status as a medical marijuana cardholder, genetic information, gender identity or expression, sexual orientation, current or past membership or service in the U.S. Armed Forces or a state military unit, or any other characteristic protected by law.

Am. Compl. ¶ 121. Beyond broadly referencing the other 278 pages of their Amended Complaint and its exhibits, Plaintiffs do not articulate in which specific instances they believe Haverford violated this policy. A college non-discrimination policy *can* constitute a contractual obligation where a plaintiff pleads specific facts surrounding the policy and its alleged violation. For example, in *Kestenbaum*, a case in which a Jewish graduate student sued Harvard University for alleged antisemitic harassment, the Court held that plaintiff Kestenbaum's breach of contract claim predicated on Harvard's nondiscrimination policy survived a motion to dismiss. *Kestenbaum*, 2024 WL 3658793, at *8. But Kestenbaum's pleadings were far more specific as to how the precise policy at issue was allegedly breached. For example, he cited to the provisions in Harvard's policy that establish complaint procedures regarding instances of discrimination. *Id.* Kestenbaum then articulated two distinct instances where he properly launched a complaint and where Harvard allegedly failed to follow their own procedures, laying out the precise flaw in Harvard's behavior for each complaint. *Id.* Thus, Kestenbaum's "cognizable breach of contract theory" was that "Harvard failed to follow the complaint-handling procedures that the Policies prescribe," not that Haverford broadly violated its non-discrimination policy. *Id.*

 **\*10** Here, in stark contrast, Plaintiffs summarily refer to their multiple allegations of discrimination and deem that sufficient to establish a breach of the antidiscrimination policy. This hardly suffices to plead breach of contract.

It is also worth noting that an element of a claim for breach of contract is the requirement that "a plaintiff must set forth facts regarding...resultant damages." *McShea*, 995 A.2d at 340. Not a single paragraph in the entire Amended Complaint references any injury stemming directly from Haverford's alleged breaches of contract. Thus, Plaintiffs' pleading deficiency is two-fold.

Because none of Plaintiffs' breach of contract claims meet the requisite pleading standard, they will be dismissed.

## IV. Conclusion

For the reasons set forth above, the motion to dismiss will be granted on 12(b)(6) grounds. The Court does not doubt that reactions to events in Israel and Palestine have created many uncomfortable moments for Jewish students at Haverford, as on other campuses. But that does not by itself create a violation of federal law. Plaintiffs seek to advance a specific legal theory under Title VI, and that comes with the obligation to comply with federal pleading standards. Plaintiffs have already availed themselves of the opportunity to amend as of right in response to Haverford's first motion to dismiss. This dismissal will be without prejudice, but if counsel chooses to file a second amended complaint, he would be well advised to file a tailored pleading that directly and specifically addresses the elements of the claims he advances, to the extent that he can do so in compliance with the obligations imposed by Federal Rule of Civil Procedure 11.

**All Citations**

Slip Copy, 2025 WL 35469

---

**Footnotes**

1    The two anonymous students, HJSB and HJSC, are permitted to proceed under pseudonym in public-facing filings for the duration of this litigation. *See* ECF 29.

2    Haverford's briefing also suffers from a lack of nuance in failing to distinguish different types of Zionism or anti-Zionism, because in current usage "Zionism" can hold many different meanings. This serves Defendant's strategic purpose of deeming Zionism strictly a political philosophy, implicitly denying it can, depending on context, constitute an element of Jewish identity.

3    *Tannous v. Cabrini Univ.*, 697 F.Supp.3d 350, 367, n. 10 (E.D. Pa. 2023) (upholding termination of professor by university concerned by tone and content of social media posts about Israel).

4    Only compensatory damages would be available in this case, as emotional distress and punitive damages are not available under Title VI or in contract law. *See Barnes v. Gorman*, 536 U.S. 181, 187-188 (2002) (as to punitive damages); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221-222 (2022) (as to damages for emotional distress).

5    The Court cautions Plaintiffs that should information arise in subsequent discovery that casts doubt on the existence of Jews at Haverford as an active membership association, this Court may sua sponte revoke its finding of Article III standing.

6    Page numbers refer to ECF pagination.

7    Some of those complexities, for example, are captured by a general summary created by The Anti-Defamation League. (Sep. 1, 2016), www.adl.org/resources/backgrounder/zionism.

8    I accept that a commitment to the existence of a Jewish state – though notably not a *carte blanche* endorsement of any activity of the State – is a piece of ethnic identity for many (though not all) Jewish people.

9    Title VI of the Civil Rights Act provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

10   District courts in this Circuit analyzing Title VI hostile environment claims frequently cite *Whitfield v. Notre Dame Middle Sch.*, 412 Fed. Appx. 517 (3d Cir. 2011), even though it is nonprecedential.

11   This assumes that the Plaintiff has already made a showing that they are a member of a protected class under Title VI and that they were qualified for the relevant educational opportunities.

12   Hostile environment claims originated in Title VII workplace harassment context. *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) (for something to constitute harassment under a "hostile environment" theory, it must both 1) be viewed as harassment by the victim and 2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment). Title VI hostile environment claims often reference and incorporate caselaw from Title VII.

13    Due to the anonymous nature of much of the pleadings, apart from Ally Landau's alleged instances, Plaintiffs do not specify what each plaintiff experienced or witnessed, nor what each respective plaintiff knew about other alleged instances.

14    The Amended Complaint broadly states that there are "several students who have explicitly brought complaints of this antisemitic behavior," and that there was a "large volume of complaints from Jewish students, parents, and alumni." Am. Compl. ¶¶ 316, 310. These sweeping statements do not indicate which instances were complained about, whether the person who heeded the complaint had authority to act, and whether any complaint procedure was properly followed.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    10