UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
REBECCA GARTENBERG, PERIE                                         :
HOFFMAN, JACOB KHALILI, GABRIEL                                   :
KRET, TAYLOR ROSLYN LENT,                                         :
BENJAMIN MEINER, MICHELLE MEINER,                                 :
MEGHAN NOTKIN, GILA ROSENZWEIG,                                   :
and ANNA WEISMAN,                                                 :
                                                                  :
                         Plaintiffs,                              :
                                                                  :
              -v-                                                 :              24 Civ. 2669 (JPC)
                                                                  :
THE COOPER UNION FOR THE                                          :              OPINION AND ORDER
ADVANCEMENT OF SCIENCE AND ART,                                   :
                                                                  :
                         Defendant.                               :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Harakat al-Muqawama al-Islamiyya—better known as Hamas—is a federally designated

terrorist organization based in the Gaza Strip.  On October 7, 2023, Hamas and its affiliates

launched a deadly terror attack on neighboring Israel, which coincided with the Jewish holidays

of Shemini Atzeret and Simchat Torah.  Armed with assault rifles, grenades, and rocket launchers,

Hamas militants hunted down the residents of Israeli border communities and concertgoers at an

outdoor music festival.  Within hours, Hamas slaughtered hundreds of men, women, and children

in what then-Secretary of State Antony J. Blinken described as "the largest massacre of Jews since

the Holocaust."[1]  Hamas also kidnapped around 250 people, including twelve Americans, some of

whom are still being held hostage as of this writing.

_____

        [1] U.S. Dep't of State, *Anniversary of October 7th Attack* (Oct. 7, 2024), available at
https://2021-2025.state.gov/anniversary-of-october-7th-attack/ (last visited Feb. 5, 2025).

The Hamas massacre and Israel's subsequent assault on Gaza unleashed a wave of campus antisemitism at colleges and universities across the United States.  The Cooper Union for the Advancement of Science and Art ("Cooper Union"), a private college located in New York City, was no exception.  On October 23, 2023, pro-Palestinian students defaced the colonnade windows of Cooper Union's Foundation Building—a building that housed the school's administrative offices, a number of classrooms, and the school's only library—with signs that described Jews as "settlers" and justified Hamas's massacre as a "counterattack."  Posters hung up by Jewish students with the names and photographs of those whom Hamas had abducted on October 7, meanwhile, were vandalized and torn down.  Then, on October 25, 2023—just a couple weeks after Hamas's attacks—around one hundred students staged a walk-out that was punctuated by chants like "resistance is justified when people are occupied," "it is right to rebel, Israel go to Hell," "there is only one solution: intifada revolution," and "from the river to the sea, Palestine will be free."  And Jewish students later found the phrase "from the river to the sea" scrawled in Spanish on a bathroom stall with lettering that resembled the font used on the front cover of *Mein Kampf*.

But the worst occurred hours after the October 25 walk-out.  At about 4:00 p.m. that day, the demonstrators stormed into the Foundation Building, shoving past the campus security guards standing watch.  After first attempting to locate Cooper Union's president, the mob descended on the building's library, where a group of students wearing recognizably Jewish attire were sheltering behind locked doors.  The demonstrators surrounded the library and proceeded to bang loudly on the library's doors and on its floor-to-ceiling glass windows, shouting demands to be let in and continuing to direct anti-Israel slogans and waive a Palestinian flag at the Jewish students inside the library.  During the roughly twenty-minute ordeal, Cooper Union's administrators did nothing to disperse the protestors and instead directed law enforcement to stand down, even as the

college's president had just escaped the building through a back exit. None of the protestors subsequently faced any discipline.

In this civil rights action against the college, Rebecca Gartenberg and a group of other Jewish Cooper Union students (collectively, "Gartenberg")[2] allege that they suffered a hostile educational environment on the basis of their national origin. Gartenberg asserts a federal claim for deliberate indifference to national-origin harassment under Title VI of the Civil Rights Act of 1964, as well as statutory claims under the New York State Human Rights Law, the New York Civil Rights Law, and the New York City Human Rights Law. She also brings a claim for breach of contract based on Cooper Union's alleged failure to enforce its disciplinary policies and a number of common law tort claims arising out of the hostile environment she claims Cooper Union failed to address. Cooper Union now moves to dismiss Gartenberg's Complaint in full for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and to strike her requests for punitive damages and injunctive relief.

For the following reasons, the Court denies Cooper Union's motion as to Gartenberg's civil rights claims and a portion of her contract claim, grants the motion as to other portions of her contract claim and as to her common law tort claims, and declines to strike her requests for punitive damages and injunctive relief.

## I. Background

The facts relied on throughout this Opinion and Order are based on allegations contained in Gartenberg's Complaint and on documents referred to in the Complaint. *See* Dkt. 1 ("Compl."). In assessing Cooper Union's motion to dismiss under Rule 12(b)(6), the Court is required to

---

[2] The other students named as Plaintiffs in this action are Perie Hoffman, Jacob Khalili, Gabriel Kret, Taylor Roslyn Lent, Benjamin Meiner, Michelle Meiner, Meghan Notkin, Gila Rosenzweig, and Anna Weisman.

assume that all well-pleaded facts in the Complaint are true and view them in the light most favorable to Gartenberg's claims. *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015). At this stage in the proceedings, the Court's role is therefore not to determine whether anything that Gartenberg alleges is actually true, but only to decide whether those allegations, *if true*, make Gartenberg's claims "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-80 (2009). A claim is plausible when there is a reasonable expectation that allowing the case to proceed to discovery would turn up evidence of the wrongdoing being alleged. *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018). A plaintiff's claim can thus be plausible even if the defendant's theory of the case appears more convincing at the outset. *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) ("[I]t is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory."). In other words, the question for now is not about who should win this case, but only about whether Gartenberg should have the opportunity to seek proof of her claims through the discovery process.

A.    **Facts**

Located in the heart of New York City, Cooper Union is a "unique institution, dedicated to Peter Cooper's proposition that education is the key not only to personal prosperity but to civic virtue and harmony." Compl. ¶ 43. Cooper Union's Manhattan campus includes the 41 Cooper Square building and the Foundation Building, which is located on 7th Street between Third and Fourth Avenues. *Id.* ¶ 42. The multi-floor Foundation Building contains the offices of Cooper Union administrators (including the office of its then-President, Laura Sparks), a number of classrooms, and the school's only library. *Id.* Though a private institution, Cooper Union receives millions of dollars in federal funding each year. *Id.* ¶ 32.

Although Cooper Union had not been shy to weigh in on hot-button political topics before, it struggled to find its voice in the aftermath of the October 7 attacks, at least initially.  In the face of an apparent uptick in violence against Asian Americans in 2021, for instance, Cooper Union forcefully condemned "hateful rhetoric and acts of violence targeting Asian [] American and Pacific Islander (AAPI) communities," and made clear that the institution "stands with [its] Asian and AAPI students, faculty, staff, and alumni." *Id.* ¶ 47.  Similarly, in 2020, President Sparks denounced the police killings of George Floyd, Ahmaud Arbery, Tony McDade, and Breonna Taylor as "outrageous," stressed the need to "eradicate racism at [Cooper Union] and beyond," and invited the Cooper Union community to "join [her] in identifying the concrete steps" that would "make The Cooper Union, New York City and our country safer, kinder, and more loving places for everyone." *Id.* ¶ 45.  And when Russia invaded Ukraine in February 2022, Cooper Union urged its community to "be supportive and show care with specific sensitivity to the needs of our students from Ukraine and Eastern Europe during this particularly difficult time." *Id.* ¶ 48. But in the immediate aftermath of the October 7 attacks, Cooper Union mustered only an anemic statement about "the upsetting news of war between Israel and Hamas in the Middle East as well as reports of devastation and aggressions in many other parts of the world" that referred vaguely to "[m]any members of [its] campus community" who might be impacted, while offering no direct statement of support for its Jewish and Israeli students.  Dkt. 24, Exh. 1; Compl. ¶ 51.  Later, however, Cooper Union did issue a statement that "emphatically denounced" the "October 7 terrorist attacks by Hamas on innocent Israeli civilians."  Dkt. 21, Exh. 3 at 2 (alumni letter dated October 31, 2023, which referred to an earlier statement issued on October 11, 2023).  Still, Jewish students were troubled by the delay and by the fact that they had to urge the administration to issue a statement.  Compl. ¶¶ 49-52.

The climate on Cooper Union's campus only intensified during the following weeks. When Jewish students attempted to hang up posters with the names and photographs of those who had been kidnapped by Hamas on October 7, the posters were quickly vandalized and torn down. *Id.* ¶ 54.  And despite vandalism being characterized as "extremely serious and subject to the highest penalties" in Cooper Union's Student Code of Conduct, none of the perpetrators faced any discipline. *Id.* ¶ 55.

Then, on October 23, 2023, students posted large signs titled "Conversations with Palestinians in Gaza" in the public-facing colonnade windows of the Foundation Building.  *Id.* ¶ 59.  The signs characterized Jews who live in Israel as "settlers liv[ing] comfortably on our lands," described the October 7 attacks as merely a "reaction to it," and cast the massacre as a blameless "counterattack." *Id.*  Cooper Union and its security staff were aware of the signs as they were being hung up.  *Id.* ¶ 60.  But despite the signs violating its policy against unauthorized postings in the colonnade windows, Cooper Union left them up for several hours and failed to issue any statements in support of its Jewish students or discipline the offenders.  *Id.* ¶¶ 59-61.  To the contrary, one member of Cooper Union's faculty shared images of the signs on social media, *id.* ¶ 66, and a Cooper Union professor told a Jewish student that he or she should just stop looking at the posters to avoid being "triggered" by them, *id.* ¶ 63.  And when Cooper Union finally did remove the offending signs, it handed them right back to the students who had put them up in the first place without taking any disciplinary action or warning the students responsible against future violations.  *Id.* ¶¶ 61, 65, 76.

The tensions at Cooper Union reached their breaking point two days later, on October 25, 2023.  That afternoon, students at Cooper Union staged a "walkout" for "Palestinian liberation." *Id.* ¶ 69.  Approximately one hundred pro-Palestinian students, joined by members of the Cooper

Union faculty, gathered on the sidewalk outside the Foundation Building. *Id.* ¶ 77. The demonstrators, many of whom had their faces covered, chanted slogans such as "[i]t is right to rebel, Israel go to Hell," "[f]rom the river to the sea, Palestine will be free," "[g]lobalize the intifada from New York to Gaza," "[t]here is only one solution: intifada revolution," "[r]esistance is justified when people are occupied," and "[h]ey hey, ho ho, Israel has got to go." *Id.* The demonstrators also displayed some of the same signs that Cooper Union had previously removed from the Foundation Building's colonnade windows. *Id.* ¶ 76. A smaller number of Jewish and other pro-Israel students, twenty-five or so in total, held a counterprotest nearby. *Id.* ¶ 78.

At around 4:00 p.m., the demonstration took a turn for the worse. Unsatisfied, the pro-Palestinian demonstrators stormed into the Foundation Building, pushing past a handful of security guards, one of whom futilely yelled, "you're going to get arrested." *Id.* ¶ 80. The demonstrators marched up the stairs to the seventh floor in an attempt to locate President Sparks, obstructing the hallway and entrances to classrooms. *Id.* ¶ 82. Feeling threatened by the trespassing mob, a number of Jewish students caught in the building communicated with each other to check whether they were safe, and one student called the police for assistance. *Id.* ¶¶ 81-82. But even though plainclothes officers from the New York City Police Department ("NYPD") were on the scene and offered to intervene, President Sparks directed the officers to stand down. *Id.* ¶ 81.

Eventually the mob descended on the Foundation Building's library, where a group of Jewish students had taken refuge. *Id.* ¶¶ 84-85. As the demonstrators drew near, one of Cooper Union's administrators, who was inside the library at the time, locked the library doors and warned the Jewish students inside that "they [*i.e.*, the mob] were coming." *Id.* ¶ 85. The demonstrators then attempted to force their way into the library, banging on and rattling the library doors and screaming, "let us in!" *Id.* When they were unable to get past the locked doors, the demonstrators

spread out in the hallway along the library's floor-to-ceiling windows and pounded against the glass while continuing to yell slogans, waving a Palestinian flag, and holding up signs and a banner. *Id.* ¶¶ 87-88. The group of Jewish students, including some wearing traditional Jewish attire, were immediately visible to the demonstrators though the windows on the library doors and the glass walls along the hallway. *Id.* ¶ 86.

The Jewish students remained in the library for approximately twenty minutes. *Id.* ¶ 89. During that time, they again called the police for help and texted family and friends for support, but neither the police, campus security, nor any Cooper Union administrators attempted to intervene while the incident was ongoing. *Id.* In fact, President Sparks had locked her own office door as the demonstrators approached before escaping the Foundation Building through a back exit while the Jewish students remained in the library. *Id.* ¶ 91. And instead of taking any action to disperse the crowd that was banging on the library windows, a Cooper Union administrator and a school librarian instead suggested that the Jewish students "hid[e] in the windowless upstairs portion of the library out of the demonstrators' sight or escap[e] the library through the back exit," offers that the Jewish students declined. *Id.* ¶¶ 92-93. Eventually, the demonstrators left of their own accord, and some of the Jewish students who had been stuck in the library were escorted out by campus security guards. *Id.* ¶ 95.

Cooper Union's response to the library incident was muted. After one student advised that he or she felt "unsafe, unwelcome, and unwanted," Dean Lisa Shay replied that the demonstration on October 25 "was a peaceful gathering" and that she would be "coming to work as usual" the next day. *Id.* ¶ 97. Statements issued by President Sparks in the days that followed did not acknowledge the library incident as one of antisemitic harassment, and instead "condemn[ed] discrimination of any kind, including antisemitism and Islamophobia," while providing a factual

description of the event. *Id.* ¶ 98. And despite President Sparks's assurances that Cooper Union would "review reports and footage from [the October 25] events and initiate any necessary actions consistent with [its] policies," *id.* ¶ 99, and that "[a]ny member of [the Cooper Union] community who poses a threat to another's safety or engages in hate speech will be held accountable for their actions," *id.* ¶ 101, none of the demonstrators faced any disciplinary consequences in connection with the library incident or the October 25 demonstration more broadly, *id.* ¶¶ 99, 102, 167.

Jewish students continued to feel uncomfortable on Cooper Union's campus after October 25. Pro-Palestinian graffiti continued appearing on the outside of the Foundation Building and was not removed for over a week despite reports to administrators. *Id.* ¶ 104. A bathroom stall was vandalized with a Spanish translation of the phrase "from the river to the sea" depicted in a font that is commonly associated with *Mein Kampf*, Adolf Hitler's well-known, antisemitic manifesto. *Id.* And fliers were "placed around Cooper Union inviting students to 'Celebrate the 36th anniversary of the First Intifada.'" *Id.*

Pro-Palestinian members of the Cooper Union community continued speaking out as well. On November 9, 2023, the Cooper Union chapter of Students for Justice in Palestine ("SJP") organized an on-campus vigil to "[h]onor Palestinian Martyrs" and invited students to "come grieve and honor all those killed by decades of Israeli occupation and imperial violence." *Id.* ¶¶ 105-106. Two weeks after that, the Cooper Union Muslim Student Association ("MSA") published a statement in Cooper Union's student-run newspaper that referred to the characterization of Jewish students having been trapped in the library as a "false narrative." *Id.* ¶ 107. The same issue of the newspaper also contained a statement by the Black Student Union ("BSU") that "declared solidarity with 'the Palestinian struggle against colonialism and genocide' and claimed that 'the conflation of Zionism and Judaism' is 'manipulative, exploitive and racist.'"

*Id.* ¶ 108.  Similarly, a December 5, 2023 alumni letter was circulated within the Cooper Union community that claimed that it was "historical malfeasance for the administration to issue a statement of condemnation of Hamas's October 7th attacks without acknowledging the context in which these attacks took place" and suggested that it was "complicity in the atrocities committed against the Palestinian people" for Cooper Union to condemn violence against Israelis without also condemning "75 years of ongoing apartheid, siege, and illegal military occupation of Gaza and the West Bank, mass imprisonment of Palestinian civilians without trial or charge, and the war crimes committed during the genocide of Palestinians in the past 58 days." *Id.* ¶ 109 (emphasis removed). The letter's signatories included a number of Cooper Union's professors, adjunct professors, and administrators. *Id.* ¶ 110.

The Israeli-Palestinian conflict continued to inspire heated commentary on Cooper Union's campus in early 2024.  In February, as part of a school-sanctioned art display, a large banner was hung in the 41 Cooper Square building with the words: "RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY.'" *Id.* ¶ 111.  Cooper Union's facilities staff assisted in hanging up the banner, and Cooper Union administrators promoted the banner on the school's Instagram accounts. *Id.* ¶ 111.  The banner remained in the 41 Cooper Square building for several days, with some Jewish students avoiding the building during this time because of the display. *Id.* ¶ 112.  Then, in April 2024, Cooper Union required all students "taking a core Humanities and Social Sciences class," including Jewish students, to attend a speech titled, "The Never Again Syndrome: Uses and Misuses of Holocaust Memory and the Weaponization of Language," which was delivered by Dr. Omer Bartov, an "anti-Israel activist." *Id.* ¶¶ 113-114.

As a result of these events, Jewish students at Cooper Union suffered "intense anxiety and panic attacks," "had difficulty concentrating during their exams," "engaged therapists," "missed

and/or dropped classes," and "failed to complete and perform on assignments," among other harms. *Id.* ¶ 142.

**B.    Procedural History**

Gartenberg filed this civil action against Cooper Union on April 9, 2024, asserting eight claims for relief.  Dkt. 1.  Specifically, Gartenberg alleges claims for deliberate indifference to a hostile educational environment under Title VI of the Civil Rights Act of 1964 (Count I), Section 296 of the New York State Human Rights Law ("NYSHRL") (Count II), Section 40 of the New York Civil Rights Law ("NYCRL") (Count III), and Section 8-107 of the New York City Human Rights Law ("NYCHRL") (Count IV); a breach of contract claim based on Cooper Union's alleged failure to enforce its campus policies and regulations (Count V); and common law claims for negligence (Count VI), premises liability (Count VII), and negligent infliction of emotional distress (Count VIII).  Compl. ¶¶ 144-231.  In addition to other traditional forms of relief, Gartenberg seeks punitive damages and an injunction that would compel Cooper Union to take steps to ameliorate the allegedly hostile educational environment on its campus.  *Id.* at 67-69.

On July 3, 2024, Cooper Union moved to dismiss Gartenberg's Complaint in full for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and to strike Gartenberg's requests for punitive damages and injunctive relief under Rule 12(f).  Dkts. 19, 20 ("Motion").  Gartenberg opposed the Motion on July 31, 2024, Dkt. 22 ("Opposition"), and Cooper Union filed a reply two weeks later, Dkt. 23 ("Reply").  Gartenberg later filed a surreply to address a trio of recent decisions regarding similar claims against other institutions.  Dkt. 27; *see generally Frankel v. Regents of Univ. of Cal.*, No. 24 Civ. 4702 (MCS), 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024); *Kestenbaum v. President & Fellows of Harvard Coll.*, No. 24 Civ. 10092 (RGS), 2024 WL 3658793 (D. Mass. Aug. 6, 2024); *StandWithUs Ctr.*

*for Legal Just. v. Mass. Inst. of Tech.*, No. 24 Civ. 10577 (RGS), 2024 WL 3596916 (D. Mass. July 30, 2024). Cooper Union then filed a letter alerting the Court to two more cases in which district courts addressed issues similar to those presented here. Dkt. 35; *see generally Landau v. Corp. of Haverford Coll.*, 24 Civ. 2044 (GAM), 2025 WL 35469 (E.D. Pa. Jan. 6, 2025); *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of Univ. Sys. of Md.*, No. 24 Civ. 2683 (PJM), 2024 WL 4361863 (D. Md. Oct. 1, 2024).

The Court held oral argument on Cooper Union's Motion on January 28, 2025.

## II. Discussion

As noted, Cooper Union moves to dismiss each of Gartenberg's causes of action for failure to state a claim. Regarding Counts I through IV, which each seeks to hold the school liable for a hostile educational environment,[3] Cooper Union argues that Gartenberg's Complaint targets instances of pure political speech that are protected under the First Amendment, and in any event fails to allege each of the elements necessary to establish a deliberate indifference claim under Title VI or state or municipal law. Motion at 7-18. As to Count V, the breach of contract claim, Cooper Union maintains that Gartenberg has not identified sufficiently specific promises in the school's policies that it could have breached and, alternatively, that the school's policies confer it broad discretion to administer discipline. *Id.* at 18-20. And as to Counts VI through VIII, which

---

[3] Gartenberg's Complaint alleges that "Cooper Union intentionally discriminated against Plaintiffs by failing to respond to the antisemitic, anti-Zionist harassment perpetrated by fellow students, faculty, and administrators, thereby depriving Plaintiffs of the full benefits of their educational opportunities at Cooper Union." Compl. ¶ 151. But apart from briefly responding to an issue raised in Cooper Union's Motion regarding "comparator evidence," Opposition at 17, Gartenberg has not meaningfully advanced or defended any distinct claim based on disparate treatment. *Cf. Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]." (internal quotation marks omitted)). The Court therefore does not construe Gartenberg's civil rights claims as advancing a disparate treatment theory distinct from her hostile environment theory.

assert claims for negligence, premises liability, and negligent infliction of emotional distress, Cooper Union argues that Gartenberg has not alleged sufficient facts to establish each element of those causes of action. *Id.* at 20-23. Cooper Union also asks the Court to strike Gartenberg's requests for punitive damages and injunctive relief. *Id.* at 23-25.

While Cooper Union is correct that the First Amendment imposes significant limits on the ways in which the Court can rely on many of the alleged acts of harassment detailed in Gartenberg's Complaint, Gartenberg nevertheless alleges sufficient facts to establish an actionably hostile educational environment based on instances of harassment that are not constitutionally protected in this context. Gartenberg has also alleged a plausible claim for breach of contract to the extent that Cooper Union failed to enforce its disciplinary policies in good faith. The Court agrees with Cooper Union, however, that Gartenberg's contract claim fails insofar as it is based on the school's Building Access Policy and on general statements of policy contained in Cooper Union's regulations. Gartenberg also has not alleged sufficient facts to state a claim for violations of state tort law. Lastly, because punitive damages and some injunctive relief may still be available under Gartenberg's surviving claims for a hostile educational environment, the Court declines to strike those requests for relief at this time.

## A.    The Title VI-First Amendment Framework

Gartenberg's claims for a hostile educational environment are based on Title VI of the Civil Rights Act of 1964 and on a trio of state and municipal anti-discrimination statutes—the NYSHRL, the NYCRL, and the NYCHRL.

Title VI makes it unlawful for institutions that receive federal funding to discriminate against participants in their programs on account of race, color, or national origin. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance."). In the educational context, actionable discrimination includes an institution's "deliberate indifference" to known instances of student-on-student harassment that are "'severe, pervasive, and objectively offensive' and discriminatory in effect." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665-66 (2d Cir. 2012) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650-51 (1999)). A Title VI deliberate indifference claim thus requires a student to plead, and eventually prove, that: (1) she was subject to severe or pervasive harassment; (2) the harassment was motivated, at least in part, by her race, color, or national origin; (3) the institution had both actual knowledge of the harassment and the ability to exercise substantial control over the harassers; (4) the institution was deliberately indifferent to the harassment; and (5) the harassment deprived the student of educational benefits or opportunities that she was otherwise entitled to. *See id.*

The NYSHRL and the NYCRL provide comparable—if not greater—protections against discriminatory harassment in education than Title VI. The NYSHRL makes it unlawful for an "educational institution . . . to permit the harassment of any student . . . by reason of his . . . national origin." N.Y. Exec. Law § 296(4). And as amended in 2019, the NYSHRL must "be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300; *see Muniz v. City of New York*, No. 20 Civ. 9223 (JPC), 2023 WL 6294169, at *14 (S.D.N.Y. Sept. 27, 2023) (explaining that "the NYSHRL's requirements for discrimination claims are either identical to or more lenient than federal law claims"). A violation of Section 296(4) of the NYSHRL also creates liability under Sections 40-c and 40-d of the NYCRL. *See* N.Y. Civ. Rights Law §§ 40-c, 40-d; *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017) ("Facts sufficient to sustain a cause

of action under [Section 296 of the NYSHRL] will support a cause of action under section 40-c of the [NYCRL]." (internal quotation marks omitted)).

The NYCHRL provides additional protection. As relevant here, the NYCHRL makes it unlawful for any place of public accommodation to discriminate against its patrons on the basis of their national origin. N.Y.C. Admin. Code § 8-107(4)(a)(1)(a). "To show discrimination under the NYCHRL, a plaintiff need only show that she was treated . . . less well, at least in part for a discriminatory reason." *Muniz*, 2023 WL 6294169, at *13 (internal quotation marks omitted). Unlike Title VI, the NYCHRL makes "no distinction between a claim premised on the creation of a hostile [] environment (a species of harassment claim) and one premised on unlawful discrimination: the former is subsumed into the latter." *Rothbein v. City of New York*, No. 18 Civ. 5106 (VEC), 2019 WL 977878, at *9 n.12 (S.D.N.Y. Feb. 28, 2019).

## 1. Title VI Must Be Applied Consistent with First Amendment Principles, Even When the Defendant is a Private Institution.

At the outset, Cooper Union maintains that Gartenberg's hostile environment claims are based largely on protected political speech by pro-Palestinian members of its community, and are therefore foreclosed by the First Amendment. Motion at 9 ("Both criticisms of Israel and/or its policies and shows of solidarity for the Palestinian cause, standing alone, are protected political expression that cannot support a Title VI claim."). Indeed, Gartenberg's Complaint—which alleges liability predicated, in part, on a demonstration on a public sidewalk concerning the Israeli-Palestinian conflict, Compl. ¶ 77, the distribution of fliers supporting the Palestinian cause, *id.* ¶ 104, a controversial "art display" advocating violent resistance to "colonialism," *id.* ¶ 111, and a speech given by Dr. Bartov about the Holocaust, *id.* ¶¶ 113-114—is "rife . . . with [F]irst [A]mendment overtones." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 592 (5th Cir. 1995).

Gartenberg responds that the First Amendment has no relevance to her hostile environment claims.  Opposition at 14-16.  Gartenberg contends that Cooper Union is a private institution and that "[i]n contrast to students at public or state institutions, students at private colleges do not enjoy First Amendment protections."  *Id.* at 14.  Going on, Gartenberg argues that regardless of whether Cooper Union is itself bound by the First Amendment, it would "still have the authority under the U.S. Constitution, and a responsibility under Title VI, to punish students who harass their Jewish peers on campus and thereby interfere with the victims' ability to participate in school activities."  *Id.* at 15.

Gartenberg's argument is unpersuasive.  A statute that burdens protected speech must comport with the First Amendment regardless of whether it does so directly, such as by prohibiting certain speech outright, or indirectly, such as by requiring a court adjudicating a "civil lawsuit between private parties" to apply a rule of law that has the effect of "impos[ing] invalid restrictions on [the defendant's] constitutional freedom[] of speech."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *see also* Kingsley R. Browne, *Title VII as Censorship: Hostile-Environment Harassment and the First Amendment*, 52 Ohio St. L.J. 481, 510-11 (1991) ("Although the primary method of enforcement of the harassment prohibition is through civil actions between private parties, imposition of liability by the courts under federal and state statutes easily falls within the definition of 'state action.'").  And as relevant here, requiring schools to censor or punish political speech to avoid liability for a hostile environment would burden not only their students' freedom of expression, but the academic freedom of the institution itself to create an educational environment centered around the free exchange of ideas.  *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 598 (2d Cir. 1990) ("[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of

orthodoxy' over the free exchange of ideas in the classroom." (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967))).

That a private institution like Cooper Union is generally free to regulate its students' speech without regard for the First Amendment, therefore, is irrelevant to the question of whether Congress may compel it to do so via the threat of civil liability under Title VI. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1344 (11th Cir. 2023) (Brasher, J., concurring) ("Although a private [institution] can adopt a speech code if it wants, the government usually cannot force people to speak in a particular way." (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992))); Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 U.C.L.A. L. Rev. 1791, 1817 (1992) ("The government cannot escape First Amendment scrutiny for its speech restriction by forcing someone else, on pain of liability, to implement that restriction.").

In addition, if a given interpretation of a statute "would raise a multitude of constitutional problems" when applied in one context, a court must consider those issues regardless of "whether or not those constitutional problems pertain to the particular litigant before the Court." *Goldstein v. Pro. Staff Cong./CUNY*, 643 F. Supp. 3d 431, 448 (S.D.N.Y. 2022) (quoting *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005)). Title VI, contrary to Gartenberg's suggestion, is not "a chameleon, its meaning subject to change depending on" whether the defendant is private or public institution. *Clark*, 543 U.S. at 382. The Court therefore cannot ignore the constitutional problems that would inevitably arise in the context of public universities—which, unlike Cooper Union, must respect their students' First Amendment rights—if Title VI required the suppression of core political speech. *See, e.g.*, *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011). Accordingly, the Court must confront the merits of Cooper Union's First Amendment defense.

Imposing civil liability on institutions based on their failure to censor or punish offensive speech raises significant constitutional concerns. The First Amendment embodies "the fundamental principle that governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Yet "a disparaging comment directed at an individual's sex, race, or some other personal characteristic has the potential to create an 'hostile environment'—and thus come within the ambit of anti-discrimination laws—precisely because of its sensitive subject matter and because of the odious viewpoint it expresses." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) (Alito, J.); *see also DeAngelis*, 51 F.3d at 596-97 (explaining that when a hostile environment claim is "founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech"). Thus, the federal anti-discrimination laws arguably "impose special prohibitions on those speakers who express views on disfavored subjects" by effectively requiring institutions to censor and punish at least some offensive speech concerning matters of race, sex, and other personal characteristics. *R.A.V.*, 505 U.S. at 391; *see, e.g.*, Volokh, *supra*, at 1854-55 ("One person in the lunch room may speak eloquently and loudly about how women are equal to men, and harassment law will not stop him. But when another tries to respond that women are inferior—belong in the home, are unreliable during their menstrual periods, or should not be allowed on the police force—harassment law steps in.").

In part because harassment claims are rarely based on pure political speech, however, few courts have had occasion to address what limits, if any, the First Amendment places on federal anti-discrimination law. But under the Supreme Court's usual First Amendment jurisprudence, a statute that "favors one viewpoint about [a topic] over the other . . . must satisfy strict scrutiny,"

meaning that Congress must adopt "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *see also Brooklyn Branch of Nat'l Ass'n for Advancement of Colored People v. Kosinski*, 657 F. Supp. 3d 504, 525-26 (S.D.N.Y. 2023) ("[L]aws that target speech 'because of the topic discussed or the idea or message expressed' are presumptively unconstitutional and subject to the strictest scrutiny as content-based regulations." (quoting *Reed*, 576 U.S. at 163-64)).  Plus, speech on matters of "public concern"— expression that "can 'be fairly considered as relating to any matter of political, social, or other concern to the community'"—is "entitled to 'special protection' under the First Amendment" and generally "cannot be restricted simply because it is upsetting or arouses contempt."  *Snyder v. Phelps*, 562 U.S. 443, 453, 458 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

It is also far from clear that most offensive speech that is regularly swept up in harassment cases would fit within the narrow sphere of traditionally recognized categories of unprotected expression, such as the exceptions for incitement, fighting words, true threats, and obscenity.  *See, e.g.*, *id.* at 448, 460-61 (protecting homophobic slurs and speech celebrating terrorism); *Virginia v. Black*, 538 U.S. 343, 365-67 (2003) (holding that cross burnings can be protected speech); *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (protecting racial and antisemitic slurs). Indeed, "courts have never embraced a categorical 'harassment exception' from First Amendment protection for speech that is within the ambit of federal anti-discrimination laws."  *Saxe*, 240 F.3d at 211; *see also Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) ("Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment.").  For these reasons, one leading treatise on the First Amendment teaches that "in the rare case in which the particular speech at issue does qualify [as expression on a matter of public concern], the [institution] should be exempted from liability" for

a hostile environment.  Rodney A. Smolla & Melville B. Nimmer, *Smolla & Nimmer on Freedom of Speech* § 13:17 (2024).

On the other hand, there is no question that the elimination of discriminatory harassment in employment and in programs receiving federal funding is a compelling government interest. *Saxe*, 240 F.3d at 209.  And as decades of judicial experience have made all too clear, abusive speech, no less than abusive conduct, can readily slam shut the doors to the workplace or seal the schoolhouse gates.  *See, e.g.*, *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) (explaining that "perhaps no single act can more quickly alter the conditions of employment . . . than the use of an unambiguously racial epithet" (internal quotation marks omitted)).  So just as federal anti-discrimination law must provide some breathing space for contentious political expression if First Amendment rights are to survive, the Constitution must tolerate the regulation of at least some offensive speech if the Civil Rights Act is to achieve its promise of unlocking the benefits of employment and education for all Americans.  *See* Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark*, 1994 Sup. Ct. Rev. 1, 48 (1994) ("[P]olitical democracy requires a broad space for unrestricted public discourse, but that space need not be boundless." (internal quotation marks omitted)).  And there may yet be a doctrinal basis for regulating offensive speech more closely in those contexts.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (citing Title VII "as an example of a permissible content-neutral regulation of conduct"); *Avis Rent A Car Sys., Inc. v. Aguilar*, 529 U.S. 1138, 1141 (2000) (Thomas, J., dissenting from denial of certiorari) (discussing the public-employee-speech and captive-audience doctrines).

Finally, the Court notes that the First Amendment concerns described above cannot be brushed aside in the Title VI context merely because Congress enacted the statute pursuant to its

power under the Spending Clause, U.S. Const. art. I, § 8, cl. 1.  *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (observing that "Title VI invokes Congress's power under the Spending Clause to place conditions on the grant of federal funds" (citation omitted)).  Because compliance with Title VI (unlike compliance with Title VII and other "mandatory" anti-discrimination statutes) is only required for institutions that voluntarily accept federal funding, one might take the position that to the extent a college or university objects to the First Amendment implications of the statute, its recourse is simply to stop accepting federal education funds.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds.  This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights.").  Congress, however, "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (internal quotation marks omitted).  Under that principle, known as the "unconstitutional conditions doctrine," a condition imposed in connection with a grant of federal funding would be unconstitutional if Congress could not impose that condition through direct legislation.  *Id.* at 59-60; *see, e.g.*, *Fed. Commc'ns Comm'n v. League of Women Voters of Cal.*, 468 U.S. 364, 399-401 (1984) (striking down a condition on federal funding of noncommercial broadcast television and radio stations that prohibited editorializing).  Accordingly, the fact that an institution could escape Title VI's requirements by declining federal funds does not, by itself, obviate the First Amendment implications of construing Title VI to require censorship of political speech.

### 2. The Court Does Not Construe Title VI as Reaching Pure Speech on Matters of Public Concern.

In light of the competing interests described above, courts have emphasized the need to "exercise special caution when applying [anti-discrimination law] to matters involving traditionally protected areas of speech." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1282 (11th Cir. 2024); *see also DeAngelis*, 51 F.3d at 596 ("Where pure expression is involved, [anti-discrimination law] steers into the territory of the First Amendment."). And the responsibility of courts to tread lightly when political speech is in the legal crosshairs is particularly important in the context of higher education. *See Dube*, 900 F.2d at 597 ("[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960))).

Following that careful approach, the Court concludes that because interpreting Title VI to impose liability for a hostile environment created in part by pure speech on matters of public concern would cast significant doubt on the statute's constitutionality, the Court must adopt a permissible construction of Title VI that avoids placing its application in First Amendment jeopardy. *See Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) ("When a serious doubt is raised about the constitutionality of an Act of Congress, it is a cardinal principle that [courts] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (internal quotation marks omitted)); *Boos v. Barry*, 485 U.S. 312, 331 (1988) ("[F]ederal courts have the duty to avoid constitutional difficulties by [adopting a limiting construction of a statute] if such a construction is fairly possible.").[4]

---

[4] In *Grove City College v. Bell*, the Supreme Court declined to reach the merits of a private college's First Amendment challenge to Title IX on the ground that the college remained free to avoid the statute's requirements by declining federal funding. 465 U.S. 555, 575-76 (1984). But, as noted at *supra* II.A.1, the Supreme Court's more recent unconstitutional conditions

Construing Title VI to avoid burdening core First Amendment rights also affords due respect to the principle that Congress must speak in clear terms when exposing recipients of federal funding to private damages suits.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24-25 (1981).  Although *Pennhurst*'s notice principle is generally inapplicable in deliberate indifference cases, *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 56 (2d Cir. 2022), the usual requirement of adequate notice itself "bears on the proper definition of 'discrimination' in the context of a private damages action" alleging a hostile environment, *Davis*, 526 U.S. at 649.  And in light of the First Amendment principles described above and express guidance provided by the Department of Education, the Court doubts that colleges and universities that have accepted federal education funds did so with "clear notice" that their failure to punish or censor political speech on their campuses could qualify as actionable "discrimination" under Title VI.  *Pennhurst*, 451 U.S. at 25; *see* Dep't of Educ., Off. of Civ. Rts., *Dear Colleague Letter* 2 (May 7, 2024) (advising schools that "[n]othing in Title VI or regulations implementing it requires or authorizes a school to restrict any rights otherwise protected by the First Amendment to the U.S. Constitution").  Accordingly, the Court must construe and apply Title VI in a manner that avoids difficult First Amendment questions and protects the reasonable expectations of institutions that

---

jurisprudence has declined to treat an institution's option of refusing federal funding as sufficient to eliminate all First Amendment concerns associated with conditions placed on federal education funds.  *Rumsfeld*, 547 U.S. at 59.  At the very least, whether requiring a college or university to compromise its core academic freedom in order to receive federal funds "goes beyond the 'reasonable' choice offered in *Grove City* and becomes an unconstitutional condition" presents a substantial constitutional question that can be avoided by construing and applying Title VI consistent with the First Amendment.  *Id.*

have accepted federal education funds, without inhibiting the statute's ability to achieve its fundamental goals.[5]

As relevant to the elements of Gartenberg's Title VI claim that are at issue in this case, three guiding principles emerge that avoid a collision between the First Amendment and anti-discrimination law while still allowing the statute to function effectively.

First, speech "on a matter of public concern, directed to the college community," will generally fail to "constitute unlawful harassment." *Rodriguez*, 605 F.3d at 710. This approach is consistent with the objective standard that courts use to assess the hostility element of federal harassment claims: a reasonable person should understand that speech on matters of public concern, directed to the community at large through generally accepted methods of communication, is very different than targeted, personal harassment aimed at a particular person. *See Yelling*, 82 F.4th at 1345 (Brasher, J., concurring) (explaining that "speech on public matters is inherently less likely to create a hostile [] environment than speech on private matters"); *DeAngelis*, 51 F.3d at 592-96 (declining to find a hostile work environment based on a series of satirical columns published in a police union's newsletter that "derogatorily referred to policewomen"). The principle underlying this approach is that a reasonable person should distinguish between the abstract expression of offensive "values, politics, and attitudes" on the one hand, and "remarks that genuinely target and harass" individuals on the other. Smolla & Nimmer, *supra* § 13:17; *see also* Volokh, *supra*, at 1871 (distinguishing between offensive speech directed at particular individuals in a targeted manner and speech that is not so directed). This is especially

---

[5] As noted, Gartenberg also alleges hostile environment claims under a handful of state and municipal laws. Because the parties' briefing focuses primarily on Gartenberg's Title VI claim, and because the Court ultimately sustains that claim, the Court does not separately analyze whether and to what extent the state and municipal laws that Gartenberg relies on must be limited in light of First Amendment principles.

true in the context of higher education, where the reasonable student expects (if not hopes) to encounter "rigorous debate and discussion, and the unfettered exchange of ideas" concerning a wide range of controversial topics.  Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385, 386 (2009).

And by the same token, a reasonable person should perceive offensive political speech communicated through generally accepted means (say, during a debate in the breakroom or in a flier pinned to a bulletin board) differently to offensive messages conveyed in a manner that does not conform to reasonable social expectations (for instance, by vandalizing a hallway).  The former is much more likely to be received as good-faith discourse; the latter as an effort to harass, intimidate, or discriminate.  *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (explaining that "local custom" is relevant to whether challenged speech is discriminatory in nature); Fallon, *supra*, at 47 (explaining that the First Amendment should protect "speech or expressive conduct that is reasonably designed or intended to contribute to reasoned debate on issues of public concern" (internal quotation marks omitted)).  And on the other side of the equation, restricting the former is far more likely to burden legitimate expressive activity than restricting the latter.

Limiting anti-discrimination statutes like Title VI in this manner does not, however, mean that courts must "fall for the glib assertion that because matters of race and gender are, at the broadest level of abstraction, clearly issues of public concern, all racist and sexist remarks automatically qualify" for First Amendment protection.  Smolla & Nimmer, *supra*, § 13:17.  Applying federal anti-discrimination law consistent with First Amendment principles does not, in other words, require courts to shield all "derogatory epithets" of marginal value or to protect speech "even about political matters, that is so persistent or patently harassing that it could not be

reasonably designed to contribute to reasoned debate." Fallon, *supra*, at 47. To be sure, political speech need not match the caliber of expression associated "with Marcus Cicero or Henry Clay" to receive constitutional protection, *Yelling*, 82 F.4th at 1344 (Brasher, J., concurring), but neither does the First Amendment demand that low-value speech of the sort "that can give an abusive character even to political discussion" be protected in all contexts, Fallon, *supra*, at 48. And as noted, the way in which a message is communicated can matter just as much to its harassing character as what is said. At the end of the day, what is important is that the law provide sufficient "breathing space for First Amendment freedoms." *Id.* at 47. Accordingly, the Court does not construe Title VI as allowing for liability based on speech that is reasonably designed or intended to contribute to debate on matters of public concern, and that is expressed through generally accepted methods of communication.

Second, the need to avoid a collision between Title VI and the First Amendment counsels in favor of an even more limited application of the already strict deliberate indifference standard. Under that standard, an institution may only be held liable when its response (or lack thereof) to known instances of student-on-student harassment was "clearly unreasonable in light of the known circumstances." *Zeno*, 702 F.3d at 666 (quoting *Davis*, 526 U.S. at 648). It is "axiomatic," however, that "the government may not silence speech because the ideas it promotes are thought to be offensive." *Rodriguez*, 605 F.3d at 708. Nor may it conscript private institutions to act as censors by dangling the threat of civil liability for a hostile environment. That is nowhere truer than in the educational context, where "the Supreme Court's academic-freedom jurisprudence principally protects the 'marketplace of ideas' in the university and prevents government intrusion." *Burt v. Gates*, 502 F.3d 183, 191 (2d Cir. 2007) (quoting *Keyishian*, 385 U.S. at 603). The First Amendment therefore "demands substantial deference to [a] college's decision not to

take action against" students who engage in expressive activity on matters of public concern and instead requires courts to "defer to colleges' decisions to err on the side of academic freedom." *Rodriguez*, 605 F.3d at 708-09.  For these reasons, it will usually be difficult—if not impossible—to show that a college or university acted in a clearly unreasonable manner under Title VI where its acts of alleged deliberate indifference consist of its refusal to punish political speech directed at the college community through reasonable means.

Finally, construing Title VI not to reach instances of pure speech on matters of public concern, or an institution's failure to censor or punish the same, does not mean that such expression is irrelevant to determining whether actionable harassment occurred.  To make out a hostile environment claim, a plaintiff must plead (and then prove) not only that they suffered objectively severe or pervasive harassment, but that the harassment was motivated, at least in part, by a protected characteristic.  *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 748 (2d Cir. 2003).  And courts have long recognized that there is "no constitutional problem with using . . . offensive speech as evidence of motive or intent."  *Saxe*, 240 F.3d at 208; *see Mitchell*, 508 U.S. at 487 (explaining that the First Amendment does not preclude evidence of discriminatory motive under the federal anti-discrimination statutes).  So for example, evidence that a white student attended a Ku Klux Klan rally, though protected expression or association in and of itself, may properly be considered in determining whether unprotected harassing conduct directed at his African-American classmates was motivated by race.  *See Dawson v. Delaware*, 503 U.S. 159, 165 (1992) ("[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment.").  Accordingly, when a hostile environment claim is based on both protected speech

and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature.

With these principles in mind, the Court turns to whether Gartenberg has pleaded a plausible harassment claim under Title VI and the relevant state and municipal laws.

**B.    Gartenberg's Hostile Educational Environment Claims**

As explained above, Gartenberg's hostile environment claims must be assessed consistent with the First Amendment.  Under that approach, her harassment claims survive dismissal under Rule 12(b)(6).

**1.    Gartenberg Plausibly Alleges Discriminatory Motive.**

Cooper Union's first line of defense is that none of the speech or conduct identified in Gartenberg's Complaint was motivated by animus towards Jews, but was instead mere "criticism[] of Israel and/or its policies" and a "show[] of solidarity for the Palestinian cause."  Motion at 9.[6] Gartenberg, by contrast, maintains that Zionism and support for Israel are "an integral part of the national origin and identity of many Jews," and that Jews' "belief in Israel as their ancestral national homeland is fundamental to their Jewish identity."  Opposition at 4.  In support of that view, Gartenberg relies on a working definition of antisemitism drafted by the International Holocaust Remembrance Alliance, an inter-governmental organization comprised of thirty-five member states, including the United States.  *Id.* at 5.[7]  That definition, which has been adopted by

---

[6] Cooper Union does not dispute that, as a general matter, antisemitic harassment is actionable under Title VI.  *See T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 353-55 (S.D.N.Y. 2014) (holding that "regardless of whether they assert their claims [based] on 'national origin' or 'race,' Plaintiffs are within their rights to assert a claim under Title VI based on anti-Semitic discrimination").

[7] According to its website, the International Holocaust Remembrance Alliance "is an intergovernmental organization with 35 Member Countries and 8 Observer Countries," with the mission of "unit[ing] governments and experts to strengthen, advance and promote Holocaust

the Department of State, provides as an example of antisemitism: "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor." Compl. ¶ 36. Based on this view, Gartenberg argues that "[h]ate focused on Plaintiffs' shared Zionist ideology targets their identities as Jews; it is indistinguishable from antisemitism." Opposition at 4; *cf. Frankel*, 2024 WL 3811250, at *6 (treating discrimination against Jewish students who refused to "disavow[] the state of Israel" as discrimination on the basis of their religion). Thus, Gartenberg maintains that the anti-Zionist and anti-Israeli expression detailed in her Complaint—such as statements that Zionism is a "racist ideolog[y] and movement[]" and a form of "[t]errorism," Compl. ¶¶ 59, 104—crossed the line into antisemitism. Opposition at 5-6.

Although the Court in no way doubts the sincerity of many Jews' religious, national, and ancestral connections to Zionism and Israel, this case can be resolved without opining on whether conduct or speech hostile to Zionism, itself a term subject to a considerable variety of interpretations, is necessarily antisemitic. Gartenberg's Complaint, for instance, alleges that pro-Palestinian students defaced Cooper Union's colonnade windows with signs that specifically referred to "Jews" in Israel as "settlers liv[ing] comfortably on our lands" and suggested that Hamas's October 7 attacks were a mere "reaction" or "counterattack" to that "settler colonization." Compl. ¶ 59. Understood in the light most favorable to Gartenberg, such speech on its face goes beyond mere criticism of Israeli government policy or of Zionist ideology, and instead sends a message that Jews as a class do not belong in Israel while justifying and encouraging violence against those Jews who do live there. *See Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342,

---

education, remembrance, and research worldwide and uphold[ing] the commitments of the 2000 Stockholm Declaration and the 2020 IHRA Ministerial Declaration." Int'l Holocaust Remembrance All., *About the International Holocaust Remembrance Alliance*, available at https://holocaustremembrance.com/who-we-are (last visited Feb. 5, 2025).

351 (S.D.N.Y. 2006) (holding that statements referring to a Hispanic employee's "own country" and comparing it to "our country" could support a jury finding that the employee was harassed on account of her national origin).

More fundamentally, there are no magic words or phrases needed to show that harassment was motivated by a protected characteristic. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014) ("[A] hostile [] environment claim need not be supported by direct evidence of explicit [discriminatory] harassment."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) ("There are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination." (internal quotation marks omitted)). To the contrary, the federal anti-discrimination laws "can hear [bigotry] sung in the whistle register." *Lloyd v. Holder*, No. 11 Civ. 3154 (AT), 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) (collecting cases). As a result, even facially neutral words and phrases can be highly probative of discriminatory intent depending on the circumstances and social context in which they are communicated. *See Ash*, 546 U.S. at 456 ("The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."). That the demonstrators at Cooper Union generally avoided the use of overtly antisemitic language and symbols is therefore not dispositive.

Here, Gartenberg's Complaint is replete with words and phrases that she alleges are thinly veiled "code words" designed to "activate conscious or subconscious [antisemitic] concepts and frames." *Lloyd*, 2013 WL 6667531, at *9. On October 25, 2023, for instance, pro-Palestinian students at Cooper Union chanted slogans like "[l]ong live the intifada," "[r]esistance is justified," and "[i]t is right to rebel." Compl. ¶ 77. In addition, demonstrators chanted the phrase "[f]rom the river to the sea, Palestine will be free." *Id.* Although the parties offer competing interpretations

30

of these slogans, when uttered just two weeks after the deadliest massacre of Jews since the Holocaust in a manner that reasonably appears to celebrate and glorify that same violence, the Court agrees that such phrases support at least a plausible inference of animus towards Jews.  *See Hayut*, 352 F.3d at 748 (holding that the use of the name "Monica" to refer to a female student, close in time to the President Clinton/Monica Lewinsky scandal, could reasonably have been motivated by gender).  Indeed, the latter phrase—which refers to the land between the Jordan River and the Mediterranean Sea, where roughly half of the world's Jewish population resides—has recently been described in a bipartisan resolution passed by the House of Representatives as antisemitic precisely because it suggests "the eradication of the State of Israel and the Jewish people."  Compl. ¶ 104; *see* H.R. 894, 118th Cong. (2023)*.*  And Gartenberg alleges that Jewish students found the same phrase, in Spanish, graffitied on a bathroom stall in lettering made to resemble the stylized font commonly associated with Hitler's *Mein Kampf*, Compl. ¶ 104, further suggesting that its use "carr[ied] the distinct tone of [antisemitic] motivations and implications," *Lloyd*, 2013 WL 6667531, at *9.  The Complaint also alleges that demonstrators directed similar slogans at Jewish students in the Foundation Building's library in particular, who were wearing visibly Jewish attire and were immediately visible to the demonstrators.  Compl. ¶¶ 85-88.

Finally, it does not matter, as Cooper Union emphasizes, that its Jewish students were not the only ones exposed to these offensive incidents: Gartenberg "pleads facts sufficient to allow a jury to find much of [the] complained of conduct particularly offensive to [Jews] and intended to provoke [their] reaction as [Jews]."  *Patane v. Clark*, 508 F.3d 106, 114-15 (2d Cir. 2007) (per curiam) ("[A] plaintiff need only allege that she suffered a hostile [] environment because of her [protected characteristic], not that all of the offensive conduct was *specifically* aimed at her.").  To be sure, the Court recognizes that much of the challenged language described in Gartenberg's

Complaint can also be used simply to express "criticism of Israel" or "support for Palestinians." Motion at 2. Accordingly, nothing in the Court's analysis of the discriminatory-intent element should be viewed as suggesting that those who use such language are necessarily antisemitic. But at this stage of the case, "[t]he test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation." *Palin*, 940 F.3d at 815. And the Court agrees that Gartenberg's view, with all reasonable inferences drawn in her favor, is plausible.

### 2. Gartenberg Plausibly Alleges a Hostile Educational Environment Based on Incidents Not Protected Under the First Amendment.

Cooper Union next argues that Gartenberg's Title VI claim must be dismissed because she fails to allege that she suffered an objectively hostile educational environment. Motion at 12-13.

Whether a complaint plausibly alleges that an educational environment was actionable under Title VI, like in the context of claims brought under Title IX, "is 'governed by traditional Title VII hostile environment jurisprudence.'" *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (quoting *Hayut*, 352 F.3d at 744); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) ("[C]ourts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII."). Under those standards, harassment is actionable only if it renders the plaintiff's educational environment "hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment." *Papelino*, 633 F.3d at 89. "Making a 'hostility' determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the victim's academic

performance." *Hayut*, 352 F.3d at 745 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

"Determining whether conduct is severe or pervasive enough to create a hostile [] environment involves a question of fact and is generally inappropriate to determine at the pleadings stage of a litigation." *Harding v. Dorilton Cap. Advisors LLC*, 635 F. Supp. 3d 286, 301 (S.D.N.Y. 2022) (citing *Patane*, 508 F.3d at 114). A motion to dismiss a hostile environment claim predicated on a failure to plausibly allege severe or pervasive harassment is thus properly denied when, based on the facts alleged in the Complaint, the defendant is not "obviously free from potential liability." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 259 (S.D.N.Y. 2014). "And courts within this Circuit routinely find that pleading allegations about an egregious single event [is] enough to survive a motion to dismiss . . . ." *Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 229 (S.D.N.Y. 2022).

As foreshadowed above, many of the alleged instances of harassment detailed in Gartenberg's Complaint are examples of pure speech on matters of public concern. For instance, Gartenberg alleges that on October 25, 2023, pro-Palestinian students demonstrated on the sidewalk adjacent to the Foundation Building and chanted slogans concerning the Israeli-Palestinian conflict. Compl. ¶ 77. Gartenberg also points to fliers that were distributed around the Cooper Union campus inviting students to "[c]elebrate the 36th anniversary of the First Intifada" and to a vigil hosted by Cooper Union's SJP chapter to "grieve and honor all those killed by decades of Israeli occupation and imperial violence." *Id.* ¶¶ 104, 106. Similarly, she points to articles in Cooper Union's student-run newspaper by the MSA and the BSU disputing Jewish students' account of the library incident and criticizing "the conflation of Zionism and Judaism" as "manipulative, exploitive, and racist"; an alumni letter that "attempted to justify the sickening

33

Hamas attack of October 7"; an "art display" that included the words "RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY'"; and Cooper Union "requiring all students, including Jewish students, taking a core Humanities and Social Sciences class to attend a speech titled 'The Never Again Syndrome: Uses and Misuses of Holocaust Memory and the Weaponization of Language' by anti-Israel activist, Omer Bartov." *Id.* ¶¶ 107-115.

Regardless of whether this expression is better characterized as righteous protest in support of a noble cause, as the vulgar celebration of terrorism and antisemitism, or as something in-between, it is not a proper basis on which to impose civil liability on Cooper Union. The content of the protest slogans, fliers, and other expressions described above related to the ongoing Israeli-Palestinian conflict and touched upon topics like Zionism, colonialism, and racism. Gartenberg's Complaint offers no factual support for its assertion that any of these messages were intended to target particular Jewish students, as opposed to efforts to communicate a political message to the Cooper Union community at large. And apart from a conclusory suggestion that this speech included "threats of violence," *id.* ¶ 77, the Complaint does not plausibly allege that any of this expressive conduct constituted true threats, incitement, fighting words, obscenity, or any other category of traditionally unprotected speech under the Supreme Court's First Amendment jurisprudence.

To the contrary, as described in the Complaint, this expression qualifies as pure speech on matters of public concern because "it can be fairly considered as relating to [a] matter of political, social, or other concern to the community" and was communicated in a manner reasonably calculated to contribute to an ongoing public debate of considerable political significance. *Snyder*, 562 U.S. at 453 (internal quotation marks omitted); *see Landau*, 2025 WL 35469, at *2 (describing

student expression in support of the Palestinian cause as a "classic example" of activity protected by the First Amendment); *Univ. of Md. Students for Just. in Palestine*, 2024 WL 4361863, at *8 (observing that "[s]tudent demonstrations on college campuses in protest of the status quo, invariably with significant First Amendment implications, have a relatively long history in this country"); *Felber*, 851 F. Supp. 2d at 1188 (holding that student speech criticizing Israel and supporting Hamas "represents pure political speech and expressive conduct" that is "entitled to special protection under the First Amendment"). Accordingly, while some of this speech may properly be considered for purposes of Title VI's discriminatory-intent element, it cannot itself support a claim for an objectively hostile educational environment under this Court's interpretation of the statute.

Gartenberg's allegations, however, go beyond identifying instances of pure political speech. Although the October 25 demonstration began as a peaceful, public protest concerning the Israeli-Palestinian conflict, Gartenberg alleges that after a couple hours a mob of protestors forced their way past campus security guards and into the Foundation Building. Compl. ¶ 80. Once inside, the protestors obstructed the hallway and disrupted classes while apparently attempting to locate President Sparks. *Id.* ¶¶ 81-82. Unable to find her, the protesters then "descended on the hallway surrounding the library" while continuing to chant their slogans. *Id.* ¶ 85.

It is plausible that this incident was physically threatening or humiliating to the Jewish students huddled inside the library.[8] The demonstrators "attempted to enter the library, banging

---

[8] Cooper Union vigorously disputes Gartenberg's characterization of the library incident and its response thereto, relying in part on statements made by the NYPD during a press conference regarding the incident. *See, e.g.*, Motion at 6 & nn.1-2. At the pleading stage, however, the Court must accept the allegations in Gartenberg's Complaint as true and view those facts in the light most favorable to her.

on and rattling the locked library doors and shouting 'let us in!'" *Id.* They then spread out along the floor-to-ceiling windows separating the library from the hallway and banged loudly on the glass while waiving a Palestinian flag, holding up signs critical of Israel, and continuing their chants, this time plausibly directed at the visibly Jewish students inside the library. *Id.* ¶¶ 86-88. This ordeal, which lasted approximately twenty minutes, was sufficiently threatening that a Cooper Union administrator locked the library doors as the mob approached, and the Jewish students left inside, some of whom were crying, contacted their loved ones and attempted to call the NYPD for help. *Id.* ¶¶ 85, 88-89. Indeed, two school employees suggested that those Jewish students, and those students alone, should "hid[e] in the windowless upstairs portion of the library out of the demonstrators' sight" or attempt to "escap[e] the library through the back exit." *Id.* ¶ 92. And as noted, President Sparks herself was sufficiently frightened that she locked her office door to keep the demonstrators out before escaping the building through a back exit, and then "had a security guard stationed in front of her office for the remainder of the fall semester." *Id.* ¶¶ 12-13. Finally, when the Jewish students were at last able to leave, some of them were escorted out by campus security. *Id.* ¶ 95. These facts provide compelling support for Gartenberg's allegation that this incident was threatening or humiliating. *See Hayut*, 352 F.3d at 747 ("The reactions of [the plaintiff's] peers and of various administrators at [the institution] are also significant to the mandated objective analysis.").

Pushing back, Cooper Union faults the Jewish students for "gather[ing] in a prominent place in the library where they could be seen by the demonstrators," Motion at 13, and for refusing the suggestion to "hid[e] in the windowless upstairs portion of the library out of the demonstrators' sight or escap[e] the library through the back exit," Compl. ¶ 92; *see* Motion at 13. The school

also notes that as the mob of protestors approached the Foundation Building's library, an administrator locked the library doors to keep the demonstrators out.  Motion at 15.

The Court is dismayed by Cooper Union's suggestion that the Jewish students should have hidden upstairs or left the building, or that locking the library doors was enough to discharge its obligations under Title VI.  These events took place in 2023—not 1943—and Title VI places responsibility on colleges and universities to protect their Jewish students from harassment, not on those students to hide themselves away in a proverbial attic or attempt to escape from a place they have a right to be.  In sum, the physically threatening or humiliating conduct that the Complaint alleges Jewish students in the library experienced "is entirely outside the ambit of the free speech clause," *Saxe*, 240 F.3d at 206, and was objectively severe, *see Banks*, 81 F.4th at 263 (describing as "extraordinarily severe" a "loud and aggressive" verbal altercation between an employee and her supervisor that involved "physically threatening demeanor" and caused the employee's coworker to become concerned for her safety); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding a hostile environment based in part on harassment that took place "at length, loudly, and in a large group"); *Kestenbaum*, 2024 WL 3658793, at *2, 5 (finding a plausibly hostile environment based, in part, on allegations of "fear-inducing conduct" that included incidents where "demonstrators blockaded Jewish students in a study room" and "protestors surrounded and intimidated Jewish students" (internal quotation marks omitted)).

Gartenberg also alleges that Jewish students were harassed both before and after the library incident through repeated instances of antisemitic vandalism and graffiti that violated Cooper Union's disciplinary policies.  Jewish students who hung up posters with the names and photographs of people who had been abducted by Hamas during the October 7 attacks found those posters vandalized and torn down, "leaving just scraps of paper behind."  Compl. ¶ 54.  Jewish

students also found a bathroom stall vandalized with the phrase "from the river to the sea" written in a font commonly associated with *Mein Kampf*, "Hitler's famous work justifying the murder of six million Jews." *Id.* ¶ 104. And on October 23, 2023, the colonnade windows of the Foundation Building were defaced with signs that denigrated Jews in Israel as "settlers," justified Hamas's October 7 terror attacks as a mere "reaction" to that "settler colonization," and suggested that there should be no "blame . . . for the counterattack." *Id.* ¶¶ 59-60.

As alleged, these incidents of vandalism were extremely serious. The act of tearing down posters drawing attention to the abduction of Israelis, just days or weeks after a horrific antisemitic terror attack, sent an unmistakable message of national-origin-based hostility to Cooper Union's Jewish students. And if the message had not been clear enough, defacing the windows of the Foundation Building with express statements justifying the October 7 attacks as a "counterattack" or "reaction" to Jews to being "settlers" drove it home. Finally, though a touch more subtle than displaying a symbol like a swastika, the use of distinctive lettering associated with Hitler's manifesto, especially when used in conjunction with a phrase than can plausibly be understood as calling for the destruction of the State of Israel and the Jewish people, was also readily "capable of arousing fear and intimidation" among Cooper Union's Jewish students. *Orlando v. BNP Paribas N. Am., Inc.*, No. 14 Civ. 4102 (AJP), 2015 WL 6387531, at *17 (S.D.N.Y. Oct. 22, 2015).

These further episodes of harassment are just as severe or pervasive, if not more so, than the kinds of verbal taunting that courts in this District have deemed sufficient to state a plausible claim for a hostile environment, especially in conjunction with the physically threatening library incident. *See, e.g.*, *Makhsudova v. City of New York*, No. 20 Civ. 10728 (KPF), 2022 WL 1571152, at *11 (S.D.N.Y. May 18, 2022) (denying a motion to dismiss a hostile work environment claim where the plaintiff's coworker told her that "'her people' . . . lived in mountains and ate horse

meat," "would 'neigh' like a horse in [her] direction," and referred to her as "the first Uzbek female"). And unlike the first category of alleged harassment that Gartenberg relies on discussed above, these acts of vandalism—tearing down hostage posters, scrawling plausibly antisemitic graffiti where Jewish students could not reasonably avoid it, and defacing the windows of a main campus building that Jewish students must enter and walk past—were not reasonably calculated to contribute to public discourse and violated Cooper Union's time, place, and manner regulations.

These acts of vandalism therefore lacked the degree of legitimate expressive "purpose that might merit the kind of First Amendment protection that has long been recognized in the academic arena." *Hayut*, 352 F.3d at 745; *see also Mahoney v. District of Columbia*, 662 F. Supp. 2d 74, 84 (D.D.C. 2009) ("[I]t is an untenable position that conduct such as vandalism is protected by the First Amendment merely because those engaged in such conduct intend thereby to express an idea." (internal quotation marks omitted)). Taking these incidents into consideration for purposes of the hostile environment analysis appropriately "balance[s] the government's interest in regulating for the public welfare with the societal value of maintaining a free marketplace of ideas," and is unlikely to pose a genuine threat to the freedom of expression on college campuses. *Kosinski*, 657 F. Supp. 3d at 525 (citing *Black*, 538 U.S. at 358-60).

Although it may ultimately turn out that the protestors' conduct on October 25 and otherwise was not in any part motivated by animus towards Jews or was less severe and pervasive than the Complaint makes it seem, "the interpretation of any ambiguous conduct is properly 'an issue for the jury.'" *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 309 (S.D.N.Y. 2016) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998)); *cf. id.* ("'The question of whether a work environment is *sufficiently* hostile to violate Title VII is one of fact,' and the Court thus declines to decide it at the motion-to-dismiss stage." (quoting *Holtz v.*

*Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001))). Accordingly, Gartenberg plausibly alleges that Jewish students at Cooper Union were subject to antisemitic abuse that was both severe and pervasive based on facts properly considered under Title VI and the First Amendment.

### 3. Gartenberg Plausibly Alleges that Cooper Union Was Deliberately Indifferent to Antisemitic Harassment on Its Campus.

Cooper Union maintains that even if Gartenberg was subject to severe, pervasive, and discriminatory harassment, it cannot be held liable for that misconduct itself. Motion at 14-15.

An institution is only liable for a hostile educational environment under Title VI if it was deliberately indifferent to known instances of harassment. *Davis*, 526 U.S. at 648-49. Under the deliberate indifference standard, an institution may only be held liable for student-on-student harassment if its response to such harassment was "clearly unreasonable in light of the known circumstances," *Zeno*, 702 F.3d at 666 (quoting *Davis*, 526 U.S. at 648), "when remedial action only follows after a lengthy and unjustified delay," *Hayut*, 352 F.3d at 751 (internal quotation marks omitted), or if it offers no response at all, *Papelino*, 633 F.3d at 89.

Many of Gartenberg's allegations concerning Cooper Union's responses (or lack thereof) to the harassment Jewish students experienced are beyond the scope of Title VI for the same reasons that the underlying incidents are. For example, Gartenberg alleges that Cooper Union demonstrated indifference to harassment when it "took no action in response to complaints by Jewish students and alumni in advance of [Dr. Bartov's] speech," Compl. ¶ 114, and failed to remove an "art display" for "several days," *id.* ¶ 112. Gartenberg also suggests that Cooper Union erred by failing to respond to Jewish students' complaints regarding "offensive posters" placed on the public sidewalk next to the Foundation Building, *id.* ¶ 76, and by declining to issue an immediate statement condemning Hamas and supporting Israel following the October 7 attacks, *id.* ¶ 49. Gartenberg also suggests that Cooper Union should have taken remedial action in

response to the articles published in the school newspaper by the MSA and the BSU, and to the December 5, 2023, alumni letter. *Id.* ¶¶ 107-110, 115.

No matter how offensive these incidents may have been, holding Cooper Union liable for failing to censor or punish such expression "cannot be squared with the Supreme Court's long-professed, 'deep commitment to safeguarding academic freedom' as 'a special concern of the First Amendment.'" *Heim v. Daniel*, 81 F.4th 212, 227 (2d Cir. 2023) (quoting *Keyishian*, 385 U.S. at 603) (alterations adopted). The school's decision to prescribe Dr. Bartov's speech, which concerned the "Uses and Misuses of Holocaust Memory and the Weaponization of Language," Compl. ¶ 113, as part of the curriculum for all Cooper Union students taking a humanities and social sciences class is unquestionably a protected exercise of its academic freedom. Likewise, the "art display," the demonstrators' placement of posters on a public sidewalk, the MSA and the BSU articles, and the alumni letter are all examples of pure speech on matters of obvious public concern directed at the campus community as a whole. It would be difficult to imagine an outcome more antithetical to the First Amendment than imposing liability for a hostile environment on a private college for its judgment about what its students should be taught or allowed to say on matters of political significance. Thus, the Court must defer to Cooper Union's "decision[] to err on the side of academic freedom" with respect to these incidents. *Rodriguez*, 605 F.3d at 709. If the rule were otherwise, for instance, nothing would prevent Palestinian or Arab students from filing mirror-image claims based on their school's failure to censor pro-Israel speakers on campus who express controversial views or to punish students who speak loudly in support of the Israeli government's policies. The freedom of academic inquiry and expression on American college campuses could not survive in such an environment of judicial superintendence.

Nor can Cooper Union be held liable for initially declining to express a view in support of Israel or in condemnation of Hamas. Under the Court's interpretation of the statute, Title VI can no more impose liability on an institution for a political view it did not express than for one it did. *See Becerra*, 585 U.S. at 766; *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257 (1974). And, in fact, Cooper Union later *did* issue statements that condemned Hamas's attacks in forceful and specific terms and expressed support for the Israeli victims. *See* Dkt. 21, Exh. 3 at 2 (noting that Cooper Union "emphatically denounced" the "October 7 terrorist attacks by Hamas on innocent Israeli civilians" and linking to an October 11, 2023 statement).

Again, however, Gartenberg also alleges numerous examples of deliberate indifference that did not involve Cooper Union's refusal to suppress political speech. According to the Complaint, Cooper Union did nothing to prevent a group of the October 25 protestors from trespassing into and occupying the Foundation Building, where they disrupted school activities and intimidated Jewish students, some of whom attempted to call the police for help. Compl. ¶¶ 80-81. Cooper Union also failed to check the student IDs of those individuals. *Id.* ¶ 80. And despite them likely violating Cooper Union's generally applicable policies against engaging in "disorderly, disruptive, or aggressive behavior," the school took no action to disperse the protestors as the demonstration spiraled out of control. *Id.* ¶ 83.

Cooper Union's arguments to the contrary are unpersuasive. The school points out that "both campus security and the NYPD were on the scene throughout, communicating closely with Cooper Union administration." Motion at 15 (citing Compl. ¶¶ 80-81). But as alleged, campus security took no actions to prevent or stop the harassment of Jewish students in the Foundation Building apart from ineffectually yelling "you're going to get arrested" as a group of protestors pushed past them and providing "brief escorts" to Jewish students after the protestors had already

dispersed of their own accord.  Compl. ¶¶ 80, 94-95.  And most alarmingly, the Complaint alleges that "[NYPD] officers had offered to enter the building to intervene, but President Sparks told them to stand down," even as President Sparks herself had locked her office door before escaping the Foundation Building through a back exit.  *Id.* ¶¶ 12, 81.[9]  Nor did President Sparks or any other Cooper Union administrator attempt to intervene as protestors continued menacing the Jewish students in the library, banging on the doors and windows, screaming loudly, and demanding to be let in, despite having both actual knowledge of the harassment and the ready ability to take steps to end the abuse.  *Id.* ¶ 89-91.  As alleged in the Complaint, these failures were "clearly unreasonable" and plausibly caused Jewish students in the Foundation Building, and especially those left in the library, "to undergo harassment or [be made] liable to or vulnerable to it."  *Zeno*, 702 F.3d at 666 (quoting *Davis*, 526 U.S. at 645).

Nor were Cooper Union's statements following the library incident sufficient to discharge its Title VI obligations.  The school emphasized that it would investigate the October 25 incident. Indeed, as part of a statement issued that same day, President Sparks assured that administrators would "review reports and footage from [that day's] events and initiate any necessary actions consistent with [Cooper Union's] policies."  Compl. ¶ 99.  President Sparks echoed that promise through a statement addressed to Cooper Union alumni that she issued a few days later.  *See* Dkt. 21, Exh. 3 at 3-4 ("[Cooper Union's] administrative and security team[s] are in the process of a

---

[9]  The Court recognizes the possibility that, in some situations, law enforcement intervention in a student protest may do more harm than good, even when the protest is unlawful. That possibility, however, presents a factual question not fit for resolution at the motion to dismiss stage, at least given the allegations presented here.  And in any event, Gartenberg also alleges that Cooper Union unreasonably failed to use less escalatory measures to prevent the harassment of Jewish students in the Foundation Building, such as having campus security guards or school administrators attempt to disperse the protestors once the demonstration became unlawful.  *See* Compl. ¶¶ 80-91.

comprehensive review of [October 25's] events and resulting complaints."). Also, on November 3, 2023, President Sparks again warned that Cooper Union takes its Code of Conduct "very seriously" and "acts expeditiously to review potential actions of discrimination," and that "[a]ny member of [Cooper Union's] community who poses a threat to another's safety or engages in hate speech will be held accountable for their actions." Dkt. 21, Exh. 4 at 3-4.

The Complaint, however, alleges that in reality Cooper Union "failed to timely investigate the acts of discrimination and harassment on October 25" and that none of the students who engaged in harassing conduct towards Jewish students on that day faced any discipline. Compl. ¶¶ 99, 156(e). Nor, according to the Complaint, did those who tore down the hostage posters put up by Jewish students or engaged in other acts of antisemitic vandalism face any consequences. *Id.* ¶¶ 14, 16, 55. In fact, as alleged, some of that graffiti was left up for over a week despite complaints by Jewish students. *Id.* ¶ 104. Moreover, not only did pro-Palestinian demonstrators deface the colonnade windows with plausibly antisemitic posters *in the view of campus security*—who did nothing to prevent the vandalism despite the clear violation of Cooper Union's policies—when the signs were finally removed hours later, Cooper Union handed them right back to the protesters that put them up and did not impose any discipline or even issue a "warning about further violations." *Id.* ¶¶ 60-65. As the District of Massachusetts recently explained in a similar context, "the mere act of launching an investigation"—let alone the mere act of *promising* to launch an investigation—"without any further follow-through" cannot defeat a deliberate indifference claim. *The Louis D. Brandeis Ctr. for Hum. Rights Under L. v. President & Fellows of Harvard Coll.*, No. 24 Civ. 11354 (RGS), 2024 WL 4681802, at *5 (D. Mass. Nov. 5, 2024). Of course, discovery may turn up evidence demonstrating that Cooper Union did in fact launch a timely and effective investigation into the alleged acts of antisemitic harassment detailed in the Complaint and took

appropriate action consistent with the findings of that investigation. *Cf. StandWithUs Ctr. for Legal Just.*, 2024 WL 3596916, at *4-5 (rejecting a deliberate indifference claim where the university took an "evolving and progressively punitive response" to antisemitic harassment that included "suspending student protestors from non-academic activities, permitting them only to attend academic classes, while suspending one of the most undisciplined of the pro-Palestine student groups"). But the precatory language in President Sparks's statements cannot, without more, justify dismissal under Rule 12(b)(6).[10]

### 4. Gartenberg Plausibly Alleges a Loss of Educational Benefits or Opportunities.

Finally, Cooper Union argues that Gartenberg's Title VI claim falls short because she fails to allege that Jewish students were deprived of educational benefits as a result of the harassment they suffered. Motion at 14. Although an institution cannot be held liable for deliberate indifference unless the plaintiff was "effectively denied equal access to [the] institution's resources and opportunities" by virtue of the harassment, *Davis*, 526 U.S. at 651, the Second Circuit has held that "[e]ducational benefits include an academic environment free from [discriminatory] hostility." *Zeno*, 702 F.3d at 666. As a result, harassment that "discouraged [the plaintiff] from more active involvement" in campus activities or which "simply created a disparately hostile educational environment relative to her peers" is properly "construed as depriving [the plaintiff] of the benefits and educational opportunities available at [her institution]." *Hayut*, 352 F.3d at 750; *see also T.E.*, 58 F. Supp. 3d at 356.

---

[10] President Sparks's November 3 statement also referred to mental health resources available to students, noted plans to develop trainings regarding free speech and harassment, and announced new educational opportunities involving the history of the Middle East. Dkt. 21, Exh. 4 at 5-8. Although the Court does not rule out the possibility that discovery regarding these offerings and their effects could support Cooper Union's assertion that it responded reasonably, the Court is unable to make that determination based on the facts alleged in the Complaint and the documents it incorporates by reference.

As described above, Gartenberg plausibly alleges that Jewish students at Cooper Union were subject to antisemitic harassment that created an objectively hostile educational environment. She also alleges that Jewish students suffered emotional distress "including intense anxiety and panic attacks"; have "engaged therapists, missed and/or dropped classes, and failed to complete and perform on assignments"; and have avoided the Foundation Building's library, and that at that least one student delayed completing his or her degree, resulting in temporal and financial losses. Compl. ¶ 142.  At the very least, these allegations plausibly demonstrate that Jewish students at Cooper Union were "deprived of a supportive, scholastic environment free of [discrimination] and harassment." *Zeno*, 702 F.3d at 667.  Accordingly, they are sufficient to plead a deprivation of educational benefits or opportunities for purposes of Title VI.  *See Hayut*, 352 F.3d at 739-42, 748-50 (explaining that a plaintiff had shown "interference with educational progress" for purposes of a Section 1983 claim and a deprivation of educational benefits for Title IX purposes based on allegations of verbal harassment on the basis of sex, "humiliation and emotional distress," trouble sleeping, difficulties concentrating on coursework, and poor academic performance); *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006) (summary order) (sustaining a jury verdict based on testimony that the victim "would be crying and upset" as a result of verbal harassment even though her "grades did not suffer").

* * *

The Court reiterates that discovery, as in any case, could well end up painting a different picture of the strength of Gartenberg's claims.  *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 244 (2024) ("As [a] case unfolds, the complaint's allegations will be tested rather than taken as true, and different facts may emerge that may call for a different conclusion.").  Or discovery may prove her allegations correct and confirm Cooper Union's fault.  For now, all that the Court

holds is that Gartenberg's Title VI deliberate indifference claim is plausible based on the allegations provided in her Complaint. And because Gartenberg's allegations are sufficient under the standards imposed by Title VI, her hostile environment claims under the equally or less demanding NYSHRL, NYCRL, and NYCHRL survive dismissal as well. *See Johnson*, 224 F. Supp. 3d at 311. The Court therefore denies Cooper Union's Motion as to Counts I, II, III, and IV.

## C.    Gartenberg's Breach of Contract Claim

In Count V, Gartenberg claims that the events surrounding October 25, 2023, are independently actionable as breaches of contract by Cooper Union, including as a breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 194-206. Specifically, Gartenberg contends that Cooper Union breached its contractual promises contained in the following policy statements and regulations: (1) Policy Upholding Human Rights and Title IX Protections ("Human Rights Policy"); (2) Student Code of Conduct ("Code of Conduct"); (3) Non Discrimination Policy; (4) Posting Policy; (5) Policy on Campus Safety and Security; and (6) Building Access Policy. *Id.* ¶¶ 116, 199. Cooper Union seeks dismissal of this contract claim on the ground that these policies did not create rights enforceable by students against Cooper Union with respect to the school's disciplinary decisions regarding third parties. Motion at 18-20; Reply at 7-8. The Court agrees in part and disagrees in part.

New York law recognizes that the legal "relationship between an institution of higher education and its students is 'contractual in nature.'" *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (quoting *Prusack v. State*, 498 N.Y.S.2d 455, 456 (2d Dep't 1986)); *see also Ward v. N.Y. Univ.*, No. 99 Civ. 8733 (RCC), 2000 WL 1448641, at *3 (S.D.N.Y. Sept. 28, 2000) ("Courts in this jurisdiction have acknowledged that a student can sue a school for breach of contract."). The terms of that contractual relationship are "contained in the university's

bulletins, circulars and regulations made available to the student." *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 421 (quoting *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987)).  To plead a breach of contract claim against her college or university, therefore, "a student must identify specific language in the school's bulletins, circulars, catalogues and handbooks which establishes the particular 'contractual' right or obligation alleged by the student" to have been breached.  *Novio v. N.Y. Acad. of Art*, 317 F. Supp. 3d 803, 810 (S.D.N.Y. 2018); *see also In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 421 ("In general, to sustain a contract claim against a university, a student must point to a provision that guarantees 'certain specified services' . . . ." (quoting *Baldridge v. State*, 740 N.Y.S.2d 723, 725 (3d Dep't 2002))).  A "general statement of policy," on the other hand, is not actionable.  *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 413 (S.D.N.Y. 2022) (internal quotation marks omitted).

Under these standards, Gartenberg's breach of contract claim is not viable to the extent that it rests on general statements of policy contained in Cooper Union's regulations.  For example, Gartenberg alleges that Cooper Union breached its promises to comply with federal, state, and local anti-discrimination laws, provide a campus experience "free from unlawful discrimination and harassment," "ensure the safety and security of [its] students," and "uphold[] the rights and dignity of all members of [the Cooper Union community]."  Compl. ¶¶ 125-126, 131-132, 137. These and other statements concerning Cooper Union's general policy of complying with anti-discrimination law and promoting a healthy learning environment are not actionable through a breach of contract claim.  *See Novio*, 317 F. Supp. 3d at 812 (dismissing a breach of contract claim against a university to the extent that it was based on promises to "provide . . . an educational environment free of sex discrimination in all programs and activities" and to "provide . . . an educational environment free of sexual harassment"); *Ward*, 2000 WL 1448641, at *4 (holding

that "broad pronouncements" of an institution's "compliance with existing anti-discrimination laws" and promises of "equitable treatment of all students" "cannot form the basis for a breach of contract claim").

Gartenberg also fails to identify any actionable promises with respect to enforcement contained in the Building Access Policy. The Building Access Policy merely states who is allowed to enter Cooper Union's facilities and under what conditions. Compl. ¶ 199(f). At most, the policy creates duties owed *to* Cooper Union by its students and, as described in the Complaint, did not by its terms suggest that Cooper Union would take any enforcement action to prevent or redress violations of that policy. *Id.* Indeed, the Complaint does not allege that the policy referred to enforcement or discipline at all beyond generally reserving Cooper Union's right to control campus access privileges. *See id.*

Gartenberg's claim, however, fares better with respect to Cooper Union's alleged failure to enforce the specific disciplinary rules prescribed by its Human Rights Policy, Code of Conduct, and Posting Policy. The Human Rights Policy expressly prohibits student-on-student harassment based on national origin and guarantees that "[i]f a policy violation is found, appropriate discipline will be imposed." Dkt. 21, Exh. 5 at 3, 64. The Code of Conduct, which applies to a much broader swath of student misconduct, prohibits "[b]ullying and intimidation in all forms," "[i]gnoring the instructions of security guards," "[a]cts of theft or vandalism (including graffiti) against the property of another student . . . or against the property of Cooper Union itself," and "[e]ngaging in disorderly, disruptive, or aggressive behavior that interferes with the general comfort, safety, security, health, welfare, or education of a member of The Cooper Union community or the regular operation of the school, including any behavior that is perceived to be threatening or dangerous to the health or safety of The Cooper Union community." Compl. ¶¶ 127, 199(b). The Code of

Conduct describes these as "Category A" forms of misconduct, meaning that Cooper Union considers them "extremely serious and subject to the highest penalties." *Id*. ¶ 127 & n.45. As a result, the Code of Conduct provides that "[f]or these categories of violation, the sanction will ordinarily be suspension or dismissal." *Id.* ¶ 128 n.45. Finally, Cooper Union's Posting Policy limits the posting of signs and other communications to a list of designated areas, requires all postings to comply with its Human Rights Policy and its Non Discrimination Policy, and states that postings in violation of those rules are "subject to immediate removal." *Id.* ¶ 199(d). Each of these policies thus prescribes specific standards of conduct that all Cooper Union students must follow and suggests that, when appropriate, Cooper Union will take action to prevent or punish violations. In other words, through these specific policies, Cooper Union "put itself out as an entity that would act in particular ways in certain situations, and as such, made specific, concrete promises." *Novio*, 317 F. Supp. 3d at 813 (allowing a breach of contract claim based on an institution's promises "to take immediate action to eliminate sexual harassment, prevent its recurrence, and address its effects" and "to respond promptly to complaints of sexual harassment").

Cooper Union argues that these disciplinary policies cannot sustain a claim for breach of contract because they reserve discretion to the institution to determine whether and to what extent disciplinary action is warranted in any given situation. *E.g.*, Motion at 19-20 ("The Code of Conduct does not legally bind Cooper Union to prosecute every potential violation or impose any specific disciplinary actions."). Cooper Union's assertion that it retains considerable discretion to determine how to enforce its policies is undoubtedly correct. Each of the disciplinary policies identified in Gartenberg's Complaint contemplates a substantial measure of discretion reserved to Cooper Union for determining whether and to what extent to punish alleged violations of its policies. And the Court (or, for that matter, a jury) is ill-equipped to second-guess Cooper Union's

exercise of that discretion. The Court therefore agrees with Cooper Union that mere allegations of a failure to impose a particular form of discipline in a given case is not sufficient to state a claim for breach of the relevant policies.

That Cooper Union has significant discretion under the relevant policies, however, does not render unviable any potential claim for breach of contract. "Under New York law, 'implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)). The implied duty of good faith prevents either party to a contract from acting in a manner that "'has the effect of destroying or injuring the right of the other party to receive the fruits of the contract,' or to violate the party's 'presumed intentions or reasonable expectations.'" *Id.* (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). As a result, "all contracts that confer discretion include an implied promise that neither party will 'act arbitrarily or irrationally' in exercising that discretion." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 810 (2d Cir. 2014) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). That principle applies with equal force in the educational context, where implicit in the contract formed between the university and the student "is the requirement that the institution 'act in good faith in its dealing with its students.'" *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 496 (S.D.N.Y. 2023) (quoting *Papelino*, 633 F.3d at 93).

As described above, Gartenberg has plausibly alleged that Cooper Union was deliberately indifferent—meaning that it acted in a clearly unreasonable manner—to known instances of harassment against Jewish students, including by failing to enforce its policies that proscribe vandalism, unauthorized postings, and intimidation; that require students to comply with the

instructions of a security guard; and that prohibit disorderly, disruptive, and threatening behavior. At the same time, as a matter of contract law, a student who submits to Cooper Union's policies against harassment and other forms of misconduct would reasonably expect those policies to be administered in an even-handed manner to protect them against others' misconduct as well. That is the clear import of the language of the policies, which list specific forms of misconduct, create an elaborate structure for adjudicating violations, and threaten harsh sanctions against students who break the rules. Although there is no question that Cooper Union retains discretion to determine how to address violations of its disciplinary codes, it may not defeat its students' reasonable expectations by arbitrarily failing to enforce its policies in a manner that effectively deprives those students of the very educational benefits and opportunities that form the basis of the contract. Accordingly, to the extent that Gartenberg alleges that Cooper Union acted in a bad faith, arbitrary, and irrational manner in failing to enforce its disciplinary policies to protect Jewish students from harassment, resulting in a loss of educational benefits or opportunities under the contract, this portion of her contract claim cannot be dismissed solely on the ground that Cooper Union made no enforceable promises. *See Kestenbaum*, 2024 WL 3658793, at *9 (denying a motion to dismiss a breach of contract claim where the complaint's allegations "sketch[ed] a claim that [the institution] breached the implied covenant by failing to evenhandedly administer its policies").

For these reasons, Cooper Union's Motion to dismiss Count V is granted as to the portion of the claim based on the Building Access Policy and on general statements of policy contained in the school's regulations, but denied as to Gartenberg's claim that the school breached its Human Rights Policy, Code of Conduct, and Posting Policy by failing to enforce its disciplinary rules in good faith.

D.      **Gartenberg's Common Law Tort Claims**

Cooper Union also seeks dismissal of Gartenberg's common law tort claims for negligence, premises liability, and negligent infliction of emotional distress.  Motion at 20-23.  The Court agrees that the Complaint lacks enough factual support to sustain these claims.

With the exception of claims for negligent infliction of emotional distress, negligence claims and premises liability claims based on a negligence theory each require plausible allegations of injury to one's person or property.  *See Morgan Stanley & Co. Inc. v. JP Morgan Chase Bank, N.A.*, 645 F. Supp. 2d 248, 257 (S.D.N.Y. 2009) ("Under New York law, a claim of negligence can only be made when the actions of the defendant have caused physical harm to the plaintiff or plaintiffs' property."); *accord Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 498 (2d Cir. 2020).  Here, Gartenberg alleges only emotional and economic harm in support of her tort claims, Compl. ¶¶ 213, 222, neither of which is sufficient under a traditional negligence theory.  Accordingly, Gartenberg does not state a plausible claim for negligence or premises liability.

Gartenberg's claim for negligent infliction of emotional distress fares no better.  "To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm."  *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021).  New York law allows a plaintiff to recover damages for emotional distress in negligence actions under three narrow theories: (1) the bystander theory; (2) the direct duty theory; and (3) when there is "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious."  *Carney v. Bos. Mkt.*, No. 18 Civ. 713 (LGS), 2018 WL 6698444, at *3 (S.D.N.Y. Dec. 20, 2018).

53

Gartenberg invokes the direct duty theory as the basis for her claim, *see* Opposition at 23, which requires a plaintiff to allege that she "suffers an emotional injury from defendant's breach of a duty which unreasonably endangered [the plaintiff's] own physical safety." *Robinson v. Sedgwick Claims Mgmt. Serv.*, No. 24 Civ. 3152 (LTS), 2024 WL 3696369, at *4 (S.D.N.Y. July 31, 2024) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)).  The direct duty theory "requires an objective inquiry turning on whether a plaintiff's physical safety was actually endangered, not a subjective evaluation dependent on the plaintiff's state of mind." *Truman v. Brown*, 434 F. Supp. 3d 100, 123 (S.D.N.Y. 2020) (internal quotation marks omitted).

Gartenberg argues that the requirement of an objective risk of physical harm is satisfied based on the October 25, 2023, library incident.  Opposition at 23.  But while plausibly threatening, the demonstrators were at all times separated from the Jewish students in the library by locked doors, and there are no allegations that the protestors engaged in any behavior that created an especially unreasonable risk of actual physical harm.  Thus, while the Court agrees that the library incident, as alleged, could reasonably have been viewed as physically threatening or humiliating by the Jewish students inside for purposes of a hostile educational environment, Gartenberg has not alleged facts showing that the incident created an objective and unreasonable risk of actual physical harm for purposes of a negligence claim.[11]

For these reasons, the Court grants Cooper Union's Motion as to Counts VI, VII, and VIII.

---

[11] Some courts have stated "that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety *or caused the plaintiff to fear for his or her own physical safety*." *Taggart v. Costabile*, 14 N.Y.S.3d 388, 396 (2d Dep't 2015) (emphasis added) (internal quotation marks omitted).  Because the parties' briefing focuses exclusively on the existence of an actual risk to safety, the Court does not consider whether a fear for one's physical safety—in the absence of actual physical harm or an objectively unreasonable risk of actual physical harm—suffices by itself.

E.      **Gartenberg's Requests for Punitive Damages and Injunctive Relief**

Among other forms of relief, the Complaint seeks an award of punitive damages.  Compl.
at 68.  Gartenberg also asks for "[i]njunctive relief requiring Cooper Union to proactively and
permanently end the antisemitic, anti-Israel environment on campus."  *Id.* at 67.  Cooper Union
moves to strike both forms of relief under Federal Rule of Civil Procedure 12(f).  Motion at 23-
25.

Rule 12(f) allows a district court, either on its own initiative or upon a motion by a party,
to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed.
R. Civ. P. 12(f).  "Federal courts have discretion in deciding whether to grant motions to strike."
*Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. 2019) (internal
quotation marks omitted).  Motions to strike, however, "are generally disfavored and granted only
if there is strong reason to do so."  *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F.
Supp. 3d 322, 352 (S.D.N.Y. 2023) (internal quotation marks omitted); *see also Bank of Am., N.A.
v. City View Blinds of N.Y., Inc.*, No. 20 Civ. 9911 (SLC), 2022 WL 580764, at *8 (S.D.N.Y. Feb.
25, 2022) ("Motions to strike call for an extreme remedy, and therefore they are disfavored and
rarely granted." (internal quotation marks omitted)).

The Court declines to strike Gartenberg's requests for punitive damages and injunctive
relief.  Punitive damages are potentially available at least under Gartenberg's claim under the
NYCHRL, which, as explained above, survives dismissal.  *See Chauca v. Abraham*, 89 N.E.3d
475, 481 (N.Y. 2017) (holding that a plaintiff may recover punitive damages under the NYCHRL
if "the wrongdoer has engaged in discrimination with willful or wanton negligence, or
recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount
to such disregard" (internal quotation marks omitted)).  And although some aspects of
Gartenberg's requested injunction would likely be impracticable and/or inconsistent with the First

Amendment principles described in this Opinion and Order, the Court cannot rule out the possibility that Gartenberg may be entitled to some injunctive relief should she ultimately prevail on her claims. The parties, of course, will have ample opportunity to further litigate the appropriateness and scope of any injunctive relief. So the Court does not find a compelling reason to resolve those issues at this time. *See Kestenbaum*, 2024 WL 3658793, at *9.

Accordingly, the Court denies Cooper Union's motion to strike.

### III.  Conclusion

For these reasons, the Court grants Cooper Union's Motion as to the portion of Count V that is based on the Building Access Policy and on general statements of policy contained in its regulations, and as to Counts VI, VII, and VIII. The Court denies the Motion as to Counts I, II, III, and IV, and as to the portion of Count V that is based on Cooper Union's alleged failure to enforce its Human Rights Policy, Code of Conduct, and Posting Policy in good faith. The Court denies Cooper Union's motion to strike Gartenberg's requests for punitive damages and injunctive relief. Because Gartenberg has not requested leave to amend or explained how she would seek to cure the deficiencies in Counts V though VIII identified herein, the Court does not grant leave to amend. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made."). Accordingly, Cooper Union shall file an answer to Gartenberg's Complaint on or before February 26, 2025. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 19.

SO ORDERED.

Dated: February 5, 2025
       New York, New York

                                    JOHN P. CRONAN
                                    United States District Judge