P1SsGARc

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   REBECCA GARTENBERG, et al.,

4                    Plaintiffs,

5            v.                              24 Civ. 2669 (JPC)

6   THE COOPER UNION FOR THE ADVANCEMENT
    OF SCIENCE AND ART,
7
                     Defendant.
8
    ------------------------------x
9                                            New York, N.Y.
                                             January 28, 2025
10                                           10:00 a.m.

11  Before:

12                       HON. JOHN P. CRONAN,

13                                           District Judge

14                           APPEARANCES

15  ARNOLD & PORTER LLP
         Attorneys for Plaintiffs
16  BY:  AARON STIEFEL
         DEBRA E. SCHRECK
17       MICHAEL J. GERSHONI
         BRIDGETTE GERSHONI
18       MELISSA ROMANOVICH

19       -and-

20  THE LAWFARE PROJECT
         Attorneys for Plaintiffs
21  BY:  ZIPORAH REICH

22  PATTERSON, BELKNAP, WEBB & TYLER LLP
         Attorneys for Defendant
23  BY:  LISA E. CLEARY
         JACQUELINE LEE BONNEAU
24       BHARATH PALLE

25
```

P1SsGARc

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Can counsel, starting with the
 3    plaintiff, please state your name for the record.
 4              MS. CLEARY:  Lisa Cleary, Patterson, Belknap, Webb &
 5    Tyler.
 6              THE COURT:  Good morning, Ms. Cleary.
 7              MS. CLEARY:  For Cooper Union.
 8              THE COURT:  I should have asked you as well.
 9              MS. BONNEAU:  Jacqueline Bonneau, also Patterson
10    Belknap, for Cooper Union.
11              THE COURT:  Good morning, Ms. Bonneau.
12              MR. PALLE:  Bharath Palle.
13              THE COURT:  Good morning, Mr. Palle.
14              And for plaintiff then?
15              MS. SCHRECK:  Good morning, your Honor.  Debra
16    Schreck.
17              THE COURT:  Turn on your microphone there.
18              MS. REICH:  Good morning, your Honor.  Ziporah Reich
19    from the Lawfare Project for plaintiffs.
20              THE COURT:  Good morning, Ms. Reich.
21              MS. ROMANOVICH:  Good morning, your Honor.  Melissa
22    Romanovich, Arnold & Porter for the plaintiffs.
23              THE COURT:  Good morning, Ms. Romanovich.
24              MR. STIEFEL:  Good morning, your Honor.  Aaron Stiefel
25    from Arnold & Porter.
```

P1SsGARc

1          THE COURT:  Good morning.

2          MR. STIEFEL:  Good morning, your Honor.  Michael

3   Gershoni from Arnold & Porter on behalf of the plaintiffs.

4          THE COURT:  Good morning, Mr. Gershoni.

5          MS. GERSHONI:  Good morning.  Bridgette Gershoni from

6   Arnold & Porter on behalf of the plaintiffs.

7          THE COURT:  Good morning, Ms. Gershoni.

8          So we're here for oral argument on the defendants'

9   motion to dismiss the complaint in this matter.  I expect to

10  have roughly 30 minutes per side.  I am not having a timer up

11  here.  There is a lot of topics to cover, and I certainly want

12  to make sure that we have the chance to discuss them.

13         For the plaintiffs, I understand Ms. Romanovich will

14  be handling the Title VI and related state and city law claims,

15  Mr. Gershoni will handle the breach of contract, and

16  Ms. Gershoni will handle the other common law claims and

17  remedies.

18         Is that correct?

19         MS. SCHRECK:  Correct, your Honor.

20         THE COURT:  OK.  And, Ms. Cleary, for the defendants,

21  will you be arguing then?

22         MS. CLEARY:  Yes, I will, your Honor.

23         THE COURT:  OK.  Just generally speaking, when

24  discussing the hostile environment claims, I expect, probably

25  for ease, I likely will be largely referring to Title VI, but

P1SsGARc

1    many of those arguments, of course, would apply to the

2    counterpart city and state causes of action.

3           OK.  Ms. Cleary then, since it's your motion, we'll

4    start with you, and feel free to use the podium.  Wherever you

5    are, just make sure you're close to the mic so we can all hear.

6           MS. CLEARY:  Thank you, your Honor.

7           There are two motions before the court, a motion to

8    dismiss all eight counts in the complaint for failure to state

9    a claim and a motion to strike the request for punitive damages

10   and injunctive reliefs.  For all of the reasons stated in

11   Cooper Union's motion to dismiss, there is no basis for this

12   litigation to proceed and all claims should be dismissed.

13          Let me begin by framing the facts as alleged by

14   plaintiffs in their complaint.  The gravamen of plaintiffs'

15   complaint concerns Cooper Union's handling of an October 25 of

16   2023 protest described as a walkout by the organizers with

17   plaintiffs participating in a counter-protest in support of

18   Israel in close proximity to the walkout protesters in the

19   public square.

20          The events at issue commenced at one o'clock p.m. on

21   the 25th and moved forward on a public sidewalk outside Cooper

22   Union's Foundation Building for approximately three hours

23   without injury to any person or any property damage.

24   Plaintiffs admit that they were fully visible and near the

25   demonstrators during this period.  There was no interaction,

P1SsGARc

1    physical or verbal, between these two groups of protestors for

2    these three hours.

3            Further, based on plaintiffs' pleadings, Cooper Union

4    had no reason to believe that the pro-Palestinian protesters

5    would decide to leave the public sidewalk and enter the

6    Foundation Building.  Throughout the afternoon, as plaintiffs

7    also admit, Cooper Union's leadership remained in close contact

8    with its security team and the NYPD, who were both on the scene

9    that afternoon.

10           THE COURT:  But does that fact really help you?

11           I mean, being in contact with the NYPD is pretty much

12   meaningless if you're not taking them up on their assistance,

13   their offer for assistance.

14           MS. CLEARY:  Your Honor, that goes to the standard

15   here for the court's consideration, which is whether Cooper

16   Union's actions and response to protest rised to the level of

17   deliberate indifference under the law.  And we submit, as Judge

18   Stearns in the case *StandWithUs v. MIT* cautioned that Cooper

19   Union's measured response to the events of the day is entirely

20   appropriate given the facts that plaintiffs pled.

21           And under these circumstances, it was not deliberately

22   indifferent.  Plaintiffs, we understand, vehemently disagree,

23   taking issue with how Cooper Union responded.  No decisional

24   law however, your Honor, cited by plaintiff supports the right

25   of plaintiffs to determine how Cooper Union should have

P1SsGARc

1    responded to these events.

2            Cooper Union's responses were reasonable and

3    appropriate under the circumstances.  A group of plaintiffs who

4    were outside on the public square during the external protest

5    chose to move into the Foundation Building.  A group of the

6    plaintiffs who were also outside in a public square during the

7    external protest chose to follow the demonstrators into the

8    Foundation Building and gather by the floor-to-ceiling windows

9    at the library.  The pro-Palestinian demonstrators returned to

10   the first floor after protesting in front of the president's

11   office on the seventh floor and attempted to enter the library.

12           Plaintiffs allege that Cooper Union's administrators

13   locked the library doors at some point after plaintiffs entered

14   the library.  There is no allegation that the pro-Palestinian

15   protesters entered the library and, indeed, plaintiffs admit in

16   paragraph 87 of their complaint that the protesters were unable

17   to gain entry to the library.

18           The pro-Palestinian demonstrators then gathered

19   outside the library's windows raising slogans and pounding on

20   the glass.  The plaintiffs who were visible to the

21   demonstrators alleged that they feared for their safety and

22   that that harassment and intimidation lasted for approximately

23   a 20-minute period.  Plaintiffs, however, also admit that they

24   refused a Cooper Union employee's suggestion that they move

25   away from the windows to avoid having to see the protesters or

P1SsGARc

1    leave the library through a back exit to avoid the protesters.

2    After 20 minutes, plaintiffs also plead that the pro-

3    Palestinian protesters left the building of their own accord.

4         Plaintiffs exited the building as a group with some,

5    in fact, accepting brief escorts by campus security guards.  No

6    one was injured during the protest inside the Foundation

7    Building and no one's property was damaged.

8         The allegations the plaintiffs plead of harassment and

9    discrimination are conclusory, your Honor.  Plaintiffs don't

10   plead that the demonstrators used any slurs or hurled any

11   invectives at plaintiffs.  On the contrary, plaintiffs only

12   allege that the demonstrators were raising broad political

13   slogans which were not directed at anyone specifically.  Even

14   though plaintiffs allege that they were visible to the

15   protesters outside the library, there is no allegation that the

16   protesters wanted to enter the library because plaintiffs were

17   there.

18        As Judge Stearns noted in the *StandWithUs* decision,

19   Title VI does not require a faultless response by college admin

20   administrators faced with claims of discrimination accompanied

21   by campus unrest, and there are no facts pled by plaintiffs

22   that meet the stringent standard of fault for deliberate

23   indifference here.

24        Plaintiffs have made no showing that Cooper Union's

25   response was so lax, misdirected, or so poorly executed as to

P1SsGARc

1    be clearly unreasonable under the known circumstances.

2            THE COURT:  Well, just talking about the October 25

3    incident, and there are more allegations than just what

4    happened in the Foundation Building that day, just talking

5    about after the demonstrators came into the building, security

6    did not check the IDs of any of them.  They pushed past

7    security.  No action was taken to disperse the demonstrators.

8            As I mentioned before, NYPD offered to enter the

9    building to intervene, but President Sparks told them to stand

10   down.  Even she herself locked herself in the office because

11   presumably she was scared as to what was occurring, and she was

12   able to escape through a back exit while these students were

13   locked in a library with demonstrators banging on the glass for

14   20 minutes.

15           How is that an adequate response?

16           MS. CLEARY:  Your Honor, the response is adequate

17   because it was a measured response, not to initiate or escalate

18   a situation.

19           THE COURT:  So no response is a measured response?

20           MS. CLEARY:  The response was to ensure that, with

21   respect to what was going on inside the library, that the doors

22   were closed so that the protesters could not enter and that

23   there be a measured response that did not escalate the

24   situation vis-a-vis police intervention.

25           THE COURT:  So let's assume that argument for now.

P1SsGARc

Part of that would be that I would imagine appropriate action

would be taken after the incident for these individuals who

clearly were in violation of the school policy and/or make the

press and number of students very scared for their safety.

President Sparks promised to review footage and take action and

assured that the school takes its code of conduct policy very

seriously.  But at the end of the day, it seemed like the

school did nothing.

          Did a single student who engaged in that conduct on

October 25 face any discipline?

          MS. CLEARY:  Your Honor, Cooper Union is also invested

with broad discretion with respect to how to handle misconduct

on the campus.  Plaintiffs pled in their complaint that

President Sparks initiated an investigation into the

circumstances of the October 25 protest.  It would be

inappropriate for Cooper Union to share details with the

community at large of what disciplinary measures were entered

against students, given the protections that students enjoy

under the law.

          THE COURT:  But at this stage, though, I have to

assume the allegations in the complaint and the complaint I

believe alleges that no actions were taken.

          Is that right?

          MS. CLEARY:  Plaintiffs would have no reason to know

whether actions were taken or not, your Honor, given the

P1SsGARc

```
 1    privacy considerations at issue here.
 2              THE COURT:  Well, don't we need discovery on that
 3    issue then?
 4              MS. CLEARY:  I don't think it's relevant, your Honor,
 5    to the claims at issue here.  The issue is, was Cooper Union
 6    deliberately indifferent in doing nothing in response to the
 7    events of the day.  And Cooper Union, in fact, did many things
 8    in response to the day including, your Honor, many of the
 9    things that the DEA in its guidance have said are appropriate
10    responses on the part of college administrators, including
11    condemning antisemitism on multiple occasions.
12              Publicly stating that it was coordinating with the
13    NYPD for ensuring campus safety, as I said, initiating an
14    investigation into the events of the day, expanding its slate
15    of counseling resources provided to the student community,
16    removing all unauthorized posters, banners, graffiti within a
17    few hours or a few days of when they were put up, and
18    commencing special programming and educational sessions to
19    educate the community on the history of the Middle East
20    conflict.
21              THE COURT:  Didn't some of the graffiti remain up over
22    a week just by complaints of students?
23              MS. CLEARY:  Your Honor, graffiti removal within a
24    reasonable period of time would not be shown to be deliberate
25    indifference.  It's a small college and a lot of territory to
```

P1SsGARc

1  cover.  And as plaintiffs pled, they did remove the graffiti,

2  they did remove the posters.  Some many within hours and some

3  within -- and the graffiti within days, so ...

4          THE COURT:  Now, Ms. Cleary, you rely a lot on the

5  First Amendment here.

6          What is the nature of the First Amendment interest

7  that you're seeking to invoke?

8          Is it Cooper Union's First Amendment right to control

9  its educational environment?  Is it the right of the students

10  to express themselves on campus?  How is the First Amendment

11  implicated here?

12          MS. CLEARY:  It would be the right of students and

13  faculty to express themselves on the Cooper Union campus, your

14  Honor.

15          THE COURT:  Does Cooper Union have standing to assert

16  First Amendment claims of its students?

17          MS. CLEARY:  What Cooper Union has stated in its

18  motion to dismiss, your Honor, is that the argument is that

19  there is nothing in Title VI or the regulations implementing it

20  that require or authorize a school to restrict any rights

21  otherwise protected by the First Amendment to the Constitution.

22          THE COURT:  Now, your moving brief has a line that

23  says, Every instance of challenged conduct in the complaint is

24  speech or expression about controversial geopolitical issues.

25          Is it your position that every allegation of potential

P1SsGARc

```
 1   harassment in the complaint must be disregarded under the First

 2   Amendment?

 3          MS. CLEARY:  I don't think that that is what we are

 4   saying, your Honor.

 5          THE COURT:  OK.  Let me ask you this scenario.

 6          If the incident here was more overt antisemitic

 7   speech, say the protesters were flying flags with swastikas on

 8   them or expressly calling for the killing of Jews, would that

 9   change the First Amendment calculus here?

10          MS. CLEARY:  It might, your Honor.

11          THE COURT:  So, if that's the case, what is the First

12   Amendment principle here that speech becomes actionable under

13   Title VI once it reaches some heightened threshold of

14   offensiveness or overtness?

15          MS. CLEARY:  Our legal position, your Honor, is that

16   the conduct alleged in the complaint, posters and banners

17   expressing a perspective on the Middle East conflict, is speech

18   protected and it does not compel Cooper Union to silence that

19   speech because plaintiffs in this case wish for Cooper Union to

20   do so.  It is not plaintiffs' right to advise and compel Cooper

21   Union to take specific action with respect to political views

22   on campus, your Honor.

23          THE COURT:  I believe you suggested, but just to

24   confirm, I assume you don't dispute that Title VI would reach

25   antisemitic harassment or other antisemitic discrimination
```

P1SsGARc

1    against Jews, is that right?

2              MS. CLEARY:  It would, your Honor.  We submit that

3    those facts are not present here.

4              THE COURT:  Understood.

5              In terms of the university's response to some of the

6    illegal or the unauthorized postings or postings in violation

7    of university policy, didn't some of that occur right in front

8    of security?

9              MS. CLEARY:  Security is guided by the administration

10   with respect to appropriate action to be taken, and for that

11   reason, for example, your Honor, that it took several hours to

12   remove posters is entirely reasonable under the circumstances.

13   And pragmatic, too, your Honor.

14             THE COURT:  Why was it then reasonable and pragmatic

15   to hand the posters back to the protesters that were improperly

16   and unlawfully put up?

17             MS. CLEARY:  It's their property, your Honor.

18             THE COURT:  They don't forfeit their interest in their

19   property when they put it up in violation of a private

20   institution's policy on that private institution's walls?

21             MS. CLEARY:  The posting policy does not state, your

22   Honor, that Cooper Union will confiscate property posters

23   improperly posted on Cooper Union's property.

24             THE COURT:  Were the students at least told don't put

25   it up again?

P1SsGARc

1          MS. CLEARY:  Your Honor, there is not a pleading by

2     the plaintiffs that the posters that went up throughout the

3     campus were identified to be posted by particular students, so

4     Cooper Union did not know who posted the posters.  It would not

5     be possible for them to discipline those students.

6          THE COURT:  I believe there is a pleading that there

7     was not a warning about future violations, though.

8          MS. CLEARY:  Could you repeat that, your Honor?

9          THE COURT:  Sure.

10          I believe there was a pleading -- I don't have the

11     paragraph at my hand right now -- that the protesters were not

12     warned about future violations and not committing future

13     violations.

14          MS. CLEARY:  Again, your Honor, I do not believe the

15     posting policy at issue requires Cooper Union to notify

16     individuals.  And, again, they didn't know who was posting

17     those posters.  There is information in the complaint about

18     President Sparks, for example, encouraging anyone who felt that

19     they were being discriminated on the basis of their religion or

20     national origin to follow the procedures that govern that

21     nondiscrimination policy under Cooper Union's policies, and

22     that was what plaintiffs pled in the complaint as well.

23          So there were avenues for people to lodge complaints

24     if they felt they were discriminated against in this matter.

25     The complaint does not allege that any of the named plaintiffs

P1SsGARc

1    ever invoked Cooper Union's nondiscrimination policies to lodge

2    complaints for what they were allegedly experiencing on the

3    campus.  The recent decision in the Eastern District of

4    Pennsylvania written by Judge McHugh suggested that a failure

5    to lodge complaints deprives a plaintiff in circumstances such

6    as this of being able to claim deliberate indifference because

7    the college would not have been put on notice of their

8    concerns.

9            THE COURT:  You don't think Cooper Union was on notice

10   of the concerns of Jewish students at this point?

11           MS. CLEARY:  And, your Honor, Cooper Union was on

12   notice and took the steps, as I outlined earlier, to ensure

13   that the campus was a safe campus or all students.

14           THE COURT:  Is it your position that simply locking

15   the doors of the library with the students in there is enough

16   for the school to discharge its obligations under Title VI?

17           MS. CLEARY:  As plaintiffs pled, your Honor, in

18   addition, I will just say the public record suggests that the

19   doors were not locked, but we'll accept that allegation as

20   true.  The plaintiffs also pled in their complaint that Cooper

21   Union's administrators offered them to move away from the

22   windows so as to avoid the protesters through the glass, and

23   that Cooper Union also offered an exit both of which the

24   plaintiffs denied those requests for assistance.  So it was

25   three steps, your Honor, that Cooper Union took to try to quell

P1SsGARc

 1    the concerns of plaintiffs.

 2         THE COURT:  Would there have been any belief of the

 3    police or security escorting them through that back exit?

 4         MS. CLEARY:  Plaintiffs do not plead that that is what

 5    they requested, but Cooper Union did offer a back exit.  And if

 6    the protesters were near the windows, it would seem unlikely

 7    that there could be a real safety concern there.

 8         THE COURT:  I mean, there were students crying, there

 9    were students calling their loved ones.  After the safety

10    issue, President Sparks was concerned enough about her safety

11    that she locked herself in her office and she was able to.  And

12    all they were told was that they should just go hide upstairs

13    in the windowless portion of the library or do their best to

14    try to escape a back exit, and this is all while they are

15    trying to have the police called, while the school is refusing

16    offers from the police to intervene.

17         I'm just having trouble understanding how this is a

18    reasonable response.

19         MS. CLEARY:  So, your Honor, several things.

20         First, the allegations confirm that there were a high

21    level of administrators in the library with the students at the

22    time offering aid and protection.  Also, the pleadings confirm

23    that security and NYPD were on standby.  And I would also note,

24    your Honor, that in the case involving Columbia and the protest

25    on the Columbia campus, forceful intervention could have led to

P1SsGARc

```
1    far more severe consequences.  And I will reaffirm, again, that
2    Title VI, as Judge Stearns noted, does not require clairvoyance
3    and it is appropriate for colleges and universities to take
4    measured approaches, given all the facts and circumstances that
5    are present at the time.
6             And as your Honor is also aware from their pleadings,
7    after 20 minutes in front of the library, the protesters left
8    of their own accord.  There was no physical injury.  There was
9    no property damage.  And Cooper Union, once again, offered the
10   plaintiffs in this case a safe exit, some of them taking
11   advantage of it by having security take them home.
12            In all of these circumstances, this set of facts that
13   played out with Cooper Union's administrators is very much in
14   line with the reasoning of Judge Stearns in the *StandWithUs v.*
15   *MIT* case and you have to look at all of the circumstances of
16   the day, not just the 20 minutes in the library, and understand
17   that Cooper Union's response was entirely reasonable under
18   those circumstances.
19            THE COURT:  And you may, at the end of the day, be
20   right about that.  But doesn't that just beg the need for
21   discovery to figure out if you are?
22            MS. CLEARY:  Based on the pleadings that plaintiffs
23   submitted, your Honor, the facts are there for this court to
24   dismiss the complaint on a finding that there can be no
25   stanchion of deliberate indifference based on the pleading, the
```

P1SsGARc

1    231-paragraph complaint that was filed, your Honor.

2              THE COURT:  You touched on it a bit.

3              MS. CLEARY:  Your Honor, I would also say --

4              THE COURT:  Go ahead.

5              MS. CLEARY:  -- that one of the other environment

6    requirements of Title VI is that there will be a loss of an

7    educational opportunity or benefit, and Cooper Union maintains

8    that they cannot substantiate that point here.

9              THE COURT:  Well, didn't the Second Circuit say in

10   *Zeno*, Z-e-n-o, that educational benefits can include an

11   academic environment free from discriminatory hostility.  So,

12   if they prevail up to that point, aren't they pretty close to

13   meeting that prong?

14             MS. CLEARY:  There was a single incident, your Honor,

15   of the protest in the 20 minutes in the library.  The *Davis*

16   case from the Supreme Court of the United States makes clear

17   that, while theoretically possible, it is highly doubtful that

18   a single incident of a peer-to-peer harassment could make a

19   Title VI claim, your Honor.

20             This case is very unlike *Zeno*.  In *Zeno*, it involved

21   a multi-year harassment of the plaintiff who was a biracial

22   child attending a rationally homogenous school with less than

23   five percent of the students being of a minority background.

24   Zeno was repeatedly assaulted and abused with racial epithets

25   over a three-year period in high school.  Other students

P1SsGARc

1    repeatedly threatened to rape his younger sister and even

2    displayed a noose on a tree.

3            Those are not the facts here, your Honor.  And I would

4    also say, in the *Zeno* case, the court suggested that, in fact,

5    under the facts of *Zeno*, the school would have been much better

6    off focusing on education and learning for the population of

7    students in the school rather than simply focusing on

8    discipline for the students who were inappropriate to Anthony,

9    the child in that matter.

10           THE COURT:  Well, the facts in *Zeno* certainly were bad

11   ones, but in terms of what's alleged here and the loss of

12   educational benefits or opportunities, why aren't the

13   allegations in paragraph 142 of the complaint enough?

14           The plaintiff alleged that Jewish students suffered

15   emotional distress, including intense anxiety and panic

16   attacks, having engaged therapists, missed and/or dropped

17   classes, failed to complete and perform on assignments, have

18   avoided campus buildings like the Foundation Building library,

19   and even that one student delayed completing their degree,

20   causing significant financial and temporal loss.

21           Doesn't that reflect at least an allegation that there

22   was a loss of educational benefits or opportunities?

23           MS. CLEARY:  The loss of educational benefits or

24   opportunities has to be related to conduct that Cooper Union

25   did or didn't take.  I don't dispute that plaintiffs may have

P1SsGARc

1    found it difficult to be on a college campus after the

2    October 7 attacks.

3         But the question is, did Cooper Union do anything with

4    respect to depriving students of educational benefits or

5    opportunities, and plaintiffs have not pled any allegation that

6    Cooper Union was a part or privy to the loss of educational

7    benefits or opportunities, your Honor.

8         THE COURT:  I do want to just briefly go back to one

9    allegation we have not touched upon that I want to give you the

10   opportunity to address.

11        I believe paragraph 104 of the complaint alleges a

12   number of things, but one of them is that a bathroom stall was

13   vandalized with the phrase *From the River to the Sea* written in

14   a font that is commonly associated with.

15        What should I take of that allegation?

16        MS. CLEARY:  It's a very serious allegation, your

17   Honor.  They did not plead that a Cooper Union administrator

18   put that on the bathroom stall.  Cooper Union, as they also

19   pled, however, removed posters and signs that were

20   inappropriate.  That is Cooper Union's obligation.  And there

21   is no pleading that Cooper Union was aware of whoever it was

22   that placed that on the bathroom stall.

23        Cooper Union cannot be in all places on the Cooper

24   Union campus.  It's a small college with a relatively small

25   group of college administrators, your Honor.  Cooper Union

P1SsGARc

responded reasonably under the circumstances and in a timely

manner under the circumstances.  That is its legal obligation

under Title VI.

THE COURT:  In terms of the breach of contract claims,

what is your view on whether students can sue a school for

breach of contract if the school's materials, that is,

handbooks, catalog, bulletins, establish certain particular

rights and obligations?

Can a student sue under those circumstances?

MS. CLEARY:  So, we submit that they cannot, your

Honor.  That generalized allegations to provide plaintiffs a

campus free of unlawful discrimination and harassment

allegation is not sufficient to support a breach of contract

claim.  And the Sarah Lawrence College case, that case, unlike

here, failed to follow its own Title IX procedures and refused

to offer the plaintiff accommodations available to a victim of

sexual assault under campus policies.  By contrast here,

plaintiffs failed to plead a breach of contract claim when they

make bald assertions and conclusory allegations claiming the

university's rules or procedures were not followed.

And on the building access policy, your Honor, Cooper

Union didn't owe a duty to plaintiffs under this policy, rather

all members of the community owed a duty, including the

plaintiffs, to comply with this campus regulation.  But that

duty of each member of the Cooper Union community does not mean

P1SsGARc

```
1    that Cooper Union owes the entire campus the same duty back.

2    They cite, plaintiffs cite no rule or judicial decision for

3    such a reading of campus policies.

4              THE COURT:  What about the human rights policy, that

5    policy seems to prohibit student-on-student harassment and also

6    guarantees that appropriate discipline will be imposed if a

7    violation occurs.

8              Why is that more -- I take your point about certain

9    allegations being generalized, about discrimination laws, but

10   why is the human rights policy more specific?

11             Why isn't it more specific?

12             MS. CLEARY:  Your Honor, in this case, there is also

13   an allegation by plaintiffs that, in fact, Cooper Union

14   initiated disciplinary -- it initiated a review of the day to

15   consider the circumstances of the October 25 protest and deal

16   with the allegations and complaints that were raised.

17             THE COURT:  Does Cooper Union have enough discretion

18   to also have the right to never enforce these policies?

19             In other words, did Cooper Union hold out these

20   policies to prospective students and then, in fact, never have

21   the intent to enforce them?

22             MS. CLEARY:  So, your Honor, it's important to note

23   that no plaintiff filed a complaint under the human rights

24   policy.  Plaintiffs do not allege that.  We also don't

25   understand plaintiffs to allege that no investigation took
```

P1SsGARc

1  place.

2        What they were complaining about in the complaint was

3  about the speed of the investigation and outcomes.  And, again,

4  your Honor, they would have no reason to know of outcomes given

5  what obligations that the college has.

6        THE COURT:  What they seem to be arguing is that

7  Cooper Union was arbitrarily failing to exercise its own

8  disciplinary rules, and that caused them to not receive the

9  benefits of the contract they entered into with the school.

10        How did that come short of stating a breach of

11  contract?

12        MS. CLEARY:  Your Honor, I don't understand how a

13  breach of contract could survive here, given the fact that no

14  plaintiff complained about a violation of the human rights

15  policy.  Cooper Union's generalized obligation to enforce its

16  policies is not really at issue here because none of the

17  plaintiffs here filed complaints.  It's unlike *Kestenbaum*,

18  where there were allegations that Mr. Kestenbaum had filed a

19  complaint and nothing happened.  There is no allegation here,

20  your Honor, that plaintiffs complained about violations of

21  Title VI and nothing was done.

22        Also, your Honor, that the human rights policy does

23  not have any provision as to the particular disciplinary

24  outcome that needs to happen, and there is no situation in

25  which individual students would ever know about specifically --

P1SsGARc

1    about specific disciplinary action taken.  That's for the

2    protection of all students on the Cooper Union campus.

3        THE COURT:  So, if there is a prospective student who

4    is trying to decide which college to go to and reads Cooper

5    Union's human rights policy or its code of conduct policy and

6    see if what appears to be a commitment to enforce the most

7    serious forms of misconduct, it would seem reasonable for that

8    student to see that, as a promise, they will be protected if

9    they decide to go to Cooper Union and take that into account in

10   deciding which college to go to.

11       Do you disagree with that?

12       Because, I guess, in other words, by paying tuition

13   and agreeing to be regulated themselves by Cooper Union's

14   disciplinary policies, why wouldn't it be reasonable for a

15   student to also expect that they will be protected under those

16   policies from misconduct by others at the school?

17       MS. CLEARY:  Your Honor, in this instance, there is no

18   allegation pled that any of the plaintiffs weren't protected

19   under Cooper Union's human rights policy.  That is not in their

20   complaint, your Honor, so there could be no breach of contract.

21       It's also difficult to understand what the breach is

22   here, your Honor, because there is no right to a specific legal

23   discipline.  I would also note, your Honor, that the *Davis* case

24   underscored that it is not within the ambit of a court in its

25   discretion to dictate how college administrators handle campus

P1SsGARc

1    issues, that college administrators should be given wide berth

2    and should refrain from second-guessing the decisions of school

3    administrators in many circumstances such as this.

4                THE COURT:  I think the breach of contract argument

5    here comes pretty close, if not directly, to making an argument

6    of a breach of the covenant of good faith and fair dealing.

7    Even if a party to a contract has discretion, the party cannot

8    exercise that discretion in an arbitrary manner, and in doing

9    so, deprived the other side of the fruits of the contract.

10    That seems to be what the argument is here.

11                MS. CLEARY:  Your Honor, I go back to what complaint

12    did plaintiffs file which they have not pled under Cooper

13    Union's nondiscrimination policy.

14                How can there be a breach if they did not file a

15    complaint and Cooper Union didn't have an opportunity to

16    respond?

17                THE COURT:  Ms. Cleary, feel free to touch on anything

18    else, hit on anything else you wish to.  I think we covered a

19    lot.

20                MS. CLEARY:  I'll just save five minutes for rebuttal,

21    your Honor.  I think we have covered a lot.

22                THE COURT:  Absolutely.

23                MS. CLEARY:  Thank you.

24                THE COURT:  OK.  Ms. Romanovich.

25                MS. ROMANOVICH:  Good morning, your Honor.  Melissa

P1SsGARc

1    Romanovich from Arnold & Porter for plaintiffs.

2              Your Honor, this court should deny Cooper Union's

3    motion to dismiss with respect to plaintiffs' Title VI claim in

4    its entirety for three reasons.

5              First, your Honor, the offending speech alleged in

6    plaintiffs' complaint were not simply policy pronouncements or

7    criticisms of Israel or its government, as Cooper Union has

8    made them out to be.  Rather, they were deliberate calls for

9    violence against Jews and against Jewish people for whom

10   Zionism and affinity for Israel is integral to their Jewish

11   identity.

12             Cooper Union has conceded, your Honor, based on the

13   scenario presented, that this would change the calculus of the

14   litigation.  Now, defendant would have this court believe that

15   plaintiffs filed this lawsuit simply because Cooper Union did

16   not prohibit expressions of opinion regarding complex

17   geopolitical issues in opposition to Israel.  Cooper Union

18   argues, for example, on pages eight and nine of its motion to

19   dismiss, your Honor, "All of the third-party postings and

20   slogans at issue in the complaint constitute political speech

21   either criticizing Israel or supporting the Palestinian cause."

22   But your Honor this could not be further from the truth.

23             The offending speech was not just anti-Zionist or

24   anti-Israel.  It was anti-Jewish.  And it was not simply

25   speech, your Honor, it was pervasive harassment and

P1SsGARc

```
1    intimidation.  For example, in the wake of Hamas' brutal attack

2    on Israel on October 7, 2023, when students chanted "globalize

3    the intifada from New York to Gaza," they were calling to bring

4    deadly attacks against all Jewish people to New York to Cooper

5    Union.  When they chanted "there is only one solution, intifada

6    revolution," they invoked Hitler's final solution, which did

7    not simply target Israelis or Zionists, it targeted all Jewish

8    people.  If those students simply had wanted to express

9    anti-Israel views and have their views be heard, they could

10   have done so in a peaceful manner outside the building.

11        Instead, your Honor, they wanted to intimidate

12   plaintiffs.  They chanted these genocidal slogans for hours,

13   and they stormed the Foundation Building, surrounded the Jewish

14   plaintiffs who sought refuge in the library.  They banged on

15   the glass windows, rattling the locked library doors, shouting

16   antisemitic slogans and, let us in, and they held up

17   antisemitic and anti-Israel posters.

18        And then throughout the school year, your Honor,

19   plaintiffs were inundated with more antisemitic postings all

20   over campus encouraging violence as resistance and celebrating

21   violence against Jewish people.  These were not expressions of

22   political opinion or peaceful slogans merely showing support

23   for the Palestinian cause, your Honor.  These slogans and

24   expressions were meant to intimidate and instill fear in

25   plaintiffs simply because of their Jewish identity.  This
```

P1SsGARc

1    identity is protected, your Honor, under Title VI, and has been

2    recognized by the Office for Civil Rights, both Biden and Trump

3    administrations, the Supreme Court, and other college's

4    policies, including NYU and, most recently, Harvard.  Cooper

5    Union failed to protect plaintiffs in violation of Title VI,

6    all while this hostile environment developed on campus.

7            Second, your Honor, Cooper Union is not bound by the

8    First Amendment as a private school.  But even if it was, the

9    school cannot rely on freedom of speech or tout its respect for

10   political expression to justify allowing plaintiffs to suffer

11   and antisemitism to fester on its campus in violation of

12   Title VI.  A school is obligated to balance students' freedom

13   of speech interests with its Title VI obligations.

14           Universities can prohibit actions and conduct that

15   materially and substantially disrupt the work of discipline of

16   the school, especially if the protesters obstruct Cooper

17   Union's educational mission through threats of violence.

18   What's more, your Honor, Cooper Union is required under

19   Title VI to act to eliminate a hostile environment for Jewish

20   students, even when speech is protected by the First Amendment,

21   and Cooper Union can do so without restricting those students

22   rights.

23           Cooper Union could have pursued any number of remedies

24   as detailed in the May 7, 2024, OCR Dear Colleague letter to

25   mete out antisemitism.  Instead, your Honor, with each

P1SsGARc

```
1    statement Cooper Union released, the school failed to mention
2    that the events of October 25 were motivated by antisemitism.
3    The school repeatedly downplayed the severity of the situation
4    and minimized what plaintiffs experienced in the library that
5    day.
6            The students who harassed plaintiffs, your Honor, on
7    October 25, and then throughout the school year, do not have a
8    First Amendment right to deprive Jewish students of the
9    benefits of a Cooper Union education, and Cooper Union should
10   have acted to uphold its Title VI obligations.  At the very
11   least, your Honor should wait to address this free speech or
12   First Amendment issue until plaintiffs can put together a fully
13   developed factual record as the District Court of Massachusetts
14   permitted in *Kestenbaum v. Harvard*.
15           Third, and finally, your Honor, plaintiffs' complaint
16   sufficiently alleges that there was a severe and persuasive
17   hostile environment at Cooper Union, and Cooper Union was
18   deliberately indifferent to this hostile environment.  The
19   harassment plaintiffs endured was severe and pervasive.
20   Harassment is severe or pervasive, your Honor, when it
21   undermines and detracts from plaintiffs' educational experience
22   and when it deprives them of taking advantage of an
23   institution's resources and opportunities.
24           I would like to make clear to the court that the
25   library incident on its own was sufficiently severe.  A single
```

P1SsGARc

1    act can be so severe to create a hostile environment for Title

2    VI purposes.  After the protest outside during which protesters

3    chanted genocidal slogans, they then aggressed the library,

4    pounded on the glass windows, rattled the doors screaming let

5    us in, they shouted hateful slogans and held intimidating

6    signs, all while the Jewish plaintiffs were readily observable

7    inside.  And as the plaintiffs were locked in the library

8    frantically calling police, texting and calling loved ones,

9    crying, the police offered to intervene and President Sparks

10   told the NYPD to stand down.

11        But even beyond the events of October 25, your Honor,

12   later throughout the year, plaintiffs were inundated with

13   violent antisemitic postings plastered all over campus.  And,

14   your Honor, antisemitism and harassment motivated by

15   antisemitism persists at Cooper Union today.  As a result, and

16   given the totality of the circumstances, plaintiffs have been

17   deprived of a full advantage of their Cooper Union education.

18   They avoid certain areas of campus, including the library,

19   still traumatized by what happened on October 25.  They have

20   missed classes, they have seen their school work decline, they

21   have engaged therapists, they have suffered severe emotional

22   trauma, including experiencing anxiety and panic attacks.

23        Notwithstanding all of this, your Honor, the

24   determination of whether harassment is severe or pervasive is a

25   factual request that is best left for trial.  Your Honor,

P1SsGARc

1  plaintiffs submit that not only did they experience severe and

2  pervasive harassment, but Cooper Union has been deliberately

3  indifferent to this hostile environment.  Cooper Union acted

4  unreasonably in light of the known circumstances, and we're not

5  aware of any remedial actions Cooper Union has taken against

6  those who calculated Cooper Union's policies and harassed

7  plaintiffs.

8          Accordingly, Cooper Union's conduct made plaintiffs

9  more vulnerable to harassment.  Your Honor, counsel for Cooper

10  Union relies on the *StandWithUs MIT* classes.  But MIT is

11  distinguishable in several respects.  First of all, your Honor,

12  in *MIT*, it was a different deliberate indifferent standard than

13  here.  But even so, your Honor, even under the *MIT* standard,

14  Cooper Union still failed to uphold its Title VI obligations.

15  And further, your Honor, MIT took steps in that case and

16  changed its approach, albeit unsuccessful, to eliminate the

17  hostile environment.  The school attempted to curtail certain

18  protests, suspended protesters from nonacademic activities,

19  suspended a group that was noncompliant with procedures.  When

20  that didn't work, the school warned students of discipline.

21  And when that didn't work, the school suspended and arrested

22  trespassing students.

23          Your Honor also mentioned Zeno.  *Zeno* requires that

24  schools evolve and change their efforts as circumstances change

25  and remedial actions that have little more than half-hearted

P1SsGARc

1    measures behind them are a basis for claimed deliberate

2    indifference.

3           Your Honor, I'm happy to provide the court with a

4    number of examples of --

5           THE COURT:  Let me just ask about the response there.

6           Can you address the point then, one point Ms. Cleary

7    made, which is the decision essentially on October 25 not to

8    send the police in or have more forceful intervention was

9    essentially a calculated one.  Doing so could have only led to

10   a worse response.

11          MS. ROMANOVICH:  Well, your Honor, even if that is

12   true, the school had an opportunity to pursue remedial measures

13   after the fact, and the school does not -- or we're not aware

14   of any remedial measures the school pursued after the fact.  It

15   would have been reasonable for the school to conduct an

16   investigation or discipline students who not only violated

17   school policies, but also harassed plaintiffs on that day.  So

18   whether or not police intervention would have escalated the

19   situation on that day, there were a number of things Cooper

20   Union could have done after the fact as well.

21          THE COURT:  How do you know that students were not

22   disciplined after the fact?

23          MS. ROMANOVICH:  Your Honor, we're not aware that

24   students have or have not been disciplined, but surely the fact

25   that the hostile environment for Jewish students continues

P1SsGARc

```
 1   means that Cooper Union's efforts have been half-hearted at
 2   best, and they have not changed their efforts to eliminate the
 3   hostile environment for Jewish plaintiffs.
 4            THE COURT:  Let me bring you back to your, I guess,
 5   the second point when you outlined the three main points that
 6   you had that involves the First Amendment.
 7            So I take it your position is that the First Amendment
 8   has no relevance to a hostile educational environment claims in
 9   this case.
10            MS. ROMANOVICH:  Well, your Honor, even if the
11   student -- even assuming the students do have First Amendment
12   rights, which they may not necessarily here because Cooper
13   Union is a private school and can impose reasonable
14   restrictions to further its educational mission, Cooper Union
15   can take certain remedial measures without restricting those
16   students' First Amendment rights.  There are a number of things
17   the school can do that would be reasonable to eliminate the
18   hostile environment on campus without suppressing or
19   prohibiting certain speech.
20            THE COURT:  I guess where it gets complicated here is
21   that there appears to be, I think in my mind, two different
22   questions when we're looking at First Amendment here.  One is
23   whether a private institution like Cooper Union can regulate
24   speech of a student without regard to the First Amendment.  But
25   there is a separate question of whether congress can compel an
```

P1SsGARc

```
1    institution to do so with the threat of civil liability.

2           In other words, why wouldn't your position necessarily

3    entail requiring a school to sensor or punish otherwise

4    protected speech to avoid facing liability for a hostile

5    educational environment under Title VI?

6           MS. ROMANOVICH:  Well, your Honor, the speech here is

7    not necessarily protected speech because it was calling for

8    violence against Jewish students.  So that is the first point,

9    your Honor.

10          But, second of all, Cooper Union, at minimum, should

11   be enforcing its policies to protect all students, including

12   Jewish plaintiffs, from a developing hostile environment.

13          THE COURT:  But some of the speech here, if done on

14   the street, would be protected speech.  So essentially we have

15   a situation here where Cooper Union might be facing liability

16   under Title VI because it did not sensor that speech.

17          Isn't that problematic?

18          MS. ROMANOVICH:  Well, your Honor, the offending

19   speech here is helpful to assess whether there is a

20   discriminatory intent, so we're not asking Cooper Union to

21   suppress or prohibit antisemitism or otherwise offensive speech

22   no matter how objectionable or offensive that speech may be.

23          But when that speech turns into harassing conduct and

24   deprives Jewish students from taking full advantage of their

25   education, that's where the line is drawn and that is why
```

P1SsGARc

 1   Cooper Union needs to step in and assure that its upholding its

 2   Title VI obligations.  Federal agencies, for example, are

 3   required to consider the IRA definition in contemporary

 4   examples in determining whether there is a discriminatory

 5   intent behind such conduct.

 6          And so Cooper Union, looking at the totality of the

 7   circumstances here, your Honor, Cooper Union can understand

 8   that the harassing conduct is based on and motivated by

 9   antisemitism.

10          THE COURT:  When did the line get crossed here?

11          At what point did we go from speech that would remain

12   protected to speech that could give rise to liability here?

13          MS. ROMANOVICH:  Well, your Honor, there is a number

14   of factors, your Honor.

15          A jury might consider including whether the protesters

16   were violating Cooper Union's own policies or its time, place,

17   and manner restrictions, whether the conduct was physically

18   threatening or humiliating, whether the speech or conduct was

19   directed kind of more generally or at a specific group, whether

20   there was psychological harm.

21          I would like to point out that physical harm or

22   property damage is not required here, your Honor.  So the

23   existence or nonexistence of these different factors make for

24   very different circumstances and feelings, and so while the

25   speech may have demonstrated the intent, the antisemitism,

P1SsGARc

1    which, again, we're not asking Cooper Union to suppress

2    objectionable speech, the conduct then turned into harassment

3    based on these and other factors.

4            THE COURT:  I don't know if you're familiar with the

5    Supreme Court decision in *Pennhurst*, but that essentially goes

6    to the principle that congress must speak in clear terms when

7    it exposes recipients of federal funds to a private damages

8    suit.  *Pennhurst*, I believe, involved the state facing a

9    liability.

10           But do we have a notice problem here under that

11   rationale?  In other words, given the background of the First

12   Amendment principles that have been discussed, how could Cooper

13   Union have reasonably expected that a failure to sensor or

14   punish debate or discussion on these matters could expose them

15   to monetary damages?

16           MS. ROMANOVICH:  Well, your Honor, Cooper Union had

17   plenty of notice, contrary to what Cooper Union argues.  Before

18   the protest, for example, Cooper Union was on notice and at

19   least one administrator acknowledged to a plaintiff that these

20   events tend to get violent, when that plaintiff expressed fear

21   and concern for that plaintiffs' safety.

22           Instead of taking appropriate measures or ensuring

23   that there was sufficient security presence that day,

24   administrators just told plaintiffs to stay inside, to avoid

25   unintended consequences.  I'm happy to list a number of other

P1SsGARc

1    paragraphs in which the complaint alleges notice that the

2    school had.  But plaintiffs time and time again e-mailed

3    administrators, e-mailed professors, e-mailed others at Cooper

4    Union to express their fear and concern, and Cooper Union did

5    not rise to the occasion, your Honor.

6          THE COURT:  Under your theory, would a lawsuit that is

7    basically flipped be able to survive?

8          In other words, would a student be able to file,

9    essentially, a mirror image of the claim arguing that there was

10   speech celebrating Israel's war in Gaza that created a hostile

11   environment for Palestinian students?

12         MS. ROMANOVICH:  Your Honor, I think it would depend

13   on what the speech was there.  If students are calling for

14   death or destruction of an entire group of people or calling

15   for globalize the intifada, globalize genocide, something like

16   that.  That is a factual question that I think is best left to

17   a jury to determine.

18         But on the facts here, given the fact that the

19   protesters were calling for death to Jews and the globalization

20   of attacks on Jewish civilians, I think the case stands.

21         THE COURT:  It's fairly easy to characterize a lot of

22   speech as calling for death if it involves actions occurring

23   during the war, isn't it?

24         MS. ROMANOVICH:  Your Honor, again, it would be

25   dependent on what the actual words are and what the conduct

P1SsGARc

1      associated with those words are.

2              Here, you had genocidal slogans that the Jewish

3      plaintiffs understood to mean death to Jews, and then that

4      speech then turned into harassing conduct, which obviously as

5      your Honor knows resulted in the students being locked in the

6      library and fearing for their safety.

7              So, your Honor must consider the totality of the

8      circumstances of what happened here and plaintiffs submit that

9      this was severe and pervasive.

10             THE COURT:  I believe you mentioned before the

11     definition of antisemitism from the International Holocaust

12     Remembrance Alliance.

13             Can you speak more about why it's appropriate for me

14     to consider that definition.

15             Are there any allegations of how, for example, that

16     definition was developed or more broadly why it should be

17     afforded weight?

18             MS. ROMANOVICH:  Sure, your Honor.

19             I'm not sure that there are any allegations that

20     explain how the IRA definition was developed, but pursuant to

21     President Trump's executive order 13899, federal agencies are

22     required to consider the IRA definition in its contrary example

23     of antisemitism in determining whether there is discriminatory

24     intent when enforcing Title VI.

25             Some examples of the contrary -- some example of the

P1SsGARc

```
1    contrary examples in the definition include calling for or

2    justifying the killing and harming of Jews in the name of

3    radical etiology or denying Jewish people the right to self-

4    determination by claiming that Israel is a racist endeavor.

5           All, if not all, but most of the speech here, your

6    Honor, falls squarely within that definition in the contrary

7    examples.  And so even if individual instances of speech may

8    not rise to -- may not rise to Cooper Union having violated

9    Title VI, they certainly contribute to understanding the intent

10   behind the conduct and why Cooper Union should have stepped in.

11          THE COURT:  In terms of the deliberate indifference

12   element, I just want to understand clearly what you're relying

13   on there.  For example, are you relying on Cooper Union's

14   failure to immediately condemn October 7 or otherwise not

15   providing an immediate statement in direct support of Israel?

16          Is that part of deliberate indifference, or is that

17   separate?

18          MS. ROMANOVICH:  Your Honor, that more so goes to the

19   fact that plaintiffs have shown that Cooper Union treated them

20   as a group differently than other groups on campus, which speak

21   to plaintiffs' state and local discrimination claims.

22          But Cooper Union should have acted differently and

23   more reasonably with respect to the known circumstances at

24   every stage of the semester in the school year.  I mentioned

25   before the protest, your Honor, Cooper Union was on notice of
```

P1SsGARc

1    what was going to happen at the protest.  The school should

2    have ensured a sufficient security presence instead of telling

3    students to simply stay inside during the protest.  Cooper

4    Union you should have enforced its ID policy and should have

5    swiftly disbursed the protests.  Instead, they permitted

6    students to bang on the glass windows, rattle the locked doors,

7    and harass the plaintiffs.

8              The school rejected NYPD's offer to intervene.  And

9    then, as I mentioned, your Honor, after the protest, Cooper

10   Union should have conducted an investigation, should have

11   imposed some kind of disciplinary measures against those who

12   violated Cooper Union's policies and tormented plaintiffs.

13             THE COURT:  Are you relying on certain allegations of

14   the conduct only for intent rather than the hostile

15   environment?

16             In other words, some of these allegations just based

17   solely to show the intent of the individuals who were

18   communicating the message?

19             MS. ROMANOVICH:  No, your Honor.  The speech and

20   conduct at issue here contributed to the hostile environment.

21   But to the extent any of the speech is protected by the First

22   Amendment, it is helpful to understand what the intent behind

23   that speech was and how it turned into the harassing conduct

24   that was motivated by antisemitism.

25             THE COURT:  Do you allege that any of the

P1SsGARc

1    communications were directed at particular Jewish students as

2    opposed to the community at large?

3         MS. ROMANOVICH:  Well, your Honor, plaintiffs were

4    standing opposite the protesters that afternoon with hostage

5    posters.  It's a fairly small school.  Many of the students

6    have classes together and they made themselves identifiable

7    with those hostage posters.  Many of the plaintiffs are also

8    visibly Jewish.  They wear kippahs, they wear tzitzit, and so

9    the protesters outside, who may have recognized those Jewish

10   students, then pursued them at the library and aggressed the

11   plaintiffs instead.  Inside the library, plaintiffs were also

12   visibly inside the library through the glass windows to the

13   protesters, and so they could definitely see who was inside.

14        THE COURT:  We're just going to go back to a question

15   I asked a few minutes ago, just so it's clear in my mind.  In

16   terms of the art display, or the Dr. Baratoff lecture, the

17   alumni letter, the vigil, how are you -- for what purposes are

18   you relying on those events?

19        MS. ROMANOVICH:  Your Honor, we are relying on those

20   events and that speech to demonstrate how that speech

21   contributed to the hostile environment, but also many of those

22   expressions of speech continued to call for violence against

23   Jewish people.  So not only did it contribute to the hostile

24   environment, but it also helps understand the harassing conduct

25   that ensued from the speech.

P1SsGARc

```
1           THE COURT:  Why would some of the offensive slogans

2    working than what was in Supreme Court's decision in Snyder,

3    which involved language that sounded like it was directly

4    celebrating terrorism, I think the quote there was, Thank God

5    for IUDs.

6           Why is what we have here worse than that?

7           MS. ROMANOVICH:  Your Honor, it's not necessarily

8    worse or better, but it certainly contributed to the hostile

9    environment and made plaintiffs feel unsafe and unwelcomed in a

10   campus environment, whereas I mentioned it's a small school.

11   They know many of their peers.

12          So to stand outside and hear your peers shout

13   "globalize intifada," and there is only one solution, and then

14   have those same students who, moments before, were chanting

15   those genocidal slogans aggress the library and pound on the

16   glass windows and continue to shout antisemitic slogans and try

17   to gain entry into the library, plaintiffs did not know what

18   would happen next.  They didn't know if they would be safe.

19          And so the slogans contributed to the hostile

20   environment and, again, your Honor, also explained the

21   motivation behind the harassing conduct.

22          THE COURT:  Thank you.

23          MS. ROMANOVICH:  Thank you, your Honor.

24          MR. GERSHONI:  Good morning, your Honor.

25          THE COURT:  Good morning, Mr. Gershoni.
```

P1SsGARc

1          MR. GERSHONI:   Thank you.

2          We can briefly address what Cooper Union stated in

3     their opening.  So, as an initial matter, your Honor,

4     plaintiffs allege that Cooper Union breached its contracts with

5     plaintiffs by failing to perform under and enforce the

6     commitments reflected in its policies.  Now I understand from

7     Cooper Union's response to your question today regarding about

8     whether or not these policies were enforceable, that they may

9     not believe that there is an enforceable contract between

10    Cooper Union and students.

11         But I would like to note, your Honor, that even in the

12    cases cited by Cooper Union, for example, *Aubrey v. The New*

13    *School*, New York law ruses that the relationship between the

14    university and its students is contractual in nature and that

15    this contractual relationship begins when the student enrolls

16    at the university.  New York law further recognizes that the

17    precise terms of the contractual relationship between the

18    university and its students are established by the university's

19    policies.

20         Now, Cooper Union tries to dismiss its own policies by

21    referring to them as general policy statements.  They do this

22    by picking and choosing, but I believe, as your Honor pointed

23    out, there is more than just general policy statements in these

24    policies.  For example, the building policy directly states

25    that IDs have to be checked.  As further examples, your Honor,

P1SsGARc

1   the policy upholding human rights.

2           THE COURT:  Can I just ask about the building policy,

3   though.  Did that policy, though, suggest in any way that

4   Cooper Union will take enforcement action to prevent or redress

5   violations of that policy?

6           MR. GERSHONI:  I don't believe the policy specifically

7   provided what that extra process was, but as your Honor noted,

8   there was an implied good faith and fair dealing with the

9   students in the university, and the students are entitled to

10  ensure that its university is going to abide by its own

11  policies such to protect them in those situations.

12          As a further example, your Honor, I believe you

13  mentioned the policy upholding human rights.  The policy

14  upholding human rights has many different provisions in it

15  that are very direct and not meet-and-confer general policy

16  statements.  For example, the policy identifies to whom it

17  applies, it identifies how complaints are made, and it also

18  states if a policy violation is found, appropriate discipline

19  will be imposed.

20          I believe your Honor also identified the posting

21  policy.  And the same thing, the posting policy, your Honor

22  identifies time, place, and manner restrictions on postings,

23  and it states that obvious violations of these rules are

24  subject to immediate removal by the Cooper Union agreement.

25          THE COURT:  Are any of these policies just

P1SsGARc

establishing duties that are owed to Cooper Union rather than
any guarantee of specific action that will be taken?

         MR. GERSHONI:  No, your Honor.  I don't believe that's
true.  And the cases that Cooper Union cites, for example, *The
New School* case, the *Doe v. Sarah Lawrence* case, they all state
that violations of these policies can actually establish a
breech of contract claim against a university, and this is
because a university has an implied contract with the students
to treat them in fair dealing.  So a violation of the school's
own policy can sustain a breach of contract claim against the
students again the school.

         Now, the third thing they addressed, your Honor, was
whether or not they have so-called broad discretion to apply
these policies.  But even if they do have broad discretion to
apply these policies, the same two things apply.  First,
implicit in the contract is a requirement that an institution
act in good faith and fair dealing with its students.  That
comes directly from the *Yeshiva* case and also comes from the
*Sarah Lawrence* case.

         Moreover, your Honor, using those two cases, another
example, district courts applying the New York law have applied
to breach of contract claim to survive when a student plausibly
alleged their assault was not handled in accordance with the
school's own internal policy.  So determining whether Cooper
Union's decision to enforce or not enforce its policies is

P1SsGARc

1    really a factual issue here.

2              So, for example, your Honor, with respect to whether

3    discipline will be imposed, plaintiff has specifically alleged

4    that they are not aware of any discipline being imposed.  So

5    whether or not that was in line with the university's

6    obligation to treat its students in fair dealing is a factual

7    question that should be addressed in discovery.

8              THE COURT:  Aren't schools entitled to considerable

9    amount of discretion in deciding how to enforce its

10   disciplinary policies?

11             It would seem like this is an area that I or a jury,

12   for that matter, would be equipped to second guess

13             MR. GERSHONI:  I think it depends on the specific

14   language of the policy, your Honor.  Refer to the policy

15   upholding human rights, it states if a policy violation is

16   found, appropriate discipline will be imposed.  It's very

17   definitive language.  It states that discipline will be

18   imposed.

19             Now, whether or not no discipline imposed meets this

20   policy or comports with the university's obligation to treat

21   its students with fair dealing is the factual question.  But on

22   its face, what courts in this district have looked for is

23   whether or not there is a sufficiently definitive statement in

24   the policies, such that you can find a breach of contract

25   claim.

P1SsGARc

1

```
 1              THE COURT:  Do you allege any specific procedures for

 2      handling misconduct that were not complied with in this case?

 3              MR. GERSHONI:  Upon information and belief, your

 4      Honor, what we just identified that there was no appropriate

 5      discipline will be imposed.

 6              THE COURT:  At the end, you're targeted at the end of

 7      the ultimate conclusion.

 8              MR. GERSHONI:  That's correct.

 9              THE COURT:  Before that, do you allege anything?

10              MR. GERSHONI:  So we identify -- we include, for

11      example, your Honor, a lot about the policy upholding human

12      rights, which specifically identifies what identity-based

13      discrimination is.  We cite to that policy directly in the

14      complaint.  That policy also has a lot of process and

15      procedures in it.

16              For example, in it notes that complaints would be

17      made, but they don't have to be made in citing, and they can be

18      made directly to an associate dean.  It further states once a

19      complaint is made, it will be referred to an equal employment

20      officer, and then there is a handful of other policies, for

21      example, that identifies that notice will be provided and so

22      forth.  But, again, despite having various allegations in

23      the complaint about complaints that students make to the

24      university, upon information and belief, there has been no

25      discipline ultimately imposed.
```

P1SsGARc

1          And with respect to the posting policy, I mean,

2     these policies are important and they are important for a few

3     reasons, your Honor.  For example, the posting policy isn't

4     just limited to, you know, it's not, like, a meet-and-confer

5     technicality that if a poster is up on the wall, for example,

6     there it's a problem.  The issue here, your Honor, is that

7     these policies are in place to protect students from content

8     that is to be inundated from offensive conduct.

9          So we had submitted that many of the posters violated

10    Cooper Union's policies, and because they violated those

11    policies, these students were inundated everywhere they went

12    with offensive conduct.  They saw it in the elevators, they saw

13    in the bathrooms, they saw it in the classrooms, they saw it on

14    the windows of the Foundation Building.  And because of that,

15    as we allege, plaintiffs no longer feel safe on campus.  They

16    have engaged therapists, they have dropped classes, failed to

17    perform their school work, delayed proceeding graduation of

18    degrees and so forth.

19          THE COURT:  Can you also respond to the argument,

20    though, that Ms. Cleary made that no student ever lodged a

21    complaint with respect to these policies or the enforcement of

22    these policies?

23          MR. GERSHONI:  Yes.

24          So the complaint has a few different examples of

25    students talking to different deans at the university.  For

P1SsGARc

```
 1   example, I refer the court to paragraph 62 and 76 in the

 2   complaint.  And there it states, looking at paragraph 62, for

 3   example, it states that despite the prominent location, the

 4   harassing conduct complaints about the postings communicated

 5   about students of concerned parents could be associate dean for

 6   academic affairs --

 7           THE COURT:  Just go back a little bit and say that

 8   again a little bit slower.

 9           MR. GERSHONI:  Sure.

10           Paragraph 62 of the complaint, your Honor states,

11   Despite the prominent location, the harassing content,

12   complaints about the posters communicated by students and

13   concerned parents of the associate dean for academic affairs,

14   Ruben Savizky, and the dean of engineering, Barry L. Shoop, and

15   the posters blatant violation of several Cooper Union policies,

16   the posters remained displayed in the windows for hours facing

17   the New York City public.

18           Now, that's a specific allegation about the complaints

19   made to the university about these posters.  Paragraph 76 of

20   the complaint, your Honor, also states that after receiving

21   complaints about the reappearance of the offensive posters,

22   Cooper Union told plaintiffs that the school would take no

23   action to remove the signs since the sidewalk is a public

24   property.  Your Honor, we do have allegations in the complaint

25   about complaints made to the university.  And in order to make
```

P1SsGARc

1    a complaint under the policy upholding human rights, all that

2    is required is that if the complainant is a student, complaints

3    can be submitted to the equal opportunity officer, the dean of

4    students, the associate dean of students, or an academic dean,

5    which is what we identified in the complaint.

6         So unless your Honor has any further questions.

7         THE COURT:  Thank you, Mr. Gershoni.

8         MR. GERSHONI:  Thank you.

9         MS. GERSHONI:  Good morning, your Honor.  I will be

10   brief.  My name is Bridgette Gershoni here on behalf of the

11   plaintiffs, and I will be discussing plaintiffs' common law

12   claims, and to the extent your Honor has any questions about

13   the remedies.

14        So, first, your Honor, Cooper Union wrongly argues in

15   its briefing that pleading physical harm is required to sustain

16   a claim for common law of negligence and negligent infliction

17   of emotional distress.  Cooper Union's reliance for this

18   proposition is on two cases, *Benoit* and *Caronia*, which are

19   cited in the briefing.  But, your Honor, we would like to point

20   out that both of these cases were distinct because they

21   involved cases for claims for medical monitoring, which is

22   where the plaintiffs were claiming they were personally

23   injured, but asking the court for discovery to confirm as much.

24   That is not at issue here.  Rather, New York law is clear that

25   a plaintiff can recover for negligence and negligent infliction

P1SsGARc

1    of emotional distress even though no physical injury occurred.

2              Second, your Honor, Cooper Union argues that it cannot

3    owe plaintiffs a duty simply to protect plaintiffs from

4    tortious acts of third parties simply because it is a college,

5    and New York has rejected the doctrine of *in loco parentis* at a

6    collegiate level.  This is legally unfounded, your Honor.  Case

7    law is clear that a duty can be placed on a college in certain

8    circumstances which we plead are present here.

9              So, first, where a college has encouraged its students

10   to participate in an activity and took affirmative steps to

11   control or supervise that activity.  Second, where the college

12   was in the best position to protect the students against the

13   risk of harm.  We submit that the complaint involves

14   allegations that meet both of these standards specifically as

15   we have discussed Cooper Union was well aware of the planned

16   protest ahead of time.  It was not only aware of rising

17   tensions on campus, but also aware of rising tensions at other

18   campuses around the city during that time.  Even worse, Cooper

19   Union was on specific notice of the safety concerns brought by

20   plaintiffs to several deans prior to and during the events of

21   October 25.

22             Cooper Union, as we plead in our complaint, your

23   Honor, one plaintiff informed a Cooper Union dean of their

24   reasonable safety concerns ahead of the protest, and the dean

25   responded that a Cooper Union's team was -- security team was,

P1SsGARc

1    quote-unquote, well aware of the proposed event and will be

2    extra vigilant.  Not only were Cooper Union professors and

3    administration in attendance at the protest itself, but some

4    professors canceled class and some professors even offered

5    extra credit for their students to participate in the

6    October 25 protest.  And so we submit that these, there can be

7    little doubt that in this situation, Cooper Union was in the

8    best position to protest the plaintiffs and it failed to do so.

9              Now, on to negligent infliction of emotional distress,

10   your Honor.  Cooper Union argues that extreme and outrageous

11   conduct is required.  We believe that it is not.  That is

12   supported by several recent decisions, including decisions from

13   the Southern District of New York in 2024 which articulate the

14   standard for negligent infliction of emotional distress without

15   articulating a requirement for extreme and outrageous conduct.

16             We also note that the Second Circuit also recites the

17   elements for this claim without reciting a requirement for

18   extreme and outrageous conduct.  But even if extreme and

19   outrageous conduct were found to be a required element of

20   negligent infliction of emotional distress, plaintiffs submit

21   that our complaint is replete with allegations that would meet

22   this standard.

23             As we have discussed, your Honor, the plaintiffs were

24   in the library during the incident.  Some of them were crying.

25   Some of them were afraid for their safety.  afraid for their

P1SsGARc

```
1   lives.  They were texting loved ed ones.  They called the New
2   York Police Department several times.  And upon information and
3   belief, the police offered to intervene, and President Sparks,
4   the president of Cooper Union, told the police to stand down,
5   to not intervene.
6           Now, your Honor, I want to respond to something that
7   Cooper Union's counsel mentioned this morning.  And they said,
8   well, they told the police not to intervene because this was a
9   measured response.  They didn't want to escalate the situation.
10  I guess our question would be, escalate the situation for who?
11  The situation was already escalated for plaintiffs.  They were
12  fearful of their lives.  It is clear that Cooper Union could
13  have done something during this incident.  They could have
14  accepted police presence.  They could have involved their,
15  quote-unquote, extra vigilant security team.  Instead, for
16  20 minutes plaintiffs were harassed in the library while people
17  were violently shaking the doors and windows trying to get into
18  the situation.
19          It is clear, Cooper Union could have done something.
20  They don't do a lot of things because they were looking out for
21  their own interests.  They were not acting in the best interest
22  of the students under the duty of care that they were owed.
23  Now, your Honor, Cooper Union also argues that a claim of
24  physical injury is required to meet the extreme and outrageous
25  conduct standard, and thus, is required for a claim of
```

P1SsGARc

```
1   negligent infliction of emotional distress.  Yet, this argument
2   is directly belied by Cooper Union's own acknowledgment on page
3   eight of its reply characterizing an NIED claim that can be
4   maintained in the absence of physical injury as an
5   uncontroversial position.
6           Lastly, your Honor, we would challenge Cooper Union's
7   position that plaintiffs' safety was not objectively
8   endangered.  As we discussed, for all the reasons we have
9   discussed, the facts support that plaintiffs' safety, in fact,
10  was objectively endangered.  But, in addition --
11          THE COURT:  Well, what allegations are there about
12  that?
13          I mean, there certainly are allegations as to a
14  subjective evaluation based on the plaintiffs' state of mind.
15  But do you allege that the protesters on October 25 engaged in
16  behavior that created an unreasonable risk of physical harm to
17  the students in the library.
18          MS. GERSHONI:  Yes, your Honor.  There can be no
19  doubt.  There are several allegations that support this.
20          So, for example, the fact -- we can start with the
21  fact that the protests were outside screaming genocidal chants
22  directly at plaintiffs.  But, beyond that, once they got into
23  the building without swiping their IDs, Cooper Union locked the
24  doors to the library, as we plead, and it wasn't plaintiffs who
25  locked the doors to the library.  So at least somebody in the
```

P1SsGARc

1    library who was a Cooper Union administrator followed the lead

2    to lock the doors to prevent the protesters from coming into

3    physical contact with plaintiffs.  But beyond that, the

4    protesters, the violent chants themselves, the shaking, the

5    violently rattling on the doors to let us in, in addition, once

6    they were unable to gain entry, banging on the doors and

7    directing their chance at plaintiffs who were visibly Jewish

8    students.

9         But even Cooper Union's counsel earlier this morning

10    characterized Cooper Union offered -- acknowledged that Cooper

11    Union offered some of the students security escort away from

12    the library.  Cooper Union's counsel characterized this today

13    as a safe exit as opposed to an unsafe exit, right, without a

14    security escort.  And it wasn't until, we note, after the mob

15    disbursed on its own regard that the security escort was

16    offered to the students.

17         Lastly, your Honor, even after the fact -- sorry.

18    I want to note the fact that President Sparks locked her own

19    office door.  Clearly she was afraid of some sort of physical

20    altercation between her and the protesters.  And Cooper Union

21    administration, offering plaintiffs potential solutions,

22    alternative exits to avoid the protesters, and lastly, in

23    Cooper Union's subsequent e-mail to its students regarding the

24    event, these e-mails included plans to, quote-unquote, ensure

25    a safe campus that upholds Cooper Union's policies.

P1SsGARc

```
 1            So we think that there are a plethora of allegations
 2    in the complaint that would support the fact that plaintiffs'
 3    safety was objectively endangered during the October 25
 4    protest.
 5            THE COURT:  OK.  Thank you, Ms. Gershoni.
 6            MS. GERSHONI:  We thank you for your time.  Unless
 7    your Honor has any further questions, we ask for these reasons
 8    and for the reasons presented by my colleagues that the court
 9    deny defendants' motion in its entirety.
10            Thank you.
11            THE COURT:  Thank you.
12            Ms. Cleary, you wanted some time for rebuttal.
13            MS. CLEARY:  Yes.  Thank you, your Honor.  So I will
14    move through the argument of the counsel as promptly as
15    possible, your Honor.
16            First, with respect to the Title VI claims, the court
17    doesn't need to reach the First Amendment offensive speech
18    issues.  The Title VI claim fails on two other elements, lack
19    of substantiation of deliberate indifference and deprivation of
20    educational benefits.
21            I direct the court to the 10/31 statements that Cooper
22    Union issued in which Cooper Union said there is no place at
23    Cooper Union for hateful and violent language or actions.
24    Cooper Union announced the review, a review of the day, and
25    reminded the community that disciplinary proceedings are
```

P1SsGARc

1   confidential.  Cooper Union condemned antisemitism and hateful

2   speech and announced resources for the entire community.  Later

3   on there was an alumni statement response very similar

4   denouncing the terrorist attacks in a 10/11 statement and

5   condemning antisemitism.

6          With respect to the *MIT* case, it's important to

7   underscore that there was no allegation that MIT called the

8   police at the first conceivable opportunity, it was two weeks

9   after the encampment had started.  With respect to your Honor's

10  point about compelling Cooper Union to violate the First

11  Amendment, we cite a decisional law saying that it is not

12  appropriate for a recipient of federal funds to be compelled to

13  gag First Amendment rights.

14         With respect to the statements made on 10/9, they

15  were condemned as horrific.  We announced counseling and

16  acknowledged the direct impact on the community.  As explained

17  in Exhibit 3 to the Cleary declaration, the 10/31 response to

18  the alumni, there was a second statement issued denouncing

19  terrorist attacks.  There were two statements on 10/31

20  denouncing violence, hate speech, antisemitism, and announcing

21  a review of the day and resources available to students.  So

22  there were at least four statements beginning within 48 hours

23  of the 10/7 seven terrorist attacks by Cooper Union.

24         With respect to the breach of contract arguments,

25  counsel paraded horribles, alleging that there was a lack of

P1SsGARc

good faith and fair dealing.  That really goes to opening the

door for a private right of action every time a student

disagrees with a disciplinary outcome by Cooper Union.  There

is no enforceable contract without an individual complaint.

There are specific process rights under Cooper Union's policy.

That is not what is at issue here, and the case law is very

supportive about a cause of action arising only where there is

a failure to follow specific procedures vis-a-vis a complainant

or a victim or a subject of the complaint.

In *Annabi* cited by plaintiffs' counsel, that breach of

contract action was dismissed because it was not sufficiently

definite.  There was a promise and no violation of a specific

contractual promise.  In *Aubrey*, there was a value statement

that was held not specific or enforceable, though the court did

uphold a promise of an in-person educational opportunity

sufficiently specific.

With respect to the complaint mention of paragraph

two, there is an admission that one complaint was made, but

there was also -- and that was not mentioned by plaintiffs'

counsel -- an admission that the posters were taken down within

hours, and there was no allegation in that paragraph that

Cooper Union knew who did this.

With respect to paragraph 76, the complaint about

language was about public property.  Cooper Union obviously has

no authority to address what happens on public property and

P1SsGARc

1    it's not a breach of the policy to do so.

2         With respect to the common law claims, Cooper Union

3    did not argue physical harm was required for an NIED claim.  It

4    did with respect to a negligence claim, and there is no case

5    law cited that negligence doesn't have a physical harm

6    requirement.

7         THE COURT:  As to the negligent infliction of

8    emotional distress claim, though, do you wish to respond to

9    Ms. Gershoni's points about why there was an objective risk of

10   physical harm?

11        MS. CLEARY:  Yes, your Honor.

12        Even accepting their arguments, there are three

13   exceptions, the bystander theory, which is not applicable here;

14   the special circumstances theory, misdiagnosing someone with

15   HIV or mishandling a loved ones remains, but then there is the

16   direct duty theory.  But, in that instance, plaintiff has to

17   show they suffered emotional distress caused by defendant's

18   breach of a duty which unreasonably endangered plaintiffs own

19   physical safety.  And there is an objective component to that

20   direct duty exception since plaintiffs allege that the library

21   doors were allegedly locked when the demonstrators arrived

22   outside the library and they also admitted that they never

23   entered the library.  They cannot sufficiently plead that their

24   safety was objectively and unreasonably endangered with an

25   allegedly locked door.

P1SsGARc

1          THE COURT:  Thank you.

2          MS. CLEARY:  I have no other points to make, your

3     Honor, unless you have questions.

4          THE COURT:  I don't.  Thank you for addressing all of

5     those issues.  And let me also just thank counsel from both

6     sides for your excellent argument today and your excellent

7     submissions.

8          I'll, of course, take the motions under advisement and

9     hope to issue my opinion in the near term, but today's argument

10    was very helpful.  So, again, I appreciate the obvious

11    preparation that went into this morning.

12         Hope everyone has a good rest of the day.  And those

13    of you going back to DC, safe travels.

14         MS. CLEARY:  Thank you, your Honor.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25