```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
REBECCA GARTENBERG, PERIE                                        :
HOFFMAN, JACOB KHALILI, GABRIEL                                  :
KRET, TAYLOR ROSLYN LENT,                                        :
BENJAMIN MEINER, MICHELLE MEINER,                                :
MEGHAN NOTKIN, GILA ROSENZWEIG,                                  :
and ANNA WEISMAN,                                                :
                                                                 :
                         Plaintiffs,                             :
                                                                 :
             -v-                                                 :    24 Civ. 2669 (JPC)
                                                                 :
THE COOPER UNION FOR THE                                         :    OPINION AND ORDER
ADVANCEMENT OF SCIENCE AND ART,                                  :
                                                                 :
                         Defendant.                              :
                                                                 :
-----------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

On February 5, 2025, the Court issued an Opinion and Order that granted in part and denied in part Cooper Union's motion to dismiss Gartenberg's Complaint, Dkt. 1 ("Compl."), and denied Cooper Union's motion to strike the Complaint's request for certain remedies. *See Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 24 Civ. 2669 (JPC), --- F. Supp. 3d ----, 2025 WL 401109 (S.D.N.Y. Feb. 5, 2025).[1] Among other things, the Court's Opinion and Order held that the Complaint plausibly alleges causes of action for a hostile educational environment under Title VI of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York Civil Rights Law, and the New York City Human Rights Law. *Id.* at *2.

---

[1] The Court refers to Plaintiffs collectively as "Gartenberg," and refers to Defendant The Cooper Union for the Advancement of Science and Art as "Cooper Union."

On February 19, 2025, Gartenberg filed a motion for reconsideration of the Court's Opinion and Order. Dkts. 42, 43 ("Motion"); *see* Local Civil Rule 6.3. Although Gartenberg avoided the dismissal of her civil rights claims, she seeks reconsideration of "certain aspects of the Court's First Amendment analysis." Motion at 1. By that she means the Court should revise its Opinion and Order to hold Cooper Union potentially liable under Title VI for "all incidents of harassment alleged in the Complaint, including those where the harassment was accomplished through political speech." *Id.* at 2-3.

Gartenberg does not specify which additional allegations of "harassment" she believes the Court misclassified as protected speech on matters of public concern. The Court therefore assumes that her Motion seeks to have the Court recast some or all of the following incidents as actionable harassment under Title VI and the First Amendment: (1) a demonstration by pro-Palestinian students on a public sidewalk adjacent to the Foundation Building concerning the Israeli-Palestinian conflict, Compl. ¶ 77; (2) the distribution of fliers supporting the Palestinian cause, *id.* ¶ 104; (3) a controversial "art display" advocating violent resistance to "colonialism," *id.* ¶ 111; (4) a speech by Dr. Omer Bartov titled, "The Never Again Syndrome: Uses and Misuses of Holocaust Memory and the Weaponization of Language," *id.* ¶¶ 113-114; (5) an on-campus "vigil" organized by a pro-Palestinian student organization to "Honor Palestinian Martyrs," *id.* ¶ 105; (6) a flier inviting members of Cooper Union's community to "come grieve and honor all those killed by decades of Israeli occupation and imperial violence," *id.* ¶ 106; (7) a statement published in Cooper Union's student newspaper by the school's Muslim Student Association that characterized "the account of the Jewish students being trapped in the library as 'a false narrative,'" *id.* ¶ 107; (8) a statement published in same issue of the school newspaper by Cooper Union's Black Student Union, which "declared solidarity with 'the Palestinian struggle against colonialism and genocide'

2

and claimed that 'the conflation of Zionism and Judaism' is 'manipulative, exploitive and racist,'" *id.* ¶ 108; and (9) an "alumni letter" signed by Cooper Union students, faculty members, and administrators that expressed support for the Palestinian cause and, among other things, stated that "[i]t is historical malfeasance for the administration to issue a statement of condemnation of Hamas's October 7th attacks without acknowledging the context in which these attacks took place," *id.* ¶¶ 109-110.

The Court declines to amend its First Amendment analysis to expose Cooper Union to possible civil liability based on these incidents. Gartenberg's Motion does not identify "an intervening change of controlling law" demonstrating that these incidents are actionable harassment under Title VI and the First Amendment. *Stollman v. Williams*, No. 20 Civ. 8937 (JPC), 2024 WL 4354987, at *2 (S.D.N.Y. Sept. 30, 2024) (quoting *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)). Neither does Gartenberg identify any "need to correct a clear error or prevent manifest injustice" flowing from the Court's decision not to subject Cooper Union to potential liability based on these incidents. *Id.* (quoting *Doe*, 709 F.2d at 789). Finally, the only "controlling decisions" that Gartenberg suggests the Court "overlooked," *id.* (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)), in its First Amendment analysis are the Supreme Court's decision in *Healy v. James*, 408 U.S. 169 (1972), and its progeny. Motion at 1-6. Gartenberg argues that under *Healy*, a lesser degree of First Amendment protection for political speech is warranted in the higher-education context due to the "'special characteristics' of schools." *Id.* at 6 (quoting *Healy*, 408 U.S. at 189).

But *Healy* said exactly the opposite: "[T]he precedents of [the Supreme Court] leave *no room* for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the

contrary, '[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy*, 408 U.S. at 180 (emphasis added) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *accord Gartenberg*, 2025 WL 401109, at *10 ("[T]he responsibility of courts to tread lightly when political speech is in the legal crosshairs is particularly important in the context of higher education."). The Supreme Court in *Healy*, therefore, made clear that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,'" and stressed its decision was "break[ing] no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom" on college campuses. *Healy*, 408 U.S. at 180-81 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)); *accord Gartenberg*, 2025 WL 401109, at *12 (explaining that the need to protect First Amendment freedoms is nowhere more important "than in the educational context, where 'the Supreme Court's academic-freedom jurisprudence principally protects the marketplace of ideas in the university and prevents government intrusion'" (quoting *Burt v. Gates*, 502 F.3d 183, 191 (2d Cir. 2007))).

Instead, *Healy* stands for the uncontroversial proposition that "First Amendment rights must always be applied in light of the special characteristics of the . . . environment in the particular case." *Healy*, 408 U.S. at 180 (internal quotation marks omitted); *accord Gartenberg*, 2025 WL 401109, at *9. And far from supporting Gartenberg's sweeping view of Congress's power to require colleges and universities to crack down on offensive political speech, the rule that the Supreme Court endorsed in *Healy* is narrow: a public school may prohibit a student's actions that "materially and substantially disrupt the work and discipline of the school" without offending the Constitution. *Healy*, 408 U.S. at 189 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). But this case is not about whether Cooper Union has the authority to discipline its students for disrupting its educational environment or for violating the civil rights of

4

its Jewish students; it is obvious that it does.  *See Gartenberg*, 2025 WL 401109, at *7.  Instead, the question is whether Congress, consistent with *its* First Amendment obligation, may expose colleges and universities to liability for a hostile educational environment based in part on their failure to censor or punish pure speech on matters of public concern.  *See id.* at *7-9.  And to that end, the Supreme Court and the Second Circuit have repeatedly and consistently admonished "that colleges play a critical role in exposing students to the 'marketplace of ideas' and, as a result, First Amendment protections must be applied with particular vigilance in that context."  *Husain v. Springer*, 494 F.3d 108, 121 n.11 (2d Cir. 2007) (citing *Healy*, 408 U.S. at 180).

The Court's Opinion and Order applied these principles in light of the allegations contained in Gartenberg's Complaint and Congress's undoubted interest in preventing discriminatory harassment on college campuses.

In refusing to dismiss Gartenberg's civil rights claims, the Court emphasized its "duty to avoid constitutional difficulties" under the First Amendment.  *Boos v. Barry*, 485 U.S. 312, 331 (1988).  The Court therefore interpreted Title VI not to "allow[] for liability based on speech that is reasonably designed or intended to contribute to debate on matters of public concern, and that is expressed through generally accepted methods of communication."  *Gartenberg*, 2025 WL 401109, at *11.  But at the same time, the Court stressed that Congress has a "compelling government interest" in "the elimination of discriminatory harassment in . . . programs receiving federal funding."  *Id.* at *9 ("[T]he Constitution must tolerate the regulation of at least some offensive speech if the Civil Rights Act is to achieve its promise of unlocking the benefits of . . . education for all Americans.").  The Court therefore explained that construing Title VI to avoid burdening core First Amendment rights "does not . . . require courts to shield all derogatory epithets of marginal value or to protect speech *even about political matters*, that is so persistent or

5

patently harassing that it could not be reasonably designed to contribute to reasoned debate." *Id.* at *11 (emphasis added) (internal quotation marks omitted); *see also id.* (emphasizing that nothing in the First Amendment demands that "low-value speech of the sort that can give an abusive character even to political discussion be protected in all contexts" (internal quotation marks omitted)). The Court also made clear that applying federal antidiscrimination law consistent with the First Amendment "does not . . . mean that courts must fall for the glib assertion that because matters of race and gender are, at the broadest level of abstraction, clearly issues of public concern, all racist and sexist remarks automatically qualify for First Amendment protection." *Id.* (internal quotation marks omitted).

Applying these standards to Gartenberg's Complaint, the Court concluded that Title VI does not reach instances of pure speech by pro-Palestinian members of Cooper Union's community that, as pleaded, were reasonably designed or intended to contribute to an ongoing debate regarding the Israeli-Palestinian conflict. *See id.* at *14-15, *17-18. The Court, however, ultimately sustained Gartenberg's civil rights claims based on plausible allegations of severe and pervasive antisemitic harassment that, despite its political character, did not merit the same degree of First Amendment protection under the circumstances alleged in the Complaint and was therefore a proper basis for liability under Title VI. *See id.* at *15-17. Accordingly, nothing in the Court's analysis suggested that schools may not regulate the activities of their students to avoid material disruptions to the learning environment or that Congress may not legislate to prevent discriminatory harassment on college campuses. To the contrary, the allegations in Gartenberg's Complaint of incidents of harassment that crossed that line formed the very basis for the Court's refusal to dismiss her civil rights claims at the pleading stage. *See id.* (relying on allegations of physically threatening or humiliating conduct and repeated acts of antisemitic vandalism to satisfy

6

Title VI's hostility element). Gartenberg's assertion that the Court's Opinion and Order could suggest that "schools are free to ignore antisemitic harassment simply because it takes the form of speech on matters of public concern," Motion at 8, therefore ignores what the Court's Opinion and Order actually says.

Gartenberg is also wrong to suggest that the Court misunderstood the fact that schools have tools at their disposal to comply with Title VI short of censoring political speech. Motion at 6-8. The Court held only that "it will usually be difficult—if not impossible— to show that a college or university acted in a clearly unreasonable manner under Title VI *where its acts of alleged deliberate indifference consist of its refusal to punish political speech directed at the college community through reasonable means*." *Gartenberg*, 2025 WL 401109, at *12 (emphasis added). Thus, the Court upheld Gartenberg's civil rights claims based on the Complaint's plausible allegations that Cooper Union failed to respond to antisemitic harassment in ways that "did *not* involve Cooper Union's refusal to suppress political speech." *Id.* at *18-19 (emphasis added) (discussing Cooper Union's alleged failure to enforce its content-neutral policies against intimidation and vandalism); *cf. id.* at *20; *accord Feminist Majority Found. v. Hurley*, 911 F.3d 674, 693 (4th Cir. 2018) (observing that schools can address unlawful harassment through ways that do not involve censoring or punishing protected expression).

In any event, the fact that schools have ways of addressing harassment short of censoring political speech does not mean that such expression is unlawful harassment in the first place. *See Gartenberg*, 2025 WL 401109, at *11. And in seeking to hold Cooper Union liable for that expression, Gartenberg cannot help but say the quiet part loud: sweeping otherwise-protected political expression into the hostility analysis will create pressure on institutions "to suppress speech to ensure compliance with Title VI," causing "regulated entities to adopt restrictive policies

7

in an effort to avoid liability" for a hostile environment.  Motion at 7.

That is a problem.  In our constitutional system of ordered liberty, the "usual and preferred remedy under the First Amendment" to offensive—even grotesque—political expression has always been "more speech."  *TikTok Inc. v. Garland*, 604 U.S. ----, 145 S. Ct. 57, 75 (2025) (Gorsuch, J., concurring in the judgment).  And the First Amendment cannot be evaded through the motte-and-bailey routine of professing to concede that "Title VI does not compel a school to restrict speech" while attempting to redefine virtually all forms of contentious political expression—from a sidewalk protest and leafletting to a disagreeable speech by a college professor—as "harassment" that colleges must address on pain of civil liability.  Motion at 6 (emphasis omitted); *compare id.* at 8 (appearing to agree that "Title VI does not require schools to suppress speech"), *with* Compl. ¶ 16 (alleging that Cooper Union violated Title VI by allowing "anti-Israel speech, posters, and other messaging on campus"), *and* Motion at 2 (urging the Court to characterize "all incidents of harassment alleged in the Complaint" as actionable under Title VI).  It is therefore no answer to say that the First Amendment concern in avoiding government censorship of campus speech dissipates merely by virtue of broadly characterizing offensive speech on sensitive issues as "harassment" or "discrimination."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause.").  After all, "[t]he Constitution deals with substance," not labels.  *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866).

* * *

The Court in no way questions the genuine pain that much of the discourse surrounding the Israeli-Palestinian conflict has inflicted, and continues to inflict, on Jewish college students across the country.  As the Court's Opinion and Order explained at length, some of that speech

8

can readily be understood by Jewish students as antisemitic. *See Gartenberg*, 2025 WL 401109, at *12-14, *16. Indeed, the hurt that such expression causes is only heightened when it is expressed in close proximity to unimaginable acts of terror carried out against innocent Jews and Israelis abroad. *See id.* at *1, *13, *16. And the Court, of course, ultimately concluded that Gartenberg's Complaint states a plausible claim for a hostile educational environment based on physically threatening or humiliating harassment and repeated acts of antisemitic vandalism and graffiti. *See id.* at *20.

But the Court's Opinion and Order also meant what it said about the First Amendment. To construe Title VI's prohibition on discriminatory harassment as sweeping in instances of pure speech that are reasonably designed or intended to contribute to the ongoing public debate concerning the Israeli-Palestinian conflict would "risk[] the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). That is a result the Court must avoid. *See Boos*, 485 U.S. at 331.

For these reasons, Gartenberg's Motion is denied. The Clerk of Court is respectfully directed to close Docket Number 42. Cooper Union is not required to respond to the Motion.

SO ORDERED.

Dated: February 25, 2025
New York, New York

                                        JOHN P. CRONAN
                                        United States District Judge