## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

REBECCA GARTENBERG, PERIE
HOFFMAN, JACOB KHALILI, GABRIEL
KRET, TAYLOR ROSLYN LENT,
BENJAMIN MEINER, MICHELLE MEINER,
MEGHAN NOTKIN, GILA ROSENZWEIG,
and ANNA WEISMAN,

                    Plaintiffs,

        v.

THE COOPER UNION FOR THE
ADVANCEMENT OF SCIENCE AND ART,

                    Defendant.

**AMENDED COMPLAINT**

Case No. 24-cv-2669

Hon. John P. Cronan, U.S.D.J.

**Jury Trial Demanded**

Plaintiffs Rebecca Gartenberg, Perie Hoffman, Jacob Khalili, Gabriel Kret, Taylor Roslyn

Lent, Benjamin Meiner, Michelle Meiner, Meghan Notkin, Gila Rosenzweig, and Anna Weisman

(collectively, "Plaintiffs"), for their Amended Complaint against Defendant The Cooper Union for

the Advancement of Science and Art ("Cooper Union" or the "School"), allege as follows.

### PRELIMINARY STATEMENT

1.      This case is about the egregious and unaddressed rise in antisemitism at Cooper

Union, which led to a group of Jewish students being locked in a campus library to shield them

from an unruly mob of students that was calling for the destruction of Israel and worldwide

violence against Jews.

2.      Antisemitism, characterized by a profound animosity toward Jewish people, has

become deeply entrenched on college campuses. For many years, this pernicious form of hatred

has been rising at an alarming rate, in large part because faculty members and administrators have

been abusing the privilege of academic freedom to propagate false anti-Jewish narratives under the guise of anti-Zionism.

3.      University leaders across the country are acutely aware of growing antisemitism on their campuses.  They are also aware, through widely-publicized reports, that during periods of intensified Israeli-Palestinian conflict, there is a noticeable surge in antisemitic incidents, which poses a significant threat to Jewish and pro-Israel students and faculty.

4.      Defendant Cooper Union had every reason to expect that the horrifying Hamas attack on Israel on October 7, 2023—the slaughter, rape, torture, dismemberment, and kidnapping of more than a thousand Israeli men, women, children, and babies—and Israel's inevitable response would trigger antisemitic and anti-Zionist activity at Cooper Union that would target Jewish students and place them at risk.  Indeed, it was widely reported that the brutal Hamas attack emboldened antisemites and ignited a firestorm of aggression toward Jewish students on college campuses in New York and throughout the country.

5.      Despite this knowledge, Cooper Union failed to take measures to ensure that its Jewish students who identify with Israel, including Plaintiffs, would not be targeted, threatened, or harassed.

6.      On the contrary, immediately following the Hamas attack, the administration of Cooper Union (the "Administration") exhibited callous and deliberate indifference to the suffering of the Jewish community by failing to swiftly and unequivocally condemn the massacre.

7.      The Administration ultimately issued a woefully inadequate statement, and only under significant pressure from Jewish students and alumni, who highlighted the Administration's prior statements unequivocally condemning violence in the U.S. and abroad that impacted other segments of the Cooper Union community.

8.      Emboldened by the Administration's inadequate response to the Hamas attack, on October 23, 2023, anti-Israel students violated School policy by placing large posters accusing Israel of "genocide" and "ethnic cleansing" on several prominent School building windows that are reserved for publicizing Cooper Union events and messaging. It took several hours and complaints from students and parents before the Administration removed the signs, and there were no known consequences for the students who posted them.

9.      Two days later, on October 25, 2023, scores of anti-Israel students held a "walkout" that turned into a hateful demonstration that went unchecked by the School. The participants, many wearing masks in an attempt to conceal their identities, chanted slogans that are widely recognized as calls to violence against Israelis and Jews who stand with Israel, including "from the river to the sea, Palestine will be free," "globalize the intifada from New York to Gaza," and "there is only one solution: intifada revolution" (which is widely accepted as a reference to Hitler's "final solution"). Plaintiffs and other Jewish students who witnessed the demonstration were painfully aware that their peers were advocating both for the elimination of the State of Israel and its Jewish population and for violence against Jews in America. Plaintiffs watched, outnumbered, as their schoolmates targeted them with these vile threats.

10.      The demonstration ultimately devolved into an unruly mob that stormed the Cooper Union Foundation Building, which houses senior administrators and the library. The demonstrators pushed their way past the School security guards and climbed the stairs toward the office of Cooper Union's then-President, Laura Sparks. Plaintiffs—Orthodox Jewish students whose affinity with Israel is part of their identities—were merely looking for a place to gather quietly, away from the jarring demonstration. Instead, they soon found themselves trapped inside the School library as the mob chanting hateful slogans attempted to enter, rattling the library doors

and then pounding on the floor-to-ceiling windows, through which the mob could see the Jewish Plaintiffs in Orthodox Jewish dress. The scene, which was publicized globally on television and social media, became a symbol of virulent antisemitism on college campuses.

11.     Shocked and panicked, Plaintiffs, some in tears, called the police and texted loved ones, seeking help.

12.     Meanwhile, President Sparks had locked herself in her office and subsequently ducked out of the Foundation Building through a back door. Plaintiffs later learned that New York City Police Department officers had offered to enter the building to intervene, but President Sparks told them to stand down.

13.     While the School has since issued statements aimed at downplaying the severity of the incident, upon information and belief, President Sparks had a security guard stationed in front of her office for the remainder of the fall semester.

14.     Despite the multiple policy violations by Cooper Union students, to Plaintiffs' knowledge, the School has taken no action to communicate that misconduct directed at Jewish and pro-Israel students, including Plaintiffs, will not be tolerated. There has been no statement of condemnation. There has been no articulation that acts of antisemitism and harassment against those who identify with Israel as their ancestral homeland will not be permitted. And no disciplinary action has been taken against any of the perpetrators. Rather, the School's course of action has been to bury its head in the sand, attempting to evade its legal obligations and commitments to its students.

15.     Cooper Union's conduct has caused various Plaintiffs to, among other things, fear for their safety on campus, miss and/or drop classes, see the quality of their schoolwork decline, avoid campus buildings, including the library, and seek therapy for the emotional trauma they have

endured.  Plaintiffs remain in a constant state of alert for threats to their safety and security on campus.

16.     Plaintiffs, like all students, have the fundamental right to pursue their education free from threats of violence, discrimination, and harassment based on their religion, national origin, or connection with Israel.  Cooper Union has failed to protect Plaintiffs by choosing not to take actions that would have prevented the October 25, 2023 mob scene at the library.  And the School continues to fail to protect its Jewish community, as it permits and even encourages harassing and intimidating anti-Israel speech, posters, and other messaging on campus, taking no action to discipline students who violate School policy through hateful acts.

17.     As detailed below, Plaintiffs assert herein claims against Cooper Union for:  (i) violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Count I); (ii) violation of New York Executive Law § 296 *et seq.* (Count II); (iii) violation of New York Civil Rights Law § 40, *et seq.* (Count III); (iv) violation of N.Y.C. Administrative Code § 8-107 (Count IV); and (v) breach of contract (Count V).

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because claims pursuant to Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) ("Title VI") arise under the laws of the United States.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to hear the related State law claims because those claims arise out of the same case or controversy as the federal claims.

19.     This Court has personal jurisdiction over Cooper Union because it is based and operates in New York, New York.

20.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

**PARTIES**

21.     Plaintiffs are Orthodox Jews who have a deep historical, national, theological, and cultural connection to the State of Israel.

22.     Plaintiff Rebecca Gartenberg is a Jewish student at Cooper Union.  Rebecca is a master's degree candidate in Cooper Union's electrical engineering graduate program.  Rebecca received her undergraduate degree in electrical engineering from Cooper Union.

23.     Plaintiff Perie Hoffman is a Jewish student at Cooper Union.  Perie is a sophomore majoring in chemical engineering.

24.     Plaintiff Jacob Khalili is a Jewish student at Cooper Union.  Jacob is a senior majoring in electrical engineering.

25.     Plaintiff Gabriel Kret is a Jewish student at Cooper Union.  Gabriel is a sophomore majoring in mechanical engineering.

26.     Plaintiff Taylor Roslyn Lent is a Jewish student at Cooper Union.  Taylor is a sophomore majoring in chemical engineering.

27.     Plaintiff Benjamin Meiner is a Jewish student at Cooper Union.  Benjamin is a senior majoring in mechanical engineering.

28.     Plaintiff Michelle Meiner is a Jewish student at Cooper Union.  Michelle is a senior majoring in mechanical engineering.

29.     Plaintiff Meghan Notkin is a Jewish student at Cooper Union.   Meghan is a sophomore majoring in electrical engineering.

30.     Plaintiff Gila Rosenzweig is a Jewish student at Cooper Union.  Gila is a senior majoring in civil engineering.

31.     Plaintiff Anna Weisman is a Jewish student at Cooper Union.  Anna is a sophomore majoring in electrical engineering.

32.     Defendant Cooper Union is a private college located in New York, New York that is incorporated under the laws of the State of New York.  Cooper Union is a recipient of federal funding.  In 2022, the School received over $3,000,000 in grant revenue from U.S. governmental resources.[1]  Cooper Union is an educational institution and a place of public accommodation within the meaning of the New York State Human Rights Law and the New York City Human Rights Law.

## **FACTS**

### **A.     The Civil Rights Act Protects Students from Antisemitism**

33.     Title VI prohibits educational institutions that receive federal funding, such as Cooper Union, from engaging in discrimination, which includes tolerating harassment, based on race, color, or national origin.  A core principle underlying this protection—which is afforded to all students, including Jewish students—is that simple justice requires that public funds, to which taxpayers of all races, colors, and national origins contribute, not be spent in any fashion that encourages, entrenches, subsidizes, or results in discrimination.[2]

---

[1]     *Consolidated Financial Statements and Report of Independent Certified Public Accountants*, The Cooper Union for the Advancement of Sci. and Art, at 6 (Dec. 20, 2022), https://cooper.edu/sites/default/files/uploads/assets/site/files/2022%20The%20Cooper%20Union%20f or%20the%20Advancement%20of%20Science%20and%20Art%20CFS.pdf.

[2]     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (quoting President John F. Kennedy).

34.     Harassment creates a "hostile environment" in violation of Title VI when it "is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school."[3] An institution subject to Title VI "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring."[4]

35.     In December 2019, then-President Trump issued an executive order declaring that, "[i]t shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in antisemitism as vigorously as against all other forms of discrimination prohibited by Title VI."[5]

36.     The federal government defines antisemitism according to the Working Definition of Antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization that includes over thirty-five countries.[6]  IHRA defines antisemitism as "a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[7]

---

[3]    *See* Letter from Asst. Sec. for Civil Rights Russlyn Ali, U.S. Dep't Of Educ. – Office For Civil Rights, at 2–3 (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf ("[Under Title VI, a] ("[Under Title VI, a] school is responsible for addressing harassment incidents about which it knows or reasonably should have known").

[4]    *Id.* at 2–3.

[5]    Exec. Order No. 13899, 84 FR 68779, *Combatting Anti-Semitism* (Dec. 11, 2019), https://www.govinfo.gov/content/pkg/FR-2019-12-16/pdf/2019-27217.pdf.

[6]    *See* U.S. Dep't of State, *Defining Antisemitism*, State.gov, https://www.state.gov/defining-antisemitism/ (last visited Apr. 8, 2024).

[7]    *See Working definition of antisemitism*, Int'l Holocaust Remembrance Alliance https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism (last visited Apr. 8, 2024).

The IHRA includes the following on its non-exhaustive list of "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion;"

- "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor;"

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation;"

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis;" and

- "Holding Jews collectively responsible for actions of the state of Israel."

37.    The U.S. State Department views the IHRA Working Definition of Antisemitism as "integral to the fight to eliminate th[e] scourge" of antisemitism.[8]

38.    Consistent with the IHRA examples, it is widely recognized that anti-Zionism is a form of antisemitism. While criticism of particular policies of the Israeli government may not rise to the level of antisemitism, the demonization and delegitimization of the Jewish people's historic, national, and cultural connection to the land of Israel, as well as the Jewish people's right to self-determination in their ancestral homeland, does constitute antisemitism.[9]

---

[8]    Press Statement, Ned Price, Dep't Spokesperson, U.S. Dep't of State, *The International Holocaust Remembrance Alliance Working Definition of Antisemitism*, State.gov (Nov. 4, 2022), https://www.state.gov/the-international-holocaust-remembrance-alliance-working-definition-of-antisemitism/.

[9]    U.S. Dep't of State, *Defining Anti-Semitism*, State.gov (June 8, 2010), https://2009-2017.state.gov/j/drl/rls/fs/2010/122352.htm.

39.     On December 5, 2023, the U.S House of Representatives overwhelmingly approved a resolution condemning antisemitism and declaring anti-Zionism a form of antisemitism.[10]

40.     On December 9, 2023, in response to shameful Congressional testimony by the presidents of three major universities who failed to state unequivocally that students "calling for the genocide of Jews" was not only morally reprehensible but also violated their institutions' codes of conduct, New York Governor Kathy Hochul penned a strongly-worded letter to the presidents of all New York State colleges and universities, reiterating the need to address antisemitism on campus:

> [F]ailure to address such activity would constitute a violation of New York State Human Rights Law as well as Title VI of the Civil Rights Act of 1964. Under Title VI, any recipient of federal funds is responsible for keeping students free from a hostile environment based upon their ethnicity or national origin - a standard that that has been applied to antisemitism . . . . I assure you that if any school in New York State is found to be in violation, I will activate the State's Division of Human Rights to take aggressive enforcement action and will refer possible Title VI violations to the federal government.[11]

41.     Plaintiffs, as Jewish students at Cooper Union whose identities include an affinity with Israel as their ancestral homeland, fall squarely within the protections of Title VI. Yet, as alleged herein, Cooper Union has violated the law by failing to afford Plaintiffs those basic protections.

**B.    Cooper Union's Deliberate Indifference and/or Negligence Toward Growing Antisemitism on Campus**

42.     Cooper Union's campus includes the 41 Cooper Square building and the Foundation Building which is located in Manhattan at 7 East 7th Street, between Third & Fourth

---

[10]  *See* H.R. 894, 118th Cong. (2023).

[11]  Letter from New York Governor Kathy Hochul to New York State Coll. and Univ. Presidents (Dec. 9, 2023), https://www.governor.ny.gov/sites/default/files/2023-12/SchoolsV2.pdf.

Avenues.  The Foundation Building is a multi-floor building on the School campus that houses

classes, offices of School administrators, including President Sparks (on the seventh floor), and

the only Cooper Union library, which is located on the main level of the building.

43.    Cooper Union is a "unique institution, dedicated to Peter Cooper's proposition that

education is the key not only to personal prosperity but to civic virtue and harmony."[12]  To that

end, Cooper Union assures its students, including Plaintiffs, that it will "safeguard" their "freedom

[] to pursue their scholarly, artistic and intellectual interests."[13]  But for its Jewish students, Cooper

Union has failed to live up to that promise.

44.    The School should have condemned the acts of terrorism perpetrated by Hamas on

hundreds of innocent Israelis on October 7 by decrying those events quickly, forcefully, and

publicly, and by expressing support for the School's Jewish and Israeli students—just as Cooper

Union had supported other victimized groups in the past.

45.    For example, on June 1, 2020 and June 12, 2020, following the "killings of George

Floyd, Ahmaud Arbery, Tony McDade, and Breonna Taylor," President Sparks recognized that

"Black lives matter" and acknowledged the fear and devastation that members of the Cooper Union

community—and other communities—were feeling:  "These killings are outrageous.  The pain is

immeasurable," and "[t]he systemic issues that brought us here are unacceptable."  She challenged

the Cooper Union community "to do more, much more, to eradicate racism at Cooper and beyond,"

and she asked everyone "to join [her] in identifying the concrete steps that each of us will take to

better understand somebody else's lived experiences; to fight for an educational [and economic]

---

[12]    *History*, The Cooper Union, https://cooper.edu/about/history (last visited Apr. 8, 2024).

[13]    *Code of Conduct*, The Cooper Union (Aug. 20, 2023), https://cooper.edu/about/policies/code-of-conduct.

system . . . that makes opportunity accessible to all; to make The Cooper Union, New York City and our country safer, kinder, and more loving places for everyone."[14]  President Sparks also apologized to those students who had written to Cooper Union administrators in the wake of the killings, stating:  "We are sorry that you needed to write the letter as a way to be sure your voices were heard.  We hear you."[15]

46.     In a July 13, 2020 statement, in response to a proposed ICE regulation that would have required international students enrolled in online-only courses to leave the United States during the COVID-19 pandemic, President Sparks wrote: "We stand with our international students."   President Sparks called the proposed regulation "appalling" and "cruel."  When the regulation was rescinded, President Sparks sent out another email, proclaiming:   "[a] victory, indeed, for all!"[16]

47.     Likewise, on March 19, 2021, in the wake of "hateful rhetoric and acts of violence targeting Asian and American and Pacific Islander (AAPI) communities," President Sparks announced:   "The Cooper Union stands with our Asian and AAPI students, faculty, staff, and alumni with the broader Asian and AAPI communities, as we do with all who face oppression and violence."[17]  President Sparks called the rise in anti-Asian violence "abhorrent, unacceptable, and

---

[14]  *Message from Laura Sparks – June 12, 2020*, The Cooper Union (June 12, 2020), https://cooper.edu/about/president/sparks/messages/june-12-2020 [hereinafter *Message from Laura Sparks*]; *A Call for Reflection, Understanding, and Action*, The Cooper Union (June 1, 2020), https://cooper.edu/about/president/sparks/messages/call-reflection-understanding-and-action.

[15]  *Message from Laura Sparks*, The Cooper Union, *supra* note 14.

[16]  *Rescinded International Student Rule*, The Cooper Union (July 15, 2020), https://cooper.edu/about/president/sparks/messages/rescinded-international-student-rule.

[17]  *Standing with the Asian Community*, The Cooper Union (Mar. 19, 2021), https://cooper.edu/about/president/sparks/messages/standing-asian-community.

heartbreaking."[18]  She also stated that "[t]he perpetrators of these crimes and assaults—verbal and physical—must be held accountable, and these horrible acts must cease."[19]

48.    And when Russia invaded Ukraine in February 2022, President Sparks urged the Cooper Union community "to be supportive and show care with specific sensitivity to the needs of our students from Ukraine and Eastern Europe during this particularly difficult time."

49.    But the calculus was plainly different when it came to Israel and the School's Jewish students who stand with Israel.  While other institutions immediately and unequivocally condemned Hamas and expressed support for Israel and their Jewish communities,[20]  Cooper Union initially said nothing.  This sent a message to the Cooper Union community that attacks on Jews are to be viewed differently than attacks on other groups, and Cooper Union was indifferent to the pain and rights of Jewish people to be free from terror.

50.    Fearing growing antisemitism on campus and concerned about Cooper Union's disregard for and unequal treatment of Jews, the Cooper Union Hillel ("Cooper Hillel")—the Jewish student group at Cooper Union, which includes several Plaintiffs as well as other students and alumni—contacted the Administration and asked that Cooper Union "recognize and

---

[18]  *Id.*

[19]  *Id.*

[20]  *See, e.g.*, Lexi Lonas, *University presidents unveil support for Israel after criticism*, The Hill (Oct. 17, 2023, 12:59 PM) https://thehill.com/homenews/education/4260554-university-presidents-support-israel-after-criticism/ ("Yeshiva University, a Jewish university, brought together Catholic schools, Christian schools, historically black colleges and universities and secular schools to release a statement showing their support for Israel."); *Statement on Israel*, Brandeis University (Oct. 7, 2023), https://www.brandeis.edu/president/letters/2023-10-08-statement-on-israel.htm ("We condemn in the strongest way terrorism such as we have seen today perpetrated against innocent civilians; we support Israel's right to defend itself."); *see also Statement of John B. King, Jr.*, The State University of New York, https://www.suny.edu/media/suny/content-assets/documents/chancellor/Chancellor-Statement-Presidents-Israel.pdf (last visited Apr. 8, 2024) ("SUNY stands with Israel, with the victims of Hamas's abhorrent terrorist attack, and with our Jewish students, faculty, and community members.").

acknowledge these unprovoked attacks on innocent civilians" and support the Jewish, pro-Israel community.  As of the morning of Monday, October 9, 2023, however, Cooper Union had not issued any public statement about the events of October 7.  Plaintiffs felt betrayed and concerned as well as a sense of unease about being on campus.  Distracted from their schoolwork, Plaintiffs devoted considerable time and energy to urging their School to issue a statement supporting them and condemning violence against Jews.

51.    Cooper Union issued a statement later that day, but it was utterly lacking in tone and content, and it was a far cry from Cooper Union's prior statements of support for other victimized groups.  Cooper Union's statement was stunningly silent on Hamas's slaughter, torture, rape, and kidnapping of Israelis.  Indeed, terrorism was not mentioned at all.  Instead, the message referred vaguely to "the upsetting news of war between Israel and Hamas in the Middle East as well as reports of devastation and aggressions in many other parts of the world."  President Sparks did not sign the message, and she did not apologize to the students and alumni who had to reach out to the Administration to urge a response in the first place.  Plaintiffs were alarmed by the School's woefully inadequate response and its disparate treatment of Jews.

52.    On October 12, 2023, Cooper Union's Dean of Students, Christopher Chamberlin, wrote to past and present members of the Cooper Union Hillel that, "[i]n hindsight, the statement responding to the events should have been issued sooner and been merged with supporting resources so that the initial outreach did not appear to fail to address the true gravity of the situation."  But Dean Chamberlain's message was the result of significant pressure from students and alumni and, even then, was limited in distribution, was not issued publicly to the broader campus community, and failed to acknowledge or attempt to correct the School's prior, deficient response.

14

53.     The School's reactions to the events of October 7 reflected a deliberate indifference toward the safety and rights of its pro-Israel Jewish students, including Plaintiffs, and sent an unmistakable message to the Cooper Union community, as demonstrated by the events that ensued.

54.     In the days that followed, Jewish students hung posters on campus with images of innocent Israelis who were kidnapped by Hamas on October 7.  Those posters were placed in areas permitted by the School's posting policy ("Posting Policy") described in more detail below. Almost immediately, however, the posters were vandalized, leaving just scraps of paper behind.



*Image of vandalized poster of Israeli hostage kidnapped by Hamas*

55.     Such acts violate, *inter alia*, the School's Code of Conduct, which describes acts of vandalism as "extremely serious and subject to the highest penalties."[21]   Upon information and belief, however, none of the perpetrators have faced disciplinary action of any kind.

56.     The Administration was plainly on notice of the potential for violence during that period and in the days that followed.   In connection with Hamas's call for a "Day of Rage" on October 13, 2023, Cooper Union disseminated a campus security message, stating:   "The College is being briefed on a daily basis by NYPD and our security partner on campus . . . regarding any potential threat[en]ing activity in the areas around the campus, the City and neighboring boroughs, related to the war between Hamas and Israel."   Jewish students, including Plaintiffs, were afraid to go to class that day.   Cooper Union plainly was on notice of the potential for violence against its Jewish students then and thereafter.

### C.     The Antisemitic, Anti-Israel Events of October 23, 2023

57.     On the morning of October 23, 2023, Cooper Union students posted large signs laced with inflammatory anti-Israel, antisemitic messages in the Colonnade Windows of Cooper Union's Foundation Building.   The posters filled the windows and faced the street.   Students stood by the signs to prevent their removal.   The posting of those signs violated the School's policies on size and content and because the Colonnade Windows are not among the locations where "[p]osters, fliers and other communications" are permitted under Cooper Union's Posting Policy.[22]

---

[21]   *Code of Conduct*, The Cooper Union, *supra* note 13.

[22]   *Posting Policy*, The Cooper Union, https://web.archive.org/web/20240409213105/https://cooper.edu/about/policies/posting-policy   (last visited May 30, 2025).

58.     Upon information and belief, the Colonnade Windows are reserved for school-sanctioned advertising of School events and guest lectures, and the students and faculty must receive permission from the Administration before placing *anything* in the Colonnade Windows. Accordingly, those responsible for hanging the posters should have been subject to disciplinary action, regardless of their content.

59.     But it was not merely the posters' location that violated School policy.   The posters—which were titled "Conversations with Palestinians in Gaza"—were replete with incendiary antisemitic, anti-Israel messaging.   Among other things, they labeled the Jewish people's right to self-determination a "racist ideolog[y] and movement[]," accused Israel of "occupation, apartheid, ethnic cleansing, and settler colonialism," claimed that Palestinians are experiencing "genocide," and encouraged violence ("a people under occupation has only three options:  to resist, to resist, and to resist").   The IHRA Working Definition defines all such statements as antisemitic.   The posting of these signs violated School policies, including the Posting Policy, Human Rights Policy, and Code of Conduct.[23]

---

[23]   For a discussion of Cooper Union's policies, see *infra* Section F.



*Unauthorized posters displayed in the Colonnade Windows of the*
*Cooper Union Foundation Building on October 23, 2023*

60.    Upon information and belief, Cooper Union was aware of these posters at the time they were being affixed to the windows of the Foundation Building and could and should have acted to prevent them from being posted, but failed to do so.  Indeed, the posters themselves were large, and they were hung in several large windows in a prominent and highly visible location. Upon information and belief, the posters were printed in Cooper Union's facilities using Cooper Union's equipment.  And the signs must have gone up in view of, among others, Cooper Union security guards who were stationed on the first floor of the Foundation Building but who did not take appropriate action.



*Unauthorized posters displayed in the Colonnade Windows on October 23, 2023*

61.    Once the posters were up, the School should have removed them immediately, the students who posted them should have been disciplined, and the School should have issued a clear statement of condemnation and a warning about further violations.  But the School did none of those things.

62.    Despite their prominent location, their harassing content, complaints about the posters communicated by students and concerned parents to the Associate Dean for Academic Affairs, Ruben Savizky, and the Dean of Engineering, Barry L. Shoop, and the posters' blatant violation of several Cooper Union policies, the posters remained displayed in the windows for hours, facing the New York City public.  Plaintiffs and other Jewish students walked by, concerned

for their safety and not understanding why their School was permitting, and even fostering, an environment of harassment and intimidation.

63.    Rather than ensure their prompt removal, one Cooper Union professor who was standing near the posters suggested that a Jewish student avoid looking at the posters so as not to be triggered by them.

64.    Many students, however, including many of the Plaintiffs, *were* triggered by the posters.  They could not concentrate on their classes or schoolwork.  Plaintiffs had no doubt that the School would have prevented the placement of the posters or immediately removed them had they targeted a group other than Jews.

65.    Upon information and belief, when Cooper Union removed the posters several hours later, the School returned them intact to the students who had posted them.  This was not without consequence, as the signs reappeared two days later outside the building.    Upon information and belief, Cooper Union has taken no disciplinary action against the individuals who hung the hateful posters in violation of the School's policies.

66.    The antisemitic posters, and the School's actions and inactions in connection with the posters, made their mark.  Pictures of the posters in the prominent School windows quickly circulated throughout campus and on social media.  In apparent support of the policy violations, Doug Ashford, a Cooper Union Professor and Academic Advisor, reposted images of these posters to his personal social media account.

67.    The damage done by the posters, the School's failure to prevent them from being posted unlawfully, the School's failure to remove them immediately, and the School's failure to discipline those involved and issue a strong statement of condemnation had foreseeable results.

20

One student emailed the Administration that afternoon about the potential consequences, expressing fear and imploring the School to take action before matters became worse:

> You all need to take control of the situation.  First it was [antisemitic] fliers, then the day of rage took place, then it was [antisemitic] Poster boards, who knows what the next attack will be (physical or emotional damage, or even violence the list can go on)?  What are you all waiting for? . . . I do not understand why the environment here is making my life and the lives of the people around me in school so much more difficult . . . I am lost for words . . . Do you really want your students feeling this way? . . . [P]lease proceed by adopting the IHRA working definition of antisemitism and send out an apology and <u>call out this antisemitic attack</u> on **YOUR** students.

(emphasis in original).

68.     But the School continued to choose inaction.  As further described below, the School's deliberate indifference to its own policies and to federal, state, and local laws—to the detriment of Plaintiffs and other Jewish students on campus—served to encourage additional antisemitic, anti-Israel activity on campus in the days that followed.

### D.     The Antisemitic, Anti-Israel Events of October 25, 2023

69.     On October 24, 2023, Plaintiffs saw signs around campus—including by the elevators, in the hallways, and outside classrooms and offices—advertising a "Student Walkout" for "Palestinian Liberation," scheduled for Wednesday, October 25 at 1:00 p.m.  The posters were red, white, black, and green—*i.e.*, the colors of the Palestinian flag—and prominently featured images of raised fists.  The posters also bore a red, white, black, and green version of the Cooper Union logo, suggesting that the walkout was sanctioned by Cooper Union.



*Poster advertising the October 25 walkout for "Palestinian Liberation,"*
*reposted on a student's social media account*

70.    Furthering the impression that the School supported the walkout, some Cooper Union student organizations and individual students reposted the signs on social media.  Upon information and belief, some Cooper Union professors even cancelled their October 25 classes to encourage students to attend the demonstration:  one art professor encouraged students to attend and draw pictures of the demonstration.

71.    At least one Plaintiff notified the Administration about the planned walkout, sending Dean Shoop a copy of the flier.  Dean Shoop did not respond.  The Administration did nothing to disclaim any association with the walkout or address the use of the School's logo.

72.    In view of the anti-Israel, antisemitic acts on the School's campus and at other campuses around New York City, Plaintiffs were reasonably and justifiably concerned for their safety in advance of the October 25 walkout.

73.      Some Plaintiffs expressed their concerns directly to those in charge at Cooper Union.  One Plaintiff reported to Dean Savizky a fear that the October 25 demonstration would not be peaceful, and asked why the Administration had not condemned the walkout as other universities had condemned similar events.  Rather than take necessary action to address that Plaintiff's concerns, however, Dean Savizky suggested, in sum and substance, that the Plaintiff and other Jewish students stay inside the Building during the walkout because, as Dean Savizky acknowledged, such events tend to get "violent."

74.      On October 25, prior to the scheduled walkout, another Plaintiff wrote to Dean Lisa Shay and Dean Shoop expressing safety concerns.  Both Deans responded by diminishing the Plaintiff's well-founded concerns.  Dean Shay responded that "[i]t's always prudent to be aware of your surroundings" and assured the Plaintiff that "in the building […] you are away from the disturbance and any unintended consequences."  Dean Shay also claimed that Cooper Union's security was "well aware of the proposed event and will be extra-vigilant."  Dean Shoop responded that Cooper Union was "not anticipating anything other than a peaceful walk-out."

75.      Failing to address and downplaying students' concerns—telling them to try to protect themselves and hide inside—is neither appropriate nor consistent with the School's obligations to protect the rights of its students.  The School's negligence, callous disregard, and deliberate indifference toward Plaintiffs and its pro-Israel Jewish student body writ large once again resulted in foreseeable consequences.

76.      Early in the morning of October 25, the day of the walkout, the large, inflammatory posters that had been posted inappropriately on the Colonnade Windows on October 23, reappeared affixed to the sidewalk in front of the Foundation Building library.  After receiving

complaints about the reappearance of the offensive posters, Cooper Union told Plaintiffs that the School would take no action to remove the signs "since the sidewalk is public property."

77.     Later that day, Plaintiffs' concerns regarding their safety on campus and their right to an educational environment free from threats of violence, intimidation, and harassment were borne out.   Upon information and belief, approximately one hundred anti-Israel students participated in the walkout and the demonstration, which was held outside of the Foundation Building.   Some Cooper Union faculty members attended and, upon information and belief, members of the public soon joined as well.   Many of the demonstrators had their faces covered. The demonstrators shouted antisemitic chants and threats of violence—directed at Plaintiffs and other Jewish and/or pro-Israel students—including:

- "From the river to the sea, Palestine will be free"

- "Globalize the intifada from New York to Gaza"

- "There is only one solution:  intifada revolution"

- "Long live the intifada"

- "Resistance is justified when people are occupied"

- "Hey hey, ho ho, Israel has got to go"

- "It is right to rebel, Israel go to Hell"

- "Palestine is our demand.  No peace on stolen land."

- "Shame on you!"

78.     The anti-Israel demonstrators far outnumbered the approximately twenty-five Jewish and/or pro-Israel students, including some of the Plaintiffs, who peacefully counterprotested at the demonstration.  Plaintiffs were concerned that the demonstrators might turn

violent, and several Plaintiffs stood with their backs to the wall of the Foundation Building, in an effort to keep the demonstrators within their line of sight.

79.     At about 2:00 p.m., someone pulled the fire alarm in the Foundation Building, in an apparent attempt by the anti-Israel demonstrators to force School administrators outside to the area of the demonstration.    The demonstrators chanted "Laura Sparks, show your face!" Firefighters arrived at the scene, but President Sparks never made an appearance.    Upon information and belief, no disciplinary action has been taken against the individual(s) who pulled the fire alarm, even though the Cooper Union Code of Conduct expressly prohibits "[u]ndermining campus safety by setting off false fire alarms."[24]

80.     At approximately 4:00 p.m., the demonstrators stormed into the Foundation Building.  The School did not check for student IDs, contrary to Cooper Union's Building Access policy, which requires all students to swipe their ID cards upon entering.  Some demonstrators carried signs and continued to chant antisemitic slogans.  The demonstrators easily pushed past the few security guards in the building.  At least one guard yelled "you're going to get arrested" at the mob, but did nothing to make that happen.

---

[24] *Code of Conduct*, The Cooper Union, *supra* note 13.

 

*Images from the October 25, 2023 "Walkout"*

81.    As the mob entered the building, one Plaintiff called the police out of fear for that Plaintiff's safety and the safety of other Jewish students.  Upon information and belief, plainclothes New York City Police Department officers were on the scene and in communication with President Sparks.  Upon information and belief, the officers offered to enter the building and address the chaos, but President Sparks declined.  This decision to refuse police intervention perpetuated Cooper Union's breach of its own policies and negligence and/or deliberate indifference to Plaintiffs' rights.

82.    Upon information and belief, the mob climbed the stairs and headed toward President Sparks's office on the seventh floor.  The mob obstructed the hallway and entrances to classrooms on the seventh floor, interfering with the ability of students to attend class.  Some Plaintiffs communicated with other Jewish students in the School to check whether they were safe, given the chaos and the School's apparent failure to exercise control over the mob.

83.     The demonstrators' conduct violated Cooper Union's Code of Conduct, which prohibits "[e]ngaging in disorderly, disruptive, or aggressive behavior that interferes with the general comfort, safety, security, health, welfare, or education of a member of The Cooper Union community or the regular operation of the school."  Despite this clear violation of the School's policy, Cooper Union did not nothing to stop the demonstrators.

84.     While the mob remained on the seventh floor, a group of the Plaintiffs gathered inside the library on the ground floor of the Foundation Building seeking a quiet place to process what they had just experienced.  Some of the Plaintiffs sat at tables by the floor-to-ceiling windows of the library.

85.     A short time later, anti-Israel demonstrators descended on the hallway surrounding the library, loudly chanting "Free Palestine."  Upon information and belief, a School employee—possibly Natalie Brooks, Cooper Union's Chief Talent Officer, who was in the library—locked the doors to the library, with Plaintiffs and other students inside.  Ms. Brooks told some of the Plaintiffs holed up inside the library that she had heard "they [*i.e.*, the mob] were coming."  The mob attempted to enter the library, banging on and rattling the locked library doors and shouting "let us in!"



*Plaintiffs standing in front of library doors as demonstrating mob attempts to enter*

86.     Through the round windows on the doors of the library, Jewish students, including a number of the Plaintiffs—some wearing *kippot* and *tzitzit* that identified them as observant Jews—were plainly visible to the demonstrators.

87.     Unable to gain entry, the demonstrators spread out through the hallway alongside the library's nearly floor-to-ceiling windows, where they could better see and be seen by Plaintiffs. The demonstrators began pounding on the glass and continued their hateful chants.  They also held antisemitic, anti-Israel signs against the glass.

88.     Inside the library, some of the Plaintiffs cried.  Plaintiffs feared for their safety, feeling targeted by a mob that was openly advocating for violence against Jews and the eradication of their ancestral homeland.  Plaintiffs were shocked that they would find themselves in such a

situation on their own college campus, and they were bewildered and disappointed that the School had failed to prevent the incident and was doing nothing to stop it.



*Demonstrators outside of the library windows*

89.     Plaintiffs in the library endured the harassment and intimidation for approximately twenty minutes.  During this time, one or more Plaintiffs again called the police.  Plaintiffs also texted family, friends, and alumni, who, upon information and belief, likewise called the police. Despite this, Plaintiffs never saw any police or School administrators attempt to intervene.

90.     President Sparks did not come to the library.  She did not show support for the besieged Jewish students.  She did nothing to disperse the mob or take a stand against the antisemitic, anti-Israel acts of harassment and intimidation that were unfolding on her campus.

91.    Indeed, President Sparks was nowhere to be found.  Despite having refused police intervention and later claiming in a public statement that students were never in danger,[25] President Sparks reportedly locked her office door as the mob of demonstrators approached her office.[26] And while Plaintiffs remained in the library with no police or School personnel coming to their aid, Ms. Brooks informed Plaintiffs that President Sparks had exited the building through a back door.

92.    Rather than take steps to prevent or stop the harassment and intimidation, Ms. Brooks and a librarian instead offered the frightened Jewish students several potential "solutions," including hiding in the windowless upstairs portion of the library out of the demonstrators' sight or escaping the library through the back exit.

93.    Although other students were in the library at the time of the incident, these "solutions" were offered only to the Jewish students there, who plainly were the ones being targeted by the mob.  Such "solutions" would not have been deemed an acceptable option for any other targeted group, and they only underscored the appalling nature of the harassment.  As such, Plaintiffs declined the "solutions" Ms. Brooks offered.

---

[25]  *See A Message from Laura Sparks, President of the Cooper Union and Ron Vogel, President of the Cooper Union Alumni Association*, The Cooper Union (Oct. 31, 2023), https://cooper.edu/alumni/message-laura-sparks-president-cooper-union-and-ron-vogel-president-cooper-union-alumni ("As an update, on Thursday morning, at a NYPD briefing on the Wednesday protest, NYPD Chief of Patrol John Chell reported that police were present throughout the protest and that 'there was no direct threat, there was no damage and there was no danger to any students in the school.  The students were not barricaded; a school administrator thought it was prudent to close the doors.'") [hereinafter *Alumni Message*].

[26]  *See* Sharon Otterman, *How a 6-Second Video Turned a Campus Protest Into a National Firestorm*, N.Y. Times (Dec. 18, 2023), https://www.nytimes.com/2023/12/18/nyregion/cooper-union-pro-palestinian-protest.html?smid=nytcore-ios-share&referringSource=articleShare.

94.    Cooper Union failed to exercise appropriate control over the demonstrators and failed to protect the rights of the School's pro-Israel Jewish students.  The demonstrators ultimately left the area of their own accord.

95.    Although shaken by the incident, Plaintiffs insisted upon leaving the building as a group, as they had entered, through the front door, with some accepting brief escorts by campus security guards.

### E.    Cooper Union Remains a Hostile Educational Environment for Plaintiffs and Other Jewish Students

96.    In the aftermath of the events of October 25, Cooper Union has continued to exhibit deliberate indifference toward the rights of Plaintiffs and other Jewish students who identify with Israel.  Upon information and belief, the School has failed to discipline responsible students and also has failed to strongly and publicly condemn the blatant antisemitic, anti-Israel displays. Instead, the School tried to downplay the events and gaslight Plaintiffs.

97.    As an example, on October 25, after the library incident, at least one student advised members of the Administration about feeling "unsafe, unwelcome, and unwanted" and asked whether the School would do anything to discipline the demonstrators.  Dean Shay responded that the demonstration "was a peaceful gathering" at the time she left the building, and that she would be "coming to work as usual" the next day.  Neither Deans Shay nor Shoop, both on that email chain, acknowledged the unruly mob, the despicable library incident, or the feelings and concerns of Plaintiffs.  The School's inadequate response further fueled Plaintiffs' belief that they had been abandoned and were "unsafe, unwelcome, and unwanted" at Cooper Union.

98.    Rather than respond to the shameful events of October 25 by swiftly condemning the actions of the demonstrators and initiating disciplinary action, President Sparks issued a

message to the Cooper Union community emphasizing the importance of "peaceful protest."[27] President Sparks's message did not acknowledge that it was Jewish students who had been locked in the library. Instead, President Sparks stated only that "some students," of no stated affiliation, "remained in the library" which was "closed." President Sparks's statement went on to "condemn discrimination of any kind, including antisemitism and Islamophobia."

99.    President Sparks's initial response also condemned "hateful and violent language or actions" generally, and vowed to "enforce" the Code of Conduct. Indeed, she stated that, "in the coming days, we will review reports and footage from today's events and initiate any necessary actions consistent with our policies." But upon information and belief, Cooper Union has taken no disciplinary action in connection with the events of October 25. The President's message further fueled Plaintiffs' fears and some Plaintiffs did not attend classes the next day out of concern for their safety.

100.    Days later, on October 31, 2023, President Sparks and Ron Vogel, President of the Cooper Union Alumni Association, issued another woefully inadequate statement to Cooper Union alumni about the October 25 incident.[28] Once again, this statement did not mention that Jewish students had to be locked in the library and made the false claim that "there was no danger to any students in the school." The statement did not include any steps to address or prevent antisemitic sentiment and conduct on campus.

101.    Just over a week later, on November 3, 2023, President Sparks issued another toothless statement to the community, this time outlining a "plan to address campus safety and

---

[27]    *Message from President Sparks on Student Protest*, The Cooper Union (Oct. 25, 2023), https://cooper.edu/about/president/sparks/messages/message-president-sparks-student-protests.

[28]    *See Alumni Message*, The Cooper Union, *supra* note 25.

care." One of the main points in this plan was "Ensuring a Safe Campus . . . That Upholds Our Policies and Student Code of Conduct."[29]  Specifically, Cooper Union confirmed that "[a]ny member of our community who poses a threat to another's safety or engages in hate speech will be held accountable for their actions. Cooper Union maintains a Policy Upholding Human Rights and Title IX Protections which continues to be enforced on our campus."

102.    These messages, however, have been nothing but empty promises, geared toward trying to shore up the School's tattered public image in the wake of the social media firestorm that followed the events of October 25.[30]  Upon information and belief, Cooper Union has taken no steps to ensure the safety of Plaintiffs and other pro-Israel Jewish students on campus.

103.    Given the School's failures, it is not surprising that antisemitic, anti-Israel acts of harassment and intimidation have continued on campus, exacerbating the already hostile educational environment for Jewish students, including Plaintiffs.

104.    Since October 25, there has been an increase in threatening and harassing anti-Israel messaging on campus targeting Jewish students, facilitated by the School's actions and inactions. Postings have appeared on campus equating Zionism with Terrorism and proclaiming "from the river to the sea"—a call for the eradication of Israel and the Jewish people from the land of Israel. Some of the postings appear in the font most commonly associated with "Mein Kampf," Hitler's

---

[29]  *Charting A Path Forward Together: Plans For Safety, Well-Being, And Learning At The Cooper Union*, The Cooper Union (Nov. 3, 2023), https://cooper.edu/about/president/sparks/messages/charting-path-forward-together-plans-safety-well-being-and-learning-cooper-union.

[30]  *See, e.g.,* E. Shanahan et al., *Israel-Hamas War Protest Leads to Tense Scene at Cooper Union Library*, N.Y. Times (Oct. 26, 2023), https://www.nytimes.com/2023/10/25/nyregion/cooper-union-protest-israel-hamas.html; Jack Stripling, *Colleges braced for antisemitism and violence. It's happening.*, Wash. Post (Oct. 31, 2023, 11:26 AM), https://www.washingtonpost.com/education/2023/10/31/antisemitism-college-campuses-jewish-hamas-gaza/; Lisa Rozner, *Pro-Palestinian rally at Cooper Union leads to tense moments at school library*, CBS News (Oct. 26, 2023, 8:47 AM), https://www.cbsnews.com/newyork/news/cooper-union-pro-palestinian-rally-jewish-students-library/.

famous work justifying the murder of six million Jews.  Fliers have also been placed around

Cooper Union inviting students to "Celebrate the 36th anniversary of the First Intifada[.]"  In

addition, the words, "Free Palestine" were graffitied in multiple places on the outside of the

Foundation Building and were not removed for more than a week, notwithstanding reports to the

Administration.  The images below are illustrative:

 




105.    On November 9, 2023, Cooper Union students held an on-campus vigil "to Honor Palestinian Martyrs." Upon information and belief, the event was organized by the Cooper Union Students for Justice in Palestine ("SJP"), a student organization apparently tied to a national organization that: (i) the Anti-Defamation League and others have criticized for its virulently antisemitic activities;[31] and (ii) since October 7, has been banned by several institutions for violating university policies, including engaging in violent, antisemitic conduct and openly supporting Hamas.[32]

---

[31]    *Students for Justice in Palestine (SJP)*, Anti-Defamation League (Oct. 19, 2023), https://www.adl.org/resources/backgrounder/students-justice-palestine-sjp.

[32]    *See, e.g.*, Hannah Marr & Rachel Moon*, GW suspends SJP for three months after anti-Israel library demonstration*, GW Hatchet (Nov. 14, 2023), https://gwhatchet.com/2023/11/14/gw-suspends-sjp-for-three-months-after-anti-israel-library-demonstration/; *Statement From Gerald Rosberg, Chair of the Special Committee on Campus Safety*, Columbia News (Nov. 10, 2023), https://news.columbia.edu/news/statement-gerald-rosberg-chair-special-committee-campus-safety; *A space for free speech, not hate speech*, Brandeis Univ. (Nov. 8, 2023), https://www.brandeis.edu/president/letters/2023-11-08-free-speech-not-hate-speech.html.

106.    The flier, a copy of which appears below, invited participants to "come grieve and honor all those killed by decades of Israeli occupation and imperial violence."



*Cooper Union SJP's Instagram post advertising the "Vigil to Honor Palestinian Martyrs"*

107.    On November 20, 2023, the Muslim Student Association ("MSA") at Cooper Union published a statement in a special issue of The Pioneer, Cooper Union's student-run newspaper, referring to the account of the Jewish students being trapped in the library as "a false narrative," further compounding the trauma Plaintiffs experienced that day.

108.    In the same issue of The Pioneer, the Black Student Union published an antisemitic, anti-Israel screed which, among other things, declared solidarity with "the Palestinian struggle against colonialism and genocide" and claimed that "the conflation of Zionism and Judaism" is "manipulative, exploitive and racist."

109.    Further, a December 5, 2023 alumni letter that circulated within the Cooper Union community expressed "solidarity" with the Cooper Union students who demonstrated against Israel and Jews on October 25, 2023.  The letter stated that "[t]he Cooper Union administration

must denounce accusations of antisemitism made against students by organizations from within and outside the school's community."  The letter attempted to justify the sickening Hamas attack of October 7:

> It is historical malfeasance for the administration to issue a statement of condemnation of Hamas's October 7th attacks without acknowledging the context in which these attacks took place.  Condemnation of violence against Israelis on October 7th without the condemnation of 75 years of ongoing apartheid, siege, and illegal military occupation of Gaza and the West Bank, mass imprisonment of Palestinian civilians without trial or charge, and the war crimes committed during the genocide of Palestinians in the past 58 days, constitutes **complicity** in the atrocities committed against the Palestinian people.

(emphasis in original).

110.    Included among the more than three hundred and fifty signatories to the letter were a number of Cooper Union professors, adjunct professors, and administrators, which further inflamed the discriminatory and hostile educational environment for Plaintiffs, other Jewish students, and pro-Israel students at Cooper Union.  A number of these professors and administrators continue to maintain public social media feeds, some of which are "followed" by Cooper Union accounts, where they post inflammatory anti-Israel, antisemitic content.

111.    The violations at Cooper Union have continued into the 2024–2025 academic year with increasing brazenness and impunity.  Jewish students, including Plaintiffs, have been subjected to an escalating pattern of harassment, discriminatory conduct, and unaddressed policy violations—all of which the School has been made aware of but has ignored.  The following are just some of the incidents that took place during the 2024–2025 academic year and are part of a sustained pattern of institutional failure, which has profoundly harmed Jewish students at Cooper Union.

112.     On February 27, 2024, as part of a School-sanctioned student "art display," a large banner was hung in a highly-visible, two-story gallery in the 41 Cooper Square building displaying the words "RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY.'"  This phrase is a recognized call to violence against Jews and supporters of Israel. Upon information and belief, one or more members of the Cooper Union facilities staff assisted in hanging the banner in this prominent location.  Cooper Union Student Affairs advertised the display on its social media accounts, and the School's own Administrators and faculty reposted and endorsed this hateful messaging.

 

*Student "Art Display" in 41 Cooper Square*




*Cooper Union Student Affairs
Instagram Account Reposting
Information about the "Art Display"*

*Cooper Union School of Architecture
Instagram Account
Reposting the "Art Display"*

113.    Several Jewish alumni emailed the Administration, including Ms. Brooks, about the art display, concerned about the violent language prominently displayed on the banner and the School's endorsement of this messaging.  Ms. Brooks defended the exhibit and told these alumni that the banner would be removed by Saturday, March 2, 2024.  It was not removed until several days later.  Some Plaintiffs have avoided the 41 Cooper Square building because of this hateful display.

114.     Cooper Union further compounded the campus climate of tension and unease for Jewish and pro-Israel students by needlessly requiring all students, including Jewish students, taking a core Humanities and Social Sciences class to attend a speech titled "The Never Again Syndrome: Uses and Misuses of Holocaust Memory and the Weaponization of Language" by anti-Israel activist, Omer Bartov, on April 1, 2024.

115.     Although Dr. Bartov's anti-Israel views are well known through his speeches, articles, and books,[33] the Administration took no action in response to complaints by Jewish students and alumni in advance of the speech.  Once again, Jewish and pro-Israel Cooper Union students were forced to endure harassment and discrimination.

116.     On April 21, 2024, on Admitted Students Day, students, faculty, and staff protesters, including Maya Krtić, the then-Assistant Director of Admissions for the School of Architecture, staged a protest outside Cooper Union's Foundation Building, where prospective students were entering with their families.  Protesters shouted aggressive anti-Zionist slogans aimed at intimidating existing Jewish and Zionist students, as well as intimidating and discouraging prospective Jewish and Zionist students from enrolling at the School.  Among other phrases, they shouted:

- "We don't want no Zionists here!"

- "We don't want no Jew/two state, we want '48!"

- "Zionists, Zionists go back home, Palestine is ours alone!"

---

[33] *See, e.g.*, Omer Bartov, Opinion, *What I Believe as a Historian of Genocide*, N.Y. Times (Nov. 10, 2023), https://www.nytimes.com/2023/11/10/opinion/israel-gaza-genocide-war.html.

117.    The protest created an intimidating and exclusionary environment for Jewish visitors at a critical moment when they were evaluating whether Cooper Union would be a safe and inclusive academic setting.

118.    Cooper Union was aware of the protest as it was taking place but failed to intervene, even when presented with reasonable measures to mitigate its impact.  For example, when the family of a prospective student requested that an alternative entrance to the Foundation Building be opened to allow Jewish families to avoid the protest, Troy Cogburn, the Vice President for Enrollment, refused.  And when an alumnus and brother of a prospective student made the same request to Hala Alkasm, the Director of the International Students & Scholars Office, he was met with the same response.

119.    Following the incident, Plaintiffs and other Jewish students asked the Administration to publicly condemn the harassment and affirm Cooper Union's Code of Conduct as applied to Jewish and Zionist students.  They also requested that the School enforce its Code of Conduct, including the Guidelines for Protests and Demonstrations (the "Guidelines"),[34] by imposing consequences on those responsible for the misconduct.

120.    Rather than taking any action to address the harassment or prevent its recurrence, President Sparks defended the School's lack of response, noting that "Cooper Union had prepared for the day by ensuring that our own security team, with support from local community affairs officers, was onsite and closely monitoring the situation," "[t]he protest was not a Cooper Union-

---

[34]    *See Community Rights, Protections, and Resources*, The Cooper Union, https://cooper.edu/about/community-rights-protections-and-resources (last visited May 30, 2025) (prohibiting, among other things, "[w]ords or actions that mock individuals based on their protected characteristics" and harassment of any kind, as defined in Cooper Union's policies) [hereinafter *Guidelines*].

sanctioned event," and "[t]here were no disruptions to our scheduled programming." In doing so, President Sparks failed to acknowledge that current and prospective Jewish students and their families were subjected to targeted intimidation in violation of Title VI. Upon information and belief, no action was taken in response to the incident.

121. In another disturbing incident of antisemitic harassment on campus, a Jewish student (and Plaintiffs' friend), "Student A," was publicly shamed and excluded from full participation in an academic program simply because of his Jewish identity.

122. On May 8, 2024, when Student A approached the front of the classroom to present his final architecture project to his peers—just as every student before him had done—the entire classroom of students stood up in unison and left the classroom. But instead of intervening by directing the students to return to the classroom to give Student A an audience, the professor colluded with the students and texted them after Student A had finished his presentation to inform them that they could return to the classroom.

123. Cooper Union did not investigate the underlying antisemitism, nor did it take steps to remedy the hostile environment. Instead, the School presented Student A with a single option if he wished to continue attending class: to sit alone in a separate room, in isolation. This "solution" removed him from his peers with whom he was meant to collaborate and diminished the effectiveness of his coursework at Cooper Union. Cooper Union effectively penalized Student A for being discriminated against, instead of punishing the perpetrators of such conduct.

124. Months later, despite no material improvement in the classroom climate, then-Dean Hayley Eber directed Student A to return to the main architecture studio and resume working alongside his classmates. Upon his return, Student A discovered his desk had been vandalized with trash, stickers, and posters, including ones that read "Zionists are terrorists." Yet again,

Cooper Union failed to respond appropriately. Instead of restoring Student A's workspace and investigating the incident in an attempt to identify and discipline the individuals responsible, Student A was once again relocated to a separate room and isolated from his classmates.

125.    In the fall of 2024, Jewish students at Cooper Union were confronted with the chilling reality that Athena Abadilla—the Director of Residential Life and Community Development or, the administrator responsible for overseeing students' residential experience and hosting social and cultural programs intended to help students build community and transition to life in New York—had publicly glorified the terrorists who raped, murdered, and burned Jewish people alive on October 7, 2023. In a comment posted to an Instagram account run by SJP, Ms. Abadilla praised those responsible for the atrocities. She wrote: **"glory to all the martyrs, every single person killed since '48"** (emphasis added). That someone entrusted with supporting students and cultivating an inclusive environment would express such overt antisemitism—particularly while occupying a role of influence and responsibility—only deepened the sense of betrayal and fear experienced by Jewish students on campus.



126.    The Administration was on notice of Ms. Abadilla's social media activity, at least after the *New York Post* published an article about her Instagram comment.[35]

127.    Yet, instead of condemning Ms. Abadilla's grotesque endorsement of antisemitic violence or offering Jewish students an alternate administrator to turn to when faced with sensitive issues surrounding housing, Acting Dean of Students Grace Kendall sent an email to students praising Abadilla as an "integral member of the Student Affairs team" and, incredibly, commended her "work to ensure a welcoming and equitable community for every student."  The result was an institutional betrayal that caused Jewish students to be deprived of the equal educational access Title VI guarantees.

128.    The hostility on campus was not limited to student interactions or administrative indifference.  It also manifested in direct efforts to undermine academic programming organized by Jewish students and faculty members.  For example, on February 6, 2025, a Jewish professor at Cooper Union organized an event focused on Black and Jewish allyship and invited Dr. John Eaves, the Director and Founder of Black and Jewish Leaders of Tomorrow, as a guest speaker.

129.    When the Jewish professor arrived at the event space approximately thirty minutes before the event, upon information and belief, members of SJP had already entered the auditorium, placing inflammatory pamphlets on each chair.  The pamphlets accused Dr. Eaves of being a "war criminal apologist" and using "Blackness" as "an offensive instrumentalization that paints a false picture of 'allyship':  one based in empire and genocide instead of justice and collective liberation."

---

[35] *See* David Spector, *Cooper Union administrator slammed for promoting Palestinian "martyrs" vigil on Oct. 7 anniversary*, N.Y. Post (Oct. 10, 2024, 1:44 PM), https://nypost.com/2024/10/10/us-news/cooper-union-administrator-slammed-for-promoting-vigil-for-palestinian-martyrs-on-oct-7-anniversary/.

130.    As the Jewish students waited outside the auditorium, approximately ten or fifteen other students—all of whom at least one Plaintiff recognized from the anti-Israel protests on campus—came and filled their plates with the kosher food the Jewish professor arranged for the event, leaving a complete mess of the table.

131.    Although the event proceeded, Jewish students were denied the opportunity to participate in uninterrupted, respectful programming due to the targeted disruption.  The interference—which was aimed squarely at the content and purpose of the event—constituted a denial of Jewish students' right, including Plaintiffs, to enjoy the same educational benefits and campus resources as their peers, in violation of Title VI.

132.    To Plaintiffs' knowledge, no students have been disciplined for violating Cooper Union's Code of Conduct[36] and the Guidelines[37] with respect to this event, further signaling that Jewish events can be disrupted without consequence and deepening the exclusion Jewish students experienced on campus.

---

[36] *Code of Conduct*, The Cooper Union, *supra* note 13 (finding the following violations, among others, to be "extremely serious and subject to the highest penalties," usually "suspension or dismissal": "Bullying and Intimidation in all forms"; "Acts of theft or vandalism (including graffiti) against the property of another student, guest, staff or faculty member or against the property of Cooper Union itself"; "Disorderly, disruptive, or aggressive behavior that interferes with the general comfort, safety, security, health, welfare or education of a member of the Cooper community or the regular operation of the College.  This includes damage to property and any behavior that is perceived to be threatening or dangerous to the health or safety of the Cooper Union community"; and "A student may not be involved in acts that cause physical or psychological harm."); *see id.* (adopting rules of behavior, including:  "a student may not willfully obstruct or disrupt any authorized activities on college premises or other Cooper Union activities, including its public service functions").

[37] *See Guidelines*, The Cooper Union, *supra* note 34 (prohibiting, among other things, "[t]argeting individuals for harassment or intimidation on account of their protected characteristics," "[w]ords or actions that exclude people from participation in, or access to, Cooper Union's programs and activities," and "[i]nterrupting, impeding, disrupting, or otherwise interfering with any college event, lecture, or program, including student group or club events, so that a speaker is unable to speak, or audience members are unable to hear or see the program").

133.    In addition to Cooper Union's ongoing failure to address this antisemitic harassment, the 2024–2025 academic year was marked by the very same policy violations that had plagued the campus in the wake of October 7, 2023.  The Administration's repeated refusal to uphold its own policies—particularly when Jewish students were impacted—reinforced the reality that Jewish students were being denied the equal protection and institutional support to which they are entitled under federal law.

134.    One such incident occurred on November 8, 2024, when SJP flagrantly violated Cooper Union's Posting Policy and the Guidelines by "flyer-bombing" the office of Interim President Malcolm King.  Dozens of unauthorized posters were affixed to his door and the surrounding walls, reciting SJP's latest list of anti-Zionist demands.  These included, among others:  "The ACADEMIC BOYCOTT of all [I]sraeli institutions;" "Removal of ALL SURVEILLANCE CAMERAS in personal studio spaces, classrooms, and workspaces;" and "AMNESTY for all involved in pro-Palestine protests and organizing."[38]  The display was both disruptive and confrontational to Jewish students, as it was posted on the Interim President's office with language and tactics designed to exert institutional pressure through public intimidation.

135.    SJP subsequently posted photographs of the incident to its public Instagram account.[39]  The caption read:  "we demand our institutions divest from death and become actively anti-Zionist, anti-racist, and anti-imperialist to the fullest extent possible.  We, the Cooper Union SJP, will not be intimidated into silence or rest until all our demands are met and Palestine is

---

[38] The Cooper Union Students for Justice in Palestine (@sjp_cooperunion), Instagram (Nov. 8, 2024), https://www.instagram.com/p/DCHVogjRSkD/?igsh=Mm1zZzAzMHFoMDlu (emphases in original).

[39] *See id.*

free."[40]  This post made clear that the "flyer-bombing" was part of an organized campaign to intimidate Jewish students and pressure Cooper Union to adopt explicitly anti-Zionist policies—policies that stigmatize and marginalize Jewish students, many of whom identify as Zionist or maintain familial, cultural, or religious ties to Israel.

136.    Upon information and belief, no students were disciplined for this violation, and the Administration took no steps to enforce its Posting Policy[41] or the Guidelines.[42]  By failing to act, Cooper Union signaled that the rules designed to ensure a neutral and respectful campus environment will not be applied or enforced when the targets of the misconduct are Jewish.  This institutional indifference further contributed to the hostile environment Jewish students faced and undermined their right to equal treatment under Title VI.

137.    In yet another example of Cooper Union's failure to enforce its own policies, the MSA and SJP hosted a fundraiser in the lobby of the New Academic Building during the Spring 2025 semester.  Ms. Abadilla was present on multiple occasions during working hours.  Her participation in the fundraiser violated policies in the Cooper Union Staff Handbook.[43]  During the

---

[40] *Id.*

[41] *See Posting Policy*, The Cooper Union, https://cooper.edu/about/policies/posting-policy (last visited May 30, 2025) (designating certain locations as appropriate for "[p]osters, fliers, and other communications," which do not include the walls and windows of the President's Office; "[p]osters or fliers put up outside these designated areas, such as on walls without pinup boards, or on structural columns, windows, doors, floors, ceilings, elevators, and furniture, are not in compliance with this policy").

[42] *See Guidelines*, The Cooper Union, *supra* note 34 (requiring all "posted content" to comply with the Posting Policy and all other Cooper Union policies and prohibiting postings from containing "intimidating and/or discriminatory language").

[43]    *See    Staff    Handbook*,    The    Cooper    Union    (Sept.    2005), https://www.cooper.edu/sites/default/files/uploads/assets/site/files/hb-staffnonunion.pdf, at 50 ("In order to avoid interference with work, **soliciting, collecting, selling products, and/or accepting contributions are not permitted during an employee's working time.**  The foregoing are also prohibited if the person being solicited is working.  Solicitation of any kind by non-employees is not permitted on The Cooper Union's premises.  **The distribution of pamphlets**, handbills, folders or other literature, **or the purchase or sale of merchandise**, **are not permitted on The Cooper Union's**

event, students distributed pamphlets accusing Israel of genocide and apartheid and hung similarly inflammatory posters around the building, upon information and belief, without approval. However, neither the students nor Ms. Abadilla faced consequences for their actions.

F.    **Cooper Union Has Failed to Enforce Its Policies and Has Failed to Protect Plaintiffs and other Jewish Students**

138.    Cooper Union could have easily addressed the hostile environment for Jews on campus by simply enforcing its own School policies.  Indeed, as referenced above and described in detail below, Cooper Union has several policies that, *inter alia*, promise to protect students, including Plaintiffs, from harassment, discrimination, and the fear of violence, including its:  (i) Policy Upholding Human Rights and Title IX Protections; (ii) Student Code of Conduct; (iii) Non Discrimination Policy; (iv) Posting Policy; (v) Policy on Campus Safety and Security; and (vi) Building Access Policy (collectively, the "School Policies").

139.    These policies are publicly available on the School's website, and all students, including Plaintiffs, are entitled to rely on them and on the School's expressed commitments to the principles they espouse, including enforcement of those policies.

140.    Despite knowledge of the antisemitic, anti-Israel activities on campus through, *inter alia*, student, parent and alumni complaints, postings across the school, media reports, student-written articles, and faculty members' social media postings, Cooper Union has failed to enforce any of its policies to protect Plaintiffs and its other Jewish students from the conduct described above.  Cooper Union's failure to enforce those policies and the promises therein—before, during,

---

**property** and by persons not employed by The Cooper Union without written authorization **or by employees in working areas at any time**." (emphasis added)); *see also id.* at 52 ("Misuse of The Cooper Union's property includes usage for personal reasons or for inappropriate purposes."); *id.* ("Employees must not engage in activities which conflict with the business interests of The Cooper Union or impede their job performance at The Cooper Union.").

and after the October 25 library incident—has resulted in continued harassment of and discrimination against Plaintiffs and other Jewish students that has created and facilitated a hostile educational environment at Cooper Union.

### i.     Cooper Union's Policy Upholding Human Rights and Title IX Protections

141.    Cooper Union's Policy Upholding Human Rights and Title IX Protections (the "Human Rights Policy") prohibits identity-based discrimination or harassment on the basis of religion, ethnicity, or national origin as well as efforts to "aid, facilitate or encourage another to engage in prohibited conduct."[44]

142.    The Human Rights Policy defines identity-based discrimination as "[t]reating individuals or groups less favorably on the basis of their race, color, religion . . . or national or ethnic origin."[45]  The Policy defines identity-based harassment as "unwelcome identity-based verbal, visual or physical conduct, which substantially interferes with an individual's living, learning or working environment by subjecting them to severe or threatening conduct or to repeated humiliating or abusive conduct, based on their membership in a protected characteristic(s)."[46]  Protected characteristics, according to the Human Rights Policy, include religion and national origin.  Harassing conduct includes, but is not limited to:  "epithets, slurs, or negative stereotyping; threatening, intimidating, or hostile acts, the circulation or display of written or graphic material that belittles or shows hostility or aversion toward an individual or group

---

[44]  *Policy Upholding Human Rights and Title IX Protections*, The Cooper Union for the Advancement of Sci. and Art (Aug. 12, 2020), https://cooper.edu/sites/default/files/uploads/assets/site/files/2020/Cooper-Union-Policy-Upholding-Human-Rights-Title-IX-Protections.pdf.

[45]  *Id.* at 3.

[46]  *Id.*

(including through e-mail and other electronic media)."[47]   The Policy describes intimidation as "unlawfully placing another person in reasonable fear of bodily harm through the use of threatening words and/or other conduct, but without displaying a weapon or subjecting the victim to actual physical attack."[48]

143.    The Human Rights Policy makes clear that "[m]anagement and supervisory personnel in particular are responsible for taking reasonable and necessary action to prevent discrimination and harassment," and those responsible "individuals include any officer or dean having formal supervisory responsibility."[49]

144.    By its terms, if the Human Rights Policy is found to have been violated, "discipline will be imposed."[50]   The Human Rights Policy states that discipline for violations of the policy include, but are not limited to:  warning, probation, loss of privileges, demotion, revocation of degree, revocation of honors or awards, training/counseling, withholding promotion or pay increase, suspension, expulsion, and termination of employment.  Upon information and belief, Cooper Union has taken no disciplinary action as a result of the events alleged herein.

145.    By its terms, the Human Rights Policy applies to "the conduct of The Cooper Union applicants, students, and employees, including faculty and non-faculty, as well as third parties doing business with The Cooper Union or attending school sponsored programs or activities."[51]

---

[47]   *Id.*

[48]   *Id.* at 6.

[49]   *Id*. at 48.

[50]   *Id.* at 64.

[51]   *Id.* at 7.

146.    As set forth herein, Cooper Union breached its Human Rights Policy by permitting identity-based discrimination against and harassment of Plaintiffs and other Jewish students and by failing to discipline such policy violations, allowing the violative conduct to persist.  Further, as alleged herein, the School's actions, inactions, negligence, and/or deliberate indifference in addressing violations of the policy have been to the detriment of Plaintiffs and other Jewish students and, as alleged herein, have caused Plaintiffs to be subjected to severe, pervasive, and objectively offensive harassment based on their religious heritage, ethnicity, and national origin.

### ii.    Cooper Union's Student Code of Conduct

147.    In its Code of Conduct (including Guidelines[52] relating to it), Cooper Union promises to "hold[] itself accountable to the expectations of this community and to upholding the rights and dignity of all members of [the Cooper Union] community."[53]   The School further promises students, including its Jewish students, the right to be free "from discrimination on the basis of age, **race**, **religion**, sex, color, disability, sexual orientation, gender identity, **ethnicity**, **national origin**, or any other legally protected characteristic."[54]

148.    Cooper Union also assures its students the "freedom to engage in free discussion, inquiry and expression," the "freedom of association," and also "freedom from assault," "freedom from discrimination," and "freedom from discriminatory or sexual harassment."

149.    To this end, Cooper Union's Student Code of Conduct identifies the following violations of its policy as "extremely serious and subject to the highest penalties:"

- Bullying and intimidation in all forms;

---

[52] *See, e.g.*, *Guidelines*, The Cooper Union, *supra* note 34.

[53]   *Code of Conduct*, The Cooper Union, *supra* note 13.

[54]   *Id.* (emphasis added).

- Ignoring the instructions of security guards or studio monitors;

- Reckless behavior involving the interior or exterior structures of campus buildings;

- Acts of theft or vandalism (including graffiti) against the property of another student, guest, staff or faculty member or against the property of Cooper Union itself;

- Involvement in acts that cause physical or psychological harm; and

- Engaging in disorderly, disruptive, or aggressive behavior that interferes with the general comfort, safety, security, health, welfare, or education of a member of The Cooper Union community or the regular operation of the School, including any behavior that is perceived to be threatening or dangerous to the health or safety of The Cooper Union community.[55]

150.    The policy states that all Cooper Union students are "responsible for upholding such laws, and any violation of law may result in disciplinary action being taken by The Cooper Union." Per the terms of the Code of Conduct, most of the above-listed acts ordinarily result in suspension or dismissal.[56]

151.    The Code of Conduct states that it applies to behavior "in person, over the telephone, internet or social media, as well as through text message, e-mail and other means of correspondence."[57]

---

[55]  *See id.*

[56]  *See id.* at Part Two, Category A ("For these categories of violation, the sanction will ordinarily be suspension or dismissal.").

[57]  *Id.* at Preamble.

152.    As alleged herein, Cooper Union breached its Code of Conduct by failing to enforce the Code's provisions, to the detriment of Plaintiffs and other Jewish students.  Further, the School has displayed deliberate indifference toward and/or negligence in enforcing its own policies and addressing violations of those policies that have been directed toward Plaintiffs and other Jewish students, including, *inter alia*, bullying, intimidation, acts of vandalism, acts that involved psychological harm, and disorderly, disruptive, and aggressive behavior that has interfered with their general comfort, safety, security, health, welfare, and education.  Although these acts are "extremely serious and subject to the highest penalties," and Cooper Union has had adequate notice of these acts, upon information and belief, Cooper Union has imposed no penalties in response to these violations, creating and facilitating an environment of hostility at the School for Plaintiffs and other Jewish students.

### iii.    Cooper Union's Non Discrimination Policy

153.    Cooper Union's Non Discrimination Policy assures students that "Cooper Union is committed to providing a working, learning, and living environment free from unlawful discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members."  To this end, Cooper Union asserts that the School is in compliance with Title VI, as well as other applicable federal, state, and local laws.[58]

154.    As alleged herein, Cooper Union breached its Non Discrimination Policy and its promises of compliance with "Title VI" and "federal, state, and local laws," to the detriment of

---

[58] *Nondiscriminatory Statement*, The Cooper Union, https://cooper.edu/admissions/applying-to-cu/nondiscriminatory-policy (last visited Apr. 8, 2024).

Plaintiffs and other Jewish students. Further, the School has been deliberately indifferent to and/or negligent in enforcing its Non Discrimination Policy and has disregarded the harassment of and discrimination against Plaintiffs and other Jewish students by permitting students and faculty at the School to create a hostile educational environment in violation of federal, state, and local laws, and by failing to remediate those violations.

### iv. Cooper Union's Posting Policy

155.    Cooper Union's Posting Policy designates only certain areas within 41 Cooper Square and the Foundation Building for the placing of posters, fliers, and other communications. Nothing may be posted outside the designated areas, upon risk of having those materials "subject to *immediate* removal."[59]

156.    The Posting Policy also specifies that, "[e]xcept in extraordinary circumstances, posters and fliers must be no larger than 11 ½ by 17 inches or they will be removed."[60]

157.    In addition, the Posting Policy warns that posters and fliers must not "violate any other institutional policies, such as The Cooper Union Nondiscrimination and Anti-Harassment Policies."[61]

158.    As alleged herein, Cooper Union breached its Posting Policy by, *inter alia*, allowing numerous unauthorized offensive posters and fliers to be posted and to remain on campus without immediately removing them, to the detriment of Plaintiffs and other Jewish students. Further, Cooper Union has been deliberately indifferent and/or negligent with respect to the enforcement

---

[59]  *Posting Policy*, The Cooper Union, *supra* note 22 (emphasis added); *see also Posting Policy*, The Cooper Union, *supra* note 41.

[60]  *Posting Policy*, The Cooper Union, *supra* note 22.

[61]  *Id.*

of this policy, resulting in a hostile educational environment, in violation of Title VI as well as other applicable laws, for Plaintiffs and other Jewish students at Cooper Union, by failing to immediately remove postings: (1) in unapproved areas; (2) that violate the policy's size requirements; and (3) that contain content and language that violate the School's policies.

### v.    Cooper Union's Policy on Campus Safety and Security

159.    Cooper Union's Policy on Campus Safety and Security claims to "ensure the safety and security of the students[.]"[62]  As part of Cooper Union's campus safety policies, swiping an ID card is required to enter campus buildings.

160.    The Safety Report recites that the "primary responsibility of the Safety and Security Department is to ensure the safety and security of the students."[63]  The Safety Report defines as "Reportable Crimes," *inter alia*: (i) bias as "a preformed negative opinion or attitude toward a group of persons," which includes categories of religion, ethnicity, and national origin; and (ii) intimidation as "unlawfully plac[ing] another person in reasonable fear of bodily harm through the use of threatening words and/or other conduct, but without displaying a weapon or subjecting the victim to actual physical attack."[64]

161.    Cooper Union has breached the promises of safety and security it made to Plaintiffs and other Jewish students as set forth in its Policy on Campus Safety and Security.  Further, the School has been deliberately indifferent to its own policies and obligations and has been negligent

---

[62]  *Campus Safety and Security*, The Cooper Union, https://cooper.edu/about/safety (last visited Apr. 8, 2024).

[63]  *Campus Safety, Security, and Fire Safety Report 2023-24*, The Cooper Union for the Advancement of Sci.                                    and                                    Art, https://cooper.edu/sites/default/files/uploads/assets/site/files/2023/CUCampSafe_2023.pdf (last visited Apr. 8, 2024).

[64]  *Id.* at 8.

in protecting the rights of Plaintiffs and other Jewish students to be and feel safe on campus, free from bias and intimidation.  As alleged herein, the School permitted a mob that was calling for violence and chanting antisemitic and anti-Israel slogans, to enter the Foundation Building, bypassing security without showing or swiping IDs, as required.  Cooper Union's conduct resulted in Plaintiffs being locked in Cooper Union's library while the mob attempted to storm the library, rattling its doors and banging on the doors and windows while continuing its hateful chants.

### vi. Cooper Union's Building Access Policy

162.    The School's obligations to ensure the safety and security of its students are also reflected in Cooper Union's Building Access Policy, which provides that "[s]tudents, faculty and staff seeking entry to our academic buildings . . . **must** swipe in with a current Cooper Union ID card at the security desk in each building."[65]

163.    Cooper Union has breached the promises made to Plaintiffs and other Jewish students in its Building Access Policy and has been deliberately indifferent to and negligent in enforcing this policy, resulting in a hostile educational environment for Plaintiffs and other Jewish students at Cooper Union, by, among other things, permitting a mob of demonstrators to storm the Foundation Building, pushing past security guards and failing to swipe their ID cards, as required.

\*\*\*

164.    As a result of the foregoing, Plaintiffs have been deprived of the full benefit of attending Cooper Union, to which they are entitled.  Plaintiffs have been traumatized and no longer feel safe on campus, including in the School's library and where participants in the October 25 demonstration attend and teach classes, and in 41 Cooper Square.  Plaintiffs have engaged

---

[65] *Building Access Policy*, The Cooper Union, https://cooper.edu/about/policies/building-access-policy (last visited Apr. 8, 2024) (emphasis added).

therapists, missed and/or dropped classes, and failed to complete and perform on assignments as a result of the hatred at Cooper Union.  Some have not felt comfortable in, and have avoided, the library since October 25.  Some Plaintiffs have experienced lasting effects from the harassment, including intense anxiety and panic attacks.  Plaintiffs have had difficulty concentrating during their exams, compromising their performance.  At least one Plaintiff has had to delay completing their degree because of the effects from the library incident, which comes at a significant financial and temporal loss.

165.    Cooper Union's fostering of this hostile environment towards Plaintiffs and other Jewish students is a patent violation of Title VI, as well as other laws, as alleged herein.

## <u>COUNT I</u>

### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

166.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

167.    Title VI of the Civil Rights Act of 1964 (Title VI) prohibits discrimination on the basis of race, color, or national origin.  National origin discrimination includes discrimination against those who identify as or are perceived to be Jewish as well as those who identify with Israel as their ancestral homeland.

168.    The U.S. Department of Education Office of Civil Rights ("OCR") has confirmed that "Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin."  Consistent with this interpretation, the OCR has demanded that federally funded schools "take immediate and appropriate action to respond to harassment that creates a hostile environment."

169.     "The U.S. National Strategy to Counter Antisemitism" that then-President Biden issued likewise directed the OCR to remind schools of "their legal obligation under Title VI of the Civil Rights Act of 1964 to address complaints of discrimination, including harassment based on race, color, or national origin, including shared ancestry, such as Jewish ancestry, and ethnic characteristics."[66]

170.     The current IHRA definition of antisemitism, adopted by the U.S. State Department, includes anti-Zionism as a widely-recognized form of antisemitism.

171.     Plaintiffs are all currently-enrolled students at Cooper Union who identify as Jewish and whose affinity with Israel is part of their identities.  Plaintiffs have shared Jewish ancestry, ethnic characteristics, and a belief that Israel is their ancestral homeland.

172.     Cooper Union receives federal financial assistance and is subject to the requirements of Title VI.

173.     Cooper Union intentionally discriminated against Plaintiffs by failing to respond to the antisemitic, anti-Zionist harassment perpetrated by fellow students, faculty, and administrators, thereby depriving Plaintiffs of the full benefits of their educational opportunities at Cooper Union.

174.     Cooper Union's deliberate indifference created a hostile environment for Plaintiffs and other Jewish and pro-Israel students, in violation of Title VI.  Cooper Union's deliberate indifference further deprived Plaintiffs of the full benefits of their educational opportunities at the School based on their actual or perceived national origin—namely, Jewish students who identify with Israel.

---

[66] *The U.S. National Strategy to Counter Antisemitism*, The White House (May 2023), https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf (emphasis added).

175.    Cooper Union exercises substantial control over the harassing conduct.    The harassing antisemitic, anti-Israel conduct has occurred and continues to occur on campus in School buildings.  Cooper Union exercises broad disciplinary oversight over students' conduct with the ability to initiate investigations, compel student testimony, and mete out remedial and disciplinary measures against violators of its myriad School Policies designed to protect against such behavior.

176.    Cooper Union had actual notice of severe and pervasive harassment against Plaintiffs.  Cooper Union possessed enough knowledge of the harassment that it reasonably should have implemented deterrence measures before, and on the day of, the October 25 demonstration and in its aftermath in response to flagrant violations of School Policies.

177.    The harassment of Plaintiffs is severe and pervasive, causing Plaintiffs to, *inter alia*, miss and/or drop classes, fail to perform on exams and in schoolwork, seek counseling support, avoid campus buildings and premises, including the library, and fear for their safety on campus.

178.    Cooper Union's deliberate indifference to the harassment is manifest.  Cooper Union did not implement any deterrence after being on notice of potentially dangerous conditions on campus, nor did it take sufficient measures to ameliorate the harassment and discrimination against Plaintiffs.  More specifically:

      a.    Prior to the October 25 demonstration, Cooper Union did not take action to prevent the placing of inflammatory, offensive, and harassing posters across windows of its Foundation Building, in flagrant violation of School policy.  Upon information and belief, Cooper Union did not timely investigate or take remedial action against violators of the School's posting policies to deter further violations or otherwise condemn the conduct.

b.   At least one Cooper Union administrator suggested to a student fearful about the planned October 25 demonstration that Jewish students should just stay inside and avoid the area during the walkout because such events tend to get violent, exhibiting both a recognition of, and deliberate indifference toward, the risks to Plaintiffs and other Jewish and pro-Israel students.

c.   Upon information and belief, Cooper Union did nothing to condemn or disperse the mob of demonstrators chanting antisemitic, anti-Israel, and violent threats at Plaintiffs and other Jewish students.   Cooper Union permitted demonstrators to shout these chants for hours before the demonstrators ultimately stormed past security in the Foundation Building, resulting in Plaintiffs being locked in the School library and subjected to the harassing and intimidating behavior of demonstrators, with no prevention or intervention by the School.

d.   Upon information and belief, President Sparks declined the New York City Police Department's offer to intervene  on October 25.

e.   Cooper Union has failed to timely investigate the acts of discrimination and harassment on October 25 despite its policies requiring that the School investigate and take action in connection with such violations of School policy.

f.   Upon information and belief, Cooper Union has not taken any disciplinary action against any members of the October 25 mob.   Cooper Union's deliberate indifference has fostered an increasingly pervasive hostile educational environment for its pro-Israel Jewish students, including Plaintiffs.

g.   Through its continued deliberate indifference, Cooper Union has facilitated further antisemitism and anti-Israel harassment of Plaintiffs and other Jewish students on

60

campus, including by, *inter alia*, promoting, not consistently removing and/or not condemning antisemitic, anti-Israel postings, signs, graffiti, and speech on campus. Nor has the School taken sufficient action to deter or prevent such harassment.

179.    Cooper Union's ongoing deliberate indifference has contributed to a hostile environment on campus that has injured Plaintiffs and left Plaintiffs vulnerable to further injury.

180.    As a result of Cooper Union's actions and inactions, Plaintiffs have suffered severe emotional distress and temporal and financial losses.  Plaintiffs no longer feel safe on campus; they have, *inter alia*, engaged therapists, missed and/or dropped classes, failed to perform on their schoolwork, delayed receiving graduation degrees and avoided campus buildings, including the library, as a result of Cooper Union's conduct.

181.    Cooper Union's deliberate indifference in violation of Title VI is the actual, direct, and proximate cause of Plaintiffs' injuries.

182.    Plaintiffs are entitled to all relief available under Title VI, including injunctive relief.

183.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## <u>COUNT II</u>

### (New York Executive Law § 296 *et seq.*)

184.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-165 as if fully set forth herein.

185.    Plaintiffs are entitled to an educational environment that is free from harassment and discrimination.  The New York State Human Rights Law ("NYSHRL") prohibits an educational institution from permitting the harassment of any student on the basis of the student's actual or perceived religion or national origin.

61

186.    Plaintiffs identify as Jewish, with an affinity toward Israel, their national and ancestral homeland, that is intrinsic to their identities.  Plaintiffs are protected by the NYSHRL.

187.    Cooper Union's actions, inactions, negligence, and/or deliberate indifference to the antisemitic, anti-Israel harassment of Plaintiffs on the basis of their religion and national origin has violated the protections owed to Plaintiffs under the NYSHRL.  Cooper Union's actions, inactions, negligence, and/or deliberate indifference have permitted the harassment of Plaintiffs to continue on campus.

188.     Cooper Union has failed to take deterrence measures to protect Plaintiffs against harassment on campus.

189.    Cooper Union has not taken any measures to remediate the harassment and discrimination; it has failed to conduct timely investigations into the harassing conduct and has failed to discipline those responsible for the harassment.

190.    Cooper Union's actions, inactions, negligence, and/or deliberate indifference have facilitated the ongoing harassment of Plaintiffs in violation of Cooper Union's statutory obligations under the NYSHRL.

191.    Cooper Union's violations have deprived Plaintiffs of the full benefits and use of Cooper Union's educational programs and facilities.  Plaintiffs are denied the use of campus spaces on the basis of their religion and national origin out of fear for their safety, and, in particular, are denied full and equal access to the library and other campus areas because of the trauma created by Cooper Union's actions, inactions, negligence, and/or deliberate indifference.

192.    As a result of Cooper Union's actions and inactions, Plaintiffs have suffered severe emotional distress and temporal and financial losses.  Plaintiffs no longer feel safe on campus; they have, *inter alia*, engaged therapists, missed and/or dropped classes, failed to perform on their

schoolwork, delayed receiving graduation degrees and avoided campus buildings, including the library, as a result of Cooper Union's conduct.

193.    Cooper Union's actions, inactions, negligence, and/or deliberate indifference in permitting the harassment of Plaintiffs in violation of the NYSHRL have been the actual, direct, and proximate causes of Plaintiffs' injuries.

194.    Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial.

195.    Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

196.    Plaintiffs are further entitled to all relief available under the NYSHRL, including injunctive relief.

**COUNT III**

**(New York Civil Rights Law § 40, *et seq.*)**

197.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–165 as if fully set forth herein.

198.    New York Civil Rights law entitles all persons to be protected from discrimination on the basis of national origin in any of their civil rights by any other person, corporation, or institution, or by the state.

199.    N.Y. Exec. Law § 291 recognizes the "opportunity to obtain education" and "the use of places of public accommodation" "without discrimination because of … national origin" as civil rights.

200.    Cooper Union is a place of public accommodation by operation of N.Y. Civ. Rights Law § 40.

201.    Cooper Union has violated Plaintiffs' civil rights by subjecting Plaintiffs to on-campus discrimination on the basis of their identity as Jews whose affinity for Israel, their national and ancestral homeland, is part of their identities.  Cooper Union's actions, inactions, negligence, and/or deliberate indifference to the hostile campus environment and its failure to protect Plaintiffs from discrimination and harassment through its ineffective deterrence and inadequate remedial measures have harmed Plaintiffs' opportunities to obtain education and unencumbered use of all campus facilities.

202.    As a direct result of Cooper Union's actions, inactions, negligence, and/or deliberate indifference, Plaintiffs do not feel safe at certain campus locations, have avoided such locations, and are thus deprived of the equal and full enjoyment of a public accommodation.

203.    As a result of Cooper Union's actions and inactions, Plaintiffs have suffered severe emotional distress and temporal and financial losses.  Plaintiffs no longer feel safe on campus; they have, *inter alia*, engaged therapists, missed and/or dropped classes, failed to perform on their schoolwork, delayed receiving graduation degrees and avoided campus buildings, including the library, as a result of Cooper Union's conduct.

204.    Cooper Union's actions, inactions, negligence, and/or deliberate indifference in violation of the NY Civil Rights Law have been the actual, direct, and proximate causes of Plaintiffs' injuries.

205.    Plaintiffs have suffered and continue to suffer damages as a result of Cooper Union's ongoing violations of their civil rights, and are entitled to the maximum statutory penalties available under N.Y. Civ. Rights Law § 40-d.  Plaintiffs are further entitled to all relief, including injunctive relief, available under the New York Civil Rights Law.

206.    Per N.Y. Civ. Rights Law § 40-d, Plaintiffs will serve notice of this complaint upon the New York State Attorney General.

## COUNT IV

### (N.Y.C. Admin. Code § 8-107)

207.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–165 as if fully set forth herein.

208.    The New York City Human Rights Law ("NYCHRL") prohibits an agent or employee of any place or provider of public accommodation from directly or indirectly refusing, withholding from, or denying any person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation because of such person's actual or perceived national origin.[67]

209.    Cooper Union is a "place or provider of public accommodation" under the NYCHRL.

210.    Cooper Union's actions, inactions, negligence, and/or deliberate indifference to the harassment of Plaintiffs on campus—because of their identity as Jews whose affinity for Israel, their national and ancestral homeland, is part of their identities—and creation of a hostile environment constitute unlawful discrimination against Plaintiffs and have denied Plaintiffs full and equal enjoyment of the advantages, services, facilities, and privileges of a public accommodation.

---

[67]    N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

211.     As a result of Cooper Union's actions and inactions, Plaintiffs have suffered severe emotional distress and temporal and financial losses.  Plaintiffs no longer feel safe on campus; they have, *inter alia*, engaged therapists, missed and/or dropped classes, failed to perform on their schoolwork, delayed receiving graduation degrees and avoided campus buildings, including the library, as a result of Cooper Union's conduct.

212.     Cooper Union's actions, inactions, negligence, and/or deliberate indifference in violation of the NYCHRL have been the actual, direct, and proximate causes of Plaintiffs' injuries.

213.     Plaintiffs are entitled to all available damages under N.Y.C. Admin. Code § 8-502(g), including attorneys' fees and costs.

214.     Plaintiffs have been damaged in amounts to be determined at trial.

215.     Per NYCHRL § 8-502, Plaintiffs will serve notice of this complaint upon the City Commission on Human Rights and the Corporation Counsel.

## COUNT V[68]

### (Breach of Contract)

216.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–165 as if fully set forth herein.

217.     Cooper Union entered into contracts with Plaintiffs through its policies and procedures governing, *inter alia*, student conduct, assurances of a campus environment free from discrimination and harassment, commitment to preserving the safety and security of all students, and policies with respect to posted content.

---

[68] Per the Court's February 5, 2025 Opinion and Order on Defendant's Motion to Dismiss and Motion to Strike (ECF No. 39), Plaintiffs have removed from this Amended Complaint certain counts that had been included in the Complaint (ECF No. 1).  Such removal is not intended to waive any applicable right to appeal the dismissal of such counts.

218.    Plaintiffs have complied with their contractual obligations.

219.    Cooper Union, however, has breached its contracts with Plaintiffs.

220.    Specifically, Cooper Union violated regulations and policies that it enacted with respect to the safety and well-being of its student population.  Each of these policies includes specific and concrete promises to students to maintain a campus that is free and clear of harassment, including but not limited to:

    a.  **Cooper Union's Policy Upholding Human Rights and Title IX Protections**:  The Human Rights Policy applies to "the conduct of The Cooper Union applicants, students, and employees, including faculty and non-faculty, as well as third parties doing business with The Cooper Union or attending school sponsored programs or activities."  It categorically prohibits identity-based discrimination or harassment on the basis of religion or national origin and conduct taken to "aid, facilitate or encourage another to engage in prohibited conduct."  The Human Rights Policy defines identity-based discrimination as "[t]reating individuals or groups less favorably on the basis of their race, color, religion… or national or ethnic origin," and identity-based harassment as "unwelcome identity-based verbal, visual or physical conduct, which substantially interferes with an individual's living, learning or working environment by subjecting them to severe or threatening conduct or to repeated humiliating or abusive conduct, based on their membership in a protected characteristic(s)."  Protected characteristics include religion and national origin.  Harassing conduct includes, but is not limited to:  "epithets, slurs, or negative stereotyping; threatening, intimidating, or hostile acts, the circulation or display of written or graphic material that belittles or shows hostility or aversion toward an individual or group (including through e-mail and other electronic media)."  The Policy describes intimidation as "unlawfully placing another person in reasonable fear of bodily harm through the use of threatening words and/or other conduct, but without displaying a weapon or subjecting the victim to actual physical attack."  Furthermore, "[m]anagement and supervisory personnel in particular are responsible for taking reasonable and necessary action to prevent discrimination and harassment in the workplace and for responding promptly and thoroughly to any such claims.  Those individuals include any officer or dean having formal supervisory responsibility over employees."  The policy also binds Cooper Union to mete out discipline if the Human Rights Policy is violated: "discipline will be imposed."

    b.  **Cooper Union's Student Code of Conduct**:  By the express provisions of its Code of Conduct, Cooper Union promises its students the "freedom to

engage in free discussion, inquiry and expression," the "freedom of association," and also "freedom from assault," "freedom from discrimination," and "freedom from discriminatory or sexual harassment." The Code of Conduct establishes a standard of conduct for students and charts out various forms of harassing conduct as violations that are "extremely serious and subject to the highest penalties." The Code of Conduct charges "[a]ll Cooper Union students" with responsibility for "upholding such laws, and any violation of law may result in disciplinary action being taken by The Coper Union." Acts subject to the highest penalties include "bullying and intimidation in all forms," "ignoring the instructions of security guards or studio monitors," "reckless behavior involving the interior or exterior structures of campus buildings," "acts of theft or vandalism (including graffiti) against the property of another student, guest, staff or faculty member or against the property of Cooper Union itself," "involvement in acts that cause physical or psychological harm," and "engaging in disorderly, disruptive, or aggressive behavior that interferes with the general comfort, safety, security, health, welfare, or education of a member of The Cooper Union community or the regular operation of the school, including any behavior that is perceived to be threatening or dangerous to the health or safety of The Cooper Union community."

c.   **Cooper Union's Non Discrimination Policy**:  The Non-`discrimination Policy provides that "Cooper Union is committed to providing a working, learning, and living environment free from unlawful discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. In compliance with Title IX of the Education Amendments of 1972, Titles VI and VII of the Civil Rights Act of 1964, and Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, as amended, the Age Discrimination Act of 1975, and applicable federal, state, and local laws, and our institutional values, The Cooper Union does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender identity or expression, age, disability, national or ethnic origin, military status, marital status, partnership status, familial status, or any other legally protected characteristic, in admissions, financial aid, or employment practices, or in the administration of any Cooper Union educational program or activity, including athletics."

d.   **Cooper Union's Posting Policy**:   Cooper Union's Posting Policy designates areas of the campus where posters and fliers are permitted, and requires that posters and fliers not "violate any other institutional policies, such as The Cooper Union Non Discrimination and Anti-Harassment Policies." Anything posted outside the designated areas risks having those materials "subject to immediate removal." Further, "[e]xcept in

68

extraordinary circumstances, posters and fliers must be no larger than 11 ½ by 17 inches or they will be removed."

e. **Cooper Union's Policy on Campus Safety and Security**: Cooper Union's Campus Safety and Security Policy promises to "ensure the safety and security of the students," and requires persons to swipe an ID card to enter campus buildings. Cooper Union's safety report recites that the "primary responsibility of the Safety and Security Department is to ensure the safety and security of the students," and it defines: (i) bias as "a preformed negative opinion or attitude toward a group of persons," which includes categories of religion, ethnicity, and national origin; and (ii) intimidation as "unlawfully plac[ing] another person in reasonable fear of bodily harm through the use of threatening words and/or other conduct, but without displaying a weapon or subjecting the victim to actual physical attack."

f. **Cooper Union's Building Access Policy**: Cooper Union's Building Access Policy provides that "[s]tudents, faculty and staff seeking entry to our academic buildings . . . **must** swipe in with a current Cooper Union ID card at the security desk in each building" (emphasis added).

221. Cooper Union has breached its contracts with Plaintiffs by failing to perform under, and enforce the commitments reflected in, its policies to provide Plaintiffs a campus free from unlawful discrimination and harassment.

222. On October 25, 2023, Cooper Union breached its contracts with Plaintiffs to protect students from dangers imposed by trespassers, in violation of the School's Policies. As the demonstrating students stormed the Cooper Union building on October 25, security personnel did not check for students' Cooper Union ID card, nor did they require the demonstrators to swipe in through the building's ID scanners. The School also did nothing to prevent or intercept the mob of demonstrators that threatened Plaintiffs, further breaching its contracts with Plaintiffs. Breaches of the contracts intended specifically to provide "a safe and secure environment for all members of The Cooper Union" endangered Plaintiffs.

223.    In addition, both before and after October 25, Cooper Union breached its School Policies by permitting the posting of anti-Israel, antisemitic posters, stickers, graffiti, and fliers on campus.

224.    As a result of Cooper Union's breaches of contract, Plaintiffs' rights, including their rights to a safe and discrimination-free educational environment, have been violated.  Cooper Union's conduct has resulted in losses, including temporal and financial losses.  Plaintiffs no longer feel safe on campus; they have, *inter alia*, engaged therapists, missed and/or dropped classes, failed to perform on their schoolwork, delayed receiving graduation degrees and avoided campus buildings, including the library, as a result of Cooper Union's conduct.

225.    Cooper Union's breaches of contract has been the actual, direct, and proximate causes of Plaintiffs' injuries.

226.    Plaintiffs have been damaged in amounts to be determined at trial.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Rebecca Gartenberg, Perie Hoffman, Jacob Khalili, Gabriel Kret, Taylor Roslyn Lent, Benjamin Meiner, Michelle Meiner, Meghan Notkin, Gila Rosenzweig, and Anna Weisman, and each of them, pray and request that a judgment be entered in favor of each, and against Cooper Union, awarding:

A.    Injunctive relief requiring Cooper Union to proactively and permanently end the antisemitic, anti-Israel environment on campus, including, but not limited to, by the following:

a.    ordering Cooper Union to take all necessary and appropriate remedial and

70

preventative measures in connection with the antisemitic, anti-Israel environment on campus, including by, among other things:  (i) launching a thorough and unbiased investigation into those responsible for the harassing conduct targeting Plaintiffs and other Jewish and pro-Israel students; (ii) disciplining deans, administrators, professors and/or other employees responsible for furthering the antisemitic, anti-Israel environment on campus; and (iii) suspending, expelling or otherwise disciplining students responsible for such conduct.

b.    mandating that Cooper Union enforce, without limitation, its School Policies to ensure that all students, staff, and faculty members, including Plaintiffs and others who are members of the Jewish and pro-Israeli community, are protected on campus with respect to their physical safety and rights to an educational environment free from harassment and discrimination because of their Jewish identity and affinity with Israel as their ancestral homeland.

c.    enjoining Cooper Union and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that:  (i) penalize or discriminate against Jewish and/or pro-Israel students, including Plaintiffs; (ii) fund student organizations that exclude or penalize Jewish and/or Pro-Israel students; and (iii) officially recognize student organizations that exclude, discriminate against, or harass Jewish and/or pro-Israel students.

B.    Compensatory and punitive damages in amounts to be determined at trial;

C.    Statutory penalties for but not limited to violations of N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law § 40-d;

D.    Plaintiffs' reasonable attorneys' fees, the costs of suit, and expenses;

E.    Pre-judgment interest and post-judgment interest at the maximum rate allowable by law; and

F.    Such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          August 6, 2025

Respectfully submitted,

By: */s/    Aaron Stiefel*

Aaron Stiefel
Debra E. Schreck
Melissa E. Romanovich
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
T: 212.836.8000
F: 212.836.8689
aaron.stiefel@arnoldporter.com
debra.schreck@arnoldporter.com

Baruch Weiss
Bridgette C. Gershoni
Michael J. Gershoni
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001-3743
P: 202.942.5000
F: 202.942.5999
baruch.weiss@arnoldporter.com

Ziporah Reich
**THE LAWFARE PROJECT**
633 Third Avenue, 21st Floor
New York, NY 10017
T: 212.339.6995
brooke@thelawfareproject.org
ziporah@thelawfareproject.org

*Attorneys for Plaintiffs*